No. 23-3565

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LARRY HOUSEHOLDER,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of Ohio
Case No. 1:20-cr-77-1

_____

## BRIEF OF APPELLANT LARRY HOUSEHOLDER

_____

Steven L. Bradley
MAREIN & BRADLEY
526 Superior Avenue
Suite 222
Cleveland, Ohio 44114
(216) 781-0722

Nicholas R. Oleski
MCCARTHY, LEBIT, CRYSTAL
  & LIFFMAN CO., LPA
1111 Superior Avenue East,
Suite 2700
Cleveland, Ohio 44114
(216) 696-1422


*Counsel for Larry Householder*


February 26, 2024

# TABLE OF CONTENTS

**Page**

Table of Authorities................................................................iv

Statement Regarding Oral Argument ....................................xiii

Statement of Jurisdiction........................................................1

Statement of Issues ................................................................2

Introduction ...........................................................................3

Statement of the Case ............................................................7

      A.     Factual Background ....................................................7

             1.    Larry Householder ..........................................7

             2.    FirstEnergy and FirstEnergy Solutions........................8

             3.    Generation Now .........................................10

             4.    House Bill 6 ..............................................12

      B.     Procedural Background................................................13

             1.    Indictment ..................................................13

             2.    Trial..........................................................14

              3.    Post-Trial Proceedings ..................................15

Summary of the Argument ....................................................15

Argument................................................................................17

I.    The district court's *ex parte* and *sua sponte* dismissal of a juror violated Householder's Sixth Amendment rights..........................17

      A.    The standard of review is de novo. ....................................18

      B.    The district court dismissed a trial juror *ex parte*................18

i

C.      Householder's Sixth Amendment rights were violated. .......20

II.    The district court improperly instructed the jury. ........................25

A.      The standard of review is de novo and abuse of
        discretion. .................................................................................25

B.      The district court's bribery instructions were wrong. ..........26

C.      The district court improperly instructed the jury that
        the government impeached a defense witness. ....................33

D.      These errors were not harmless. ...........................................38

III.   The evidence was insufficient to convict Householder. ................40

A.      The standard of review is whether any reasonable jury
        could find the essential elements beyond a reasonable
        doubt. ........................................................................................40

B.      The evidence was insufficient to convict Householder. ........42

        1.      Householder did not engage in bribery. ......................43

        2.      The private sector bribery predicates are insufficient.
                .......................................................................................54

        3.      The money laundering predicates fail. ........................57

IV.    The district court committed evidentiary errors. ..........................57

A.      The standard of review is abuse of discretion. ....................57

B.      The admission of two Title III recordings during
        Householder's cross-examination was erroneous. ................57

C.      The district court erred in permitting the government to
        tell the jury about Longstreth and Cespedes's guilty
        pleas. ..........................................................................................60

D.      The district court's evidentiary errors were not
        harmless. ...................................................................................66

V.    The district court erred in sentencing Householder to the maximum sentence permitted by law............................................67

    A.    The standard of review is de novo and abuse of discretion. ..................................................................67

    B.    The district court's maximum sentence is procedurally unreasonable. ..................................................67

    C.    The district court's maximum sentence was substantively unreasonable too. ...........................................73

VI.   There was an appearance of impropriety, and the district judge should have recused himself. ...............................................76

Conclusion ......................................................................82

Certificate of Compliance ..................................................83

Certificate of Service ......................................................84

Designation of Relevant District Court Documents ..............................85

{01997861-1}

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bracy v. Gramley*,
520 U.S. 899 (1997)..............................................................76

*Callanan v. United States*,
881 F.2d 229 (6th Cir. 1989)..............................................39

*Caperton v. A.T. Massey Coal Co.*,
556 U.S. 868 (2009)......................................................80, 81

*Ciminelli v. United States*,
143 S. Ct. 1121 (2023).........................................................56

*Citizens United v. FEC*,
558 U.S. 310 (2010)...............................................................4

*Dimora v. United States*,
973 F.3d 496 (6th Cir. 2020)...........................5, 25, 39, 52

*FEC v. Ted Cruz for Senate*,
142 S. Ct. 1638 (2022).........................................................46

*French v. Jones*,
332 F.3d 430 (6th Cir. 2003)...............................................22

*Gall v. United States*,
552 U.S. 38 (2007)................................................................67

*Gomez v. United States*,
490 U.S. 858 (1989).............................................................22

*Henderson v. Frank*,
155 F.3d 159 (3d Cir. 1998)................................................22

{01997861-1}

*Holguin-Hernandez v. United States,*
    140 S. Ct. 762 (2020)..........................................................................73

*Kelly v. United States,*
    140 S. Ct. 1565 (2020)...................................................................4, 5

*McCormick v. United States,*
    500 U.S. 257 (1991)................................................................... *passim*

*McCutcheon v. FEC,*
    572 U.S. 185 (2014)......................................................................44, 50

*McDonnell v. United States,*
    579 U.S. 550 (2016)......................................................27, 29, 33, 38

*Missouri v. Frye,*
    566 U.S. 134 (2012)...............................................................................22

*Mitchell v. Mason,*
    325 F.3d 732 (6th Cir. 2003)...........................................................21

*Percoco v. United States,*
    143 S. Ct. 1130 (2023)......................................................................56

*Rippo v. Baker,*
    580 U.S. 285 (2017) (per curiam)....................................................76

*Rita v. United States,*
    551 U.S. 338 (2007).............................................................................72

*Salinas v. United States,*
    522 U.S. 52 (1997)..............................................................................42

*United States v. Abbey,*
    560 F.3d 513 (6th Cir. 2009)...........................................................44

*United States v. Adams,*
    722 F.3d 788 (6th Cir. 2013)...........................................................66

v

*United States v. Bauer,*
   82 F.4th 522 (6th Cir. 2023) .......................................................... 26

*United States v. Bell,*
   516 F.3d 432 (6th Cir. 2008) .......................................................... 60

*United States v. Benjamin,*
   No. 21-CR-706 (JPO), 2022 U.S. Dist. LEXIS 219044
   (S.D.N.Y. Dec. 5, 2022) ........................................................... 31, 51

*United States v. Blandford,*
   33 F.3d 685 (6th Cir. 1994) ............................................................ 45

*United States v. Brewster,*
   408 U.S. 501 (1972) ......................................................................... 33

*United States v. Caseer,*
   399 F.3d 828 (6th Cir. 2005) .......................................................... 41

*United States v. Clark,*
   No. 1:19-cr-148, 2020 WL 830057 (N.D. Ohio Feb. 20, 2020) ...... 62, 63

*United States v. Cody,*
   114 F.3d 772 (8th Cir. 1997) .......................................................... 36

*United States v. Corsey,*
   723 F.3d 366 (2d Cir. 2013) ........................................................... 72

*United States v. Cronic,*
   466 U.S. 648 (1984) ................................................................. 17, 21

*United States v. Dunnican,*
   961 F.3d 859 (6th Cir. 2020) .......................................................... 57

*United States v. Dunnigan,*
   507 U.S. 87 (1993) ................................................................... 70, 71

vi

*United States v. Emmons,*
   8 F.4th 454 (6th Cir. 2021) ............................................................. 26

*United States v. Farrad,*
   895 F.3d 859 (6th Cir. 2018) ........................................................... 57

*United States v. Frost,*
   125 F.3d 346 (6th Cir. 1997 ...................................................... 56, 57

*United States v. Gay,*
   522 F.2d 429 (6th Cir. 1975) ..................................................... 22, 23

*United States v. Gooding,*
   351 F.3d 738 (6th Cir. 2003) ........................................................... 40

*United States v. Gullo,*
   502 F.2d 759 (3d Cir. 1974) ............................................................ 65

*United States v. Hazelwood,*
   979 F.3d 398 (6th Cir. 2020) ........................................................... 59

*United States v. Henderson,*
   2 F.4th 593 (6th Cir. 2021) ............................................................... 4

*United States v. Hills,*
   27 F.4th 1155 (6th Cir. 2022) ..................................................... 53, 69

*United States v. Inzunza,*
   638 F.3d 1006 (9th Cir. 2011) ......................................................... 48

*United States v. Jones,*
   260 F. App'x 873 (6th Cir. 2008) .................................................... 68

*United States v. Jones,*
   641 F.3d 706 (6th Cir. 2011) ........................................................... 69

*United States v. Kennedy,*
   714 F.3d 951 (6th Cir. 2013) ........................................................... 40

*United States v. Kilpatrick,*
  798 F.3d 365 (6th Cir. 2015)...............................................................66

*United States v. Lee,*
  919 F.3d 340 (6th Cir. 2019)..............................................................4

*United States v. Menendez,*
  291 F. Supp. 3d 606 (D.N.J. 2018)........................................50, 51, 54

*United States v. Moon,*
  513 F.3d 527 (6th Cir. 2008)............................................................67

*United States v. Nosal,*
  No. CR-08-0237 EMC, 2013 WL 11327121
  (N.D. Cal. Mar. 29, 2013)...........................................................62, 65

*United States v. Paulus,*
  952 F.3d 717 (6th Cir. 2020)............................................................24

*United States v. Payton,*
  754 F.3d 375 (6th Cir. 2014)............................................................74

*United States v. Peters,*
  512 F.3d 787 (6th Cir. 2008)............................................................73

*United States v. Pinson,*
  860 F.3d 152 (4th Cir. 2017)............................................................42

*United States v. Presley,*
  547 F.3d 625 (6th Cir. 2008)............................................................75

*United States v. Sadler,*
  750 F.3d 585 (6th Cir. 2014)......................................................41, 56

*United States v. Sanders,*
  95 F.3d 449 (6th Cir. 1996)..............................................................61

{01997861-1}

*United States v. Sassanelli,*
    118 F.3d 495 (6th Cir. 1997)......................................................71

*United States v. Saunders,*
    325 F.2d 840 (6th Cir. 1964)......................................................41

*United States v. Siegelman,*
    640 F.3d 1159 (11th Cir. 2011).............................................44, 47

*United States v. Silver,*
    948 F.3d 538 (2d Cir. 2020) ............................................29, 30, 53

*United States v. Skelos,*
    988 F.3d 645 (2d Cir. 2021) ............................................29, 30, 31

*United States v. Smith,*
    411 F.2d 733 (6th Cir. 1969)......................................................22

*United States v. Taylor,*
    489 F. App'x 34 (6th Cir. 2012)..................................................23

*United States v. Terry,*
    707 F.3d 607 (6th Cir. 2013).............................................*passim*

*United States v. Thomas-Mathews,*
    81 F.4th 530 (6th Cir. 2023) .....................................................72

*United States v. Thornton,*
    609 F.3d 373 (6th Cir. 2010).................................................61, 65

*United States v. Tocco,*
    200 F.3d 401 (6th Cir. 2000).....................................................61

*United States v. Toney,*
    161 F.3d 404 (6th Cir. 1998).....................................................36

*United States v. Townsend,*
    796 F.2d 158 (6th Cir. 1986).....................................................61

ix

*United States v. Wade,*
   388 U.S. 218 (1967)..................................................................22

*United States v. Walker,*
   871 F.2d 1298 (6th Cir. 1989).................................................63

*United States v. Warshak,*
   631 F.3d 266 (6th Cir. 2010)...................................................70

*United States v. Watkins,*
   509 F.3d 277 (6th Cir. 2007)...................................................18

*United States v. Wettstain,*
   618 F.3d 577 (6th Cir. 2010)...................................................41

*Van v. Jones,*
   475 F.3d 292 (6th Cir. 2007)......................................18, 21, 23, 24

*Williams v. Pennsylvania,*
   579 U.S. 1 (2016)....................................................................77

## Statutes

18 U.S.C. § 1952 ......................................................................54

18 U.S.C. § 1962(c) ..................................................................42

18 U.S.C. § 3231 ........................................................................1

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 455(a) ....................................................................77

Ohio Rev. Code § 2961.02.........................................................75

Ohio Rev. Code § 3517.22(A)(2).................................................55

**Other Authorities**

2000 Election Results, *Ohio Supreme Court—Term Beginning January 1, 2001: November 7, 2000*, Ohio Sec'y of State, https://www.ohiosos.gov/elections/election-results-and-data/2000-elections-results/ohio-supreme-court---term-beginning-january-1-2001-november-7-2000 (last visited Feb. 19, 2024) ........................ 78

2002 Election Results, *Justices of the Supreme Court of Ohio*, Ohio Sec'y of State, https://www.ohiosos.gov/elections/election-results-and-data/2002-elections-results/justices-of-the-ohio-supreme-court/ (last visited Feb. 19, 2024) ............................................................... 78

Pattern Crim. Jury Instr. 6th Cir. 2.01(3) ............................................ 64

Pattern Crim. Jury Instr. 6th Cir. 7.04, use note ................................. 35

U.S.S.G. § 2C1.1 cmt. n.2 ................................................................. 69

U.S.S.G. § 2C1.1(b)(2) ...................................................................... 68

**Rules**

Fed. R. Evid. 401(a) ........................................................................ 58

Fed. R. Evid. 401(b) ........................................................................ 58

Fed. R. Evid. 403 ............................................................................ 59

Fed. R. Evid. 609(a) ........................................................................ 63

Fed. R. Evid. 613(b) ........................................................................ 37

**Constitutional Provisions**

U.S. Const. amend. VI ...................................................................... 20

**Articles**

Andrew J. Tobias & Jake Zuckerman, *Indicted Ohio lobbyist breaks silence during Householder trial testimony*, Cleveland.com, available at https://www.cleveland.com/news/2023/02/indicted-

ohio-lobbyist-breaks-silence-during-householder-trial-testimony.html (Feb. 13, 2023) ...................................................... 36

Bill Bush, *Under appeals court order, federal judge sentences John Raphael to 6 months in prison*, Columbus Dispatch, https://www.dispatch.com/story/news/local/2023/07/11/democratic-operative-john-raphael-resentenced-to-serve-six-months-in-federal-prison-for-bribery/70398485007/ (July 11, 2023) .............. 74

Ian MacDougall, *"Every Politician Has Got to Have Somebody That's the Hitman,"* New York Times, https://www.nytimes.com/2024/01/25/magazine/ohio-bribery-politics.html (Jan. 25, 2024) ............................................................. 3

John McCarthy, *Candidate pledges to shun outside help*, Associated Press (Feb. 28, 2002) ........................................................................ 79, 81

Jon Craig & Katy Waters, *Ohio Supreme Court; Battle of Independent TV Ads Gets Even Uglier*, Columbus Dispatch, Nov. 1, 2002 at 1A ... 78

Jon Craig, *Political-action committees make supreme court plans*, The Columbus Dispatch, Sept. 28, 2002, at 3C .................................... 78

T.C. Brown, *Celeste ex-aide works for secretive GOP court group*, Plain Dealer, Sept. 6, 2002 at B2 ........................................................... 78

William Hershey, *Some Try to Shine Public Disclosure Light on Campaigns*, Dayton Daily News, Feb. 4, 2001 .............................. 79

{01997861-1}

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is appropriate in this case. The government charged the then-Speaker of the Ohio House of Representatives, Larry Householder, with leading a racketeering bribery conspiracy. After a six-week jury trial, Householder was convicted. Given the voluminous trial record, the public interest in this case, and the complex legal issues on appeal—including whether the government may convict a defendant based on undisclosed campaign contributions protected by the First Amendment—Householder submits that oral argument would assist the Court in resolving this appeal.

{01997861-1}

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 because Appellant Larry Householder was charged with a federal crime. This Court has jurisdiction under 28 U.S.C. § 1291 from the district court's final judgment: its judgment of conviction. (R. 288, Judgment, PageID 11308). Householder timely appealed the district court's judgment. (R. 293, Notice of Appeal, PageID 11650).

{01997861-1}

## STATEMENT OF ISSUES

1.    Did the district court violate Householder's Sixth Amendment rights by dismissing an impaneled trial juror *ex parte* and *sua sponte*?

2.    Were the district court's jury instructions erroneous?

3.    Was the evidence sufficient to convict Householder?

4.    Did the district court's evidentiary errors prejudice Householder?

5.    Was the district court's maximum sentence of Householder reasonable?

6.    Should the district judge have recused?

{01997861-1}

# INTRODUCTION

The federal government was not content to charge the then-Speaker of the Ohio House of Representatives, Appellant Larry Householder, with ordinary honest-services bribery charges.[1] Instead, it charged him with leading a racketeering enterprise and tried him as a scapegoat for what it viewed to be a corrupt piece of legislation supported by undisclosed campaign contributions that were permitted by federal law. The government did not charge—and still has not charged—any of the corporate executives who allegedly bribed Householder, nor did the government call these alleged bribers as witnesses at trial. Instead, the government rested most of its case on the testimony of its case agent, who testified for over a week on direct examination about events for which he had no personal knowledge and by simply reading text messages and other

---

[1] In fact, its decision to charge Householder with a racketeering offense was motivated by the Supreme Court's recent caselaw limiting the scope of the federal bribery laws: "David M. DeVillers, the United States attorney for the Southern District of Ohio … ultimately decided to rely on a statute whose use in corruption cases the Roberts court has yet to pare back." Ian MacDougall, *"Every Politician Has Got to Have Somebody That's the Hitman,"* New York Times, https://www.ny-times.com/2024/01/25/magazine/ohio-bribery-politics.html (Jan. 25, 2024).

3

communications to which he was not a party. And the government packaged its entire case in an unwieldy single-count racketeering conspiracy.

The Supreme Court has repeatedly admonished federal prosecutors that they are not the arbiters of good government for state officials: "Federal prosecutors may not use property fraud statutes to set standards of disclosure and good government for local and state officials." *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020) (cleaned up). This case is just the latest in a long line of cases in which federal prosecutors have overstepped the limits of their authority. The district court, however, never heeded the defendants' attempts to reign in these prosecutors. Instead, the district court permitted the government to convict Householder and his co-defendant by simply relying on undisclosed campaign contributions permitted by federal law and protected by the First Amendment, *Citizens United v. FEC*, 558 U.S. 310 (2010). Unlike most other bribery prosecutions, Householder did not receive an envelope of cash[2] or

---

[2] *See United States v. Lee*, 919 F.3d 340, 357 (6th Cir. 2019) (public official given cash); *United States v. Henderson*, 2 F.4th 593, 595-96 (6th Cir. 2021) (prison guard received $500 in cash).

extravagant gifts or trips.[3] Rather, the government presented evidence that Householder helped raised money into a 501(c)(4) organization, Generation Now. Under federal law and under the First Amendment, corporations can contribute unlimited monies to those organizations, which are not required to disclose publicly the identity of the contributors.

The government's purpose was laid bare in its sentencing memorandum: "501(c)(4)s remain a tool for Ohio politicians to receive unlimited payments – which are hidden from the public's view – and *potential* vehicles for bribery." (R. 278, Govt. Sent. Mem., PageID 11010) (emphasis added). Said differently, the government wanted and wants to deter corporations and other donors from exercising their constitutional right to contribute monies to 501(c)(4) organizations. That, however, is not the function of federal prosecutors or criminal juries. *See Kelly*, 140 S. Ct. at 1574.

The trial evidence showed that Householder was a longtime supporter of public utilities and energy policy in Ohio. FirstEnergy Corp. and

---

[3] *See Dimora v. United States*, 973 F.3d 496, 499 (6th Cir. 2020) (public official provided "with dinners, jewelry, a television and refrigerator, and a trip to Las Vegas that included flights, a hotel suite, gambling money, and an encounter with a prostitute").

FirstEnergy Solutions Corp. were large Ohio energy companies that supported Householder. Although the evidence showed that those entities—and others—contributed millions of dollars to Generation Now, there is nothing criminal about that. Nor does it matter that Householder backed an energy bill, House Bill 6, that FirstEnergy and FirstEnergy Solutions supported too: "to hold that legislators commit" federal bribery offenses "when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress" intended. *McCormick v. United States*, 500 U.S. 257, 272 (1991). The corruption laws require an unambiguous agreement to sustain convictions based on campaign contributions. There was no unambiguous agreement here. Yet, the district court allowed the government to get to the jury and argue that the jury should simply find "based on your common sense [if] bribery was committed." (R. 238, Tr. 24-3791, PageID 9484). This expansive interpretation of the federal bribery laws would chill contributions "long been thought to be well within the law"—*the* core concern in *McCormick*. 500 U.S. at 272.

6

This Court should vacate Householder's conviction. The district court's errors were numerous and taken together they require vacatur.

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    *Larry Householder*

In 2016, Larry Householder sought reelection to the Ohio House of Representatives. (R. 217, Tr. 16-2549, PageID 7583). About 20 years earlier, he had served as Speaker of the Ohio House. (R. 228, Tr. 21-3320, PageID 8490). Householder was generally known to be a support of "the utilities and energy producers in Ohio." (R. 219, Tr. 17-2725-26, PageID 7826-27); (*see also* R. 224, Tr. 19-3051, PageID 8214).

Sometime in late summer 2016, on the recommendation of Mike Carey,[4] Householder met with Jeff Longstreth about providing campaign services to Householder. (R. 217, Tr. 16-2549-50, PageID 7853-54). Householder's plan at the time was to "run for Speaker" after the 2018 elections. (*Id.*). To do so, Householder needed to garner the support of incumbent House members and "recruit candidates" to run for open

---

[4] At the time, Carey worked for Murray Energy (R. 197, Tr. 546, PageID 5105); Carey is currently a U.S. congressman (R. 228, Tr. 21-3331, PageID 8501).

{01997861-1}

House seats. (*Id.*). So, he hired Longstreth to run that operation, which eventually expanded to 25 or so people. (*Id.*, PageID 7585).

Householder was "excellent at fundraising." (*Id.*, PageID 7588). As Longstreth explained, "[a]lmost everybody who is contributing to a political campaign is contributing because they have an issue." (*Id.*, PageID 7589).

In January 2019, Householder won a contentious race to be Speaker of the Ohio House of Representatives. (R. 219, Tr. 17-2842, PageID 7943). Shortly thereafter, the members of the House Republican Party met to discuss priority pieces of legislation for the upcoming term. (*See* R. 224, Tr. 19-3061, PageID 8224). One of those pieces of legislation was energy legislation that ultimately became House Bill 6. (*See id.*).

### 2.   *FirstEnergy and FirstEnergy Solutions*

FirstEnergy Corp. is an Ohio-based energy company. (R. 194, Tr. 205, PageID 4751). At all times relevant to this case, Charles Jones was its CEO and Michael Dowling was an executive in its external affairs (*i.e.*, lobbying) department. (*Id.*, PageID 4787).

In 2016, FirstEnergy, through various corporate subsidiaries, had three main business functions: energy transmission, distribution, and

{01997861-1}

generation. (*Id.*, PageID 4754). At that time, its generation business was run through a subsidiary called FirstEnergy Solutions Corp. ("FES"), which, among other things, operated the only two nuclear power plants in Ohio. (*Id.*).

But by 2016, FirstEnergy's generation business (*i.e.*, FES) was "having financial complications." (R. 194, Tr. 223, PageID 4769). So, in September 2016, FirstEnergy's board began to review strategic options to exit the generation business. (*Id.*, PageID 4769-70). One option discussed in FirstEnergy's public annual 2016 shareholder report was a "legislative or regulatory solution," meaning FirstEnergy "would work with, for example, the Ohio State Legislature to see if there was a way in which there could be a financial solution to help" FES have enough cash flow to keep the nuclear power plants open. (*Id.*, PageID 4777). At that time, FirstEnergy "attempted through the legislature and the [Ohio] House to get ZEN legislation passed," which was ultimately unsuccessful. (R. 194, Tr. 233, PageID 4779). And another option, which FES eventually took, was to file bankruptcy. (*Id.*, PageID 4781).

Around that time in fall 2016, Householder encountered Jones at a World Series game in Cleveland. (R. 217, Tr. 16-2597, PageID 7631); (R.

228, Tr. 21-3334, PageID 8504). Jones apparently told Householder that there was a "sense of urgency" about finding a solution for FES' nuclear power plants because if, according to Jones, there was not "some type of supplant [*sic*] in first half of 2017 it will be too late." (GX 212,[5] App'x 3). In response, Householder explained that "[w]e are more than ready to sit down and craft something with Utilities that will make sense." (*Id.*). At that time, neither FirstEnergy nor FES had contributed anything to Householder or Generation Now. (R. 228, Tr. 21-3341, PageID 8511); (*see also* GX 16, App'x 2) (showing contributions to Generation Now).

In March 2018, FES filed a petition for bankruptcy. (R. 194, Tr. 233, PageID 4779). Before it did so, FES' board of directors resigned and independent board members were appointed "to avoid even an appearance of conflict." (*Id.*, PageID 4793-94).

### 3.  *Generation Now*

Generation Now was a 501(c)(4), a social welfare group that under federal law was permitted to received unlimited contributions without

---

[5] References to "GX" are to the government's admitted trial exhibits, references to "HX" are to Householder's admitted trial exhibits, and references to "App'x" are to appendix filed contemporaneously with this brief.

{01997861-1}

disclosing the identity of its contributors. (R. 194, Tr. 190-91, PageID 4736-37). Longstreth created Generation Now in early 2017 and made the decision to do so on January 10, 2017. (R. 219, Tr. 17-2736, PageID 7837). In general, between 2017 and 2018, Generation Now was used by Longstreth to help run the campaigns for the 2018 House election; it helped pay for the infrastructure that was put in place to help recruit candidates and get them elected. (R. 217, Tr. 16-2612, PageID 7646).

Donors contributed to Generation Now. Between February 2017 and the November 2018 elections, donors contributed about $4.6 million to Generation Now. (*See* GX 16, App'x 2). During that time, FirstEnergy[6] and FES contributed $2.4 million to Generation Now, or about 52% of the total contributions to it. (*See id.*).

The money that Generation Now raised was spent. It was spent on advertising and on the infrastructure to support Longstreth's organization that was trying to help Householder win the speakership in 2018.

---

[6] Some of FirstEnergy's contributions were made through FirstEnergy's own 501(c)(4), Partners for Progress. For ease of reference, "FirstEnergy" refers to FirstEnergy Corp. and Partners for Progress.

### 4.    *House Bill 6*

House Bill 6 was introduced in the Ohio House of Representatives in early April 2019. In simple terms, it "[c]reated a $9.25 credit for carbon-free generation," a "chunk" of which "would probably go to the nuclear plants in Ohio." (R. 217, Tr. 16-2516, PageID 7550). But the credit the bill created "was available for other forms of generation" too. (*Id.*). In addition, House Bill 6 eliminated certain energy efficiency mandates, which effectively lowered the amounts consumers paid on their monthly bills. (*Id.*, PageID 7569-70).

Between October 2018 and April 12, 2019 (when House Bill 6 was introduced), neither FirstEnergy nor FES contributed anything to Generation Now. (*See* GX 16, App'x 2). After House Bill 6 was introduced, FirstEnergy and FES' contributions increased. FES' independent board recommended and approved contributing $40 million to Generation Now between May and August 2019. (HX 392 at 42-43, App'x 68-69); (HX 403 at 2-3, App'x 116-17). FirstEnergy contributed another approximately $15 million during that same period. (*See* GX 16, App'x 2).

FirstEnergy and FES contributed these monies because Generation Now was running a media campaign to support House Bill 6. (R. 217, Tr.

16-2650-51, PageID 7684-85). To this end, Longstreth prepared budgets to show the efforts that Generation Now would undertake to "educate members and build public support for HB6." (GX 462, App'x 4). And Generation Now spent the monies contributed on advertising and other media.

Eventually, in late May 2019, House Bill 6 passed the Ohio House, in mid July 2019 it passed the Ohio Senate, and Ohio's governor, Mike DeWine, signed House Bill 6 into law on the same day that it passed the Ohio legislature. (GX 6, App'x 1); (R. 206, Tr. 9-1526-27, PageID 6203-04).

## B. Procedural Background

### 1. Indictment

The government charged Householder, Matt Borges, Jeff Longstreth, Juan Cespedes, Neil Clark, and Generation Now in a single-count RICO conspiracy indictment. (R. 22, Indictment, PageID 1247-1289). Its allegation: the monies FirstEnergy and FES contributed to Generation Now were bribes. More specifically, the government alleged that the defendants engaged in a pattern of racketeering through seven predicate offenses: (1) public official honest services wire fraud (18 U.S.C. § 1346),

(2) Hobbs Act extortion (18 U.S.C. § 1951), (3) Ohio state-law bribery (Ohio Rev. Code § 2921.02), (4) private sector honest services wire fraud (18 U.S.C. § 1346), (5) Travel Act (18 U.S.C. § 1952) through alleged violations of Ohio Rev. Code § 3517.22(A)(2), (6) money laundering (18 U.S.C. § 1956), and (7) engaging in monetary transactions with money derived from unlawful activity (18 U.S.C. § 1957). (R. 22, Indictment ¶ 33, PageID 1256-57).

Longstreth and Cespedes pleaded guilty and agreed to cooperate with the government. (R. 63, Cespedes Plea Agreement, PageID 1415-1421); (R. 64, Longstreth Plea Agreement, PageID 1422-1428). Clark died by suicide before trial. (R. 88, Order Dismissing Clark, PageID 1591). So, Householder and Borges proceeded to trial in January 2023.

## 2.    *Trial*

The trial lasted 27 trial days. For about seven of those trial days, the government's lead case agent, Blane Wetzel, testified on direct examination. (R. 194, Tr. 268, PageID 4814) (beginning of direct); (R. 206, Tr. 9-1458, PageID 6135) (start of cross). Most of that examination consisted of him simply reading text messages that he collected during his investigation.

14

Householder put on a defense case and testified in his defense.

Householder moved for a judgment of acquittal at the close of the government's case and the close of the evidence. (R. 224, Tr. 19-3036, PageID 8199); (R. 229, Tr. 22-3646, PageID 8816). The district court denied both motions. (R. 224, Tr. 19-3037-38, PageID 8201); (R. 229, Tr. 22-3647, PageID 8817).

The jury returned a guilty verdict. (R. 261, Verdict, PageID 10646).

### 3.    *Post-Trial Proceedings*

After Householder's conviction, the district court sentenced Householder to the maximum term of imprisonment allowed by law: 240 months incarceration. (R. 288, Judgment, PageID 11308).

Householder timely appealed. (R. 293, Notice of Appeal, PageID 11650).

## SUMMARY OF THE ARGUMENT

I.    A criminal defendant has a constitutional right to be represented by counsel at all critical stages of the trial. Selecting trial jurors and then deciding whether those jurors—once impaneled and sworn—should be dismissed from jury service are critical stages of a criminal trial. The district court, *ex parte* and *sua sponte*, dismissed a trial juror.

15

Because Householder's counsel was excluded from that decision making process, Householder was denied his Sixth Amendment right to counsel. This violation is structural error and requires a new trial.

II.    The district court must accurately instruct the jury on the law that they must apply. The court failed its task here. Under this Court's caselaw, a bribery requires an agreement. The district court's instructions failed to make that clear.

III.    When campaign contributions are alleged to be bribes, courts demand proof of an unambiguous quid pro quo. The government failed to show one here. Its evidence was, therefore, insufficient.

IV.    To be admissible, evidence must be relevant and not unfairly prejudicial. The district court admitted two highly inflammatory recordings of Householder and permitted the jury to hear that two of Householder's co-defendants pleaded guilty, even though Householder stipulated that he would not impeach those witnesses with their pleas. The district court's decision was error and it prejudiced Householder.

V.    A district court's sentence must be reasonable. The district court here calculated Householder's offense level by adding 22 levels based on the value of the bribe. But the value of the bribe was not $60

16

million. Because the judge incorrectly calculated the Sentencing Guidelines range, this case should, at a minimum, be remanded for resentencing.

VI.    If the probability of actual bias on the part of the judge is too high to be constitutionally tolerable, the judge must recuse. Here, the district judge ran for the Ohio Supreme Court, was opposed by Householder, who helped raise money into political advocacy groups that did not have to disclose their donors, and those groups too opposed Judge Black's election to Ohio's high court. Because there was an appearance of impropriety, Judge Black should have recused.

## ARGUMENT

## I.    The district court's *ex parte* and *sua sponte* dismissal of a juror violated Householder's Sixth Amendment rights.

"Lawyers in criminal cases are necessities, not luxuries. Their presence is essential because they are the means through which the other rights of the person on trial are secured." *United States v. Cronic*, 466 U.S. 648, 653 (1984) (internal quotation marks and footnote omitted). The "other rights" of a defendant secured through counsel include the right to assert legal positions on the selection of trial jurors and whether those jurors should be excused once impaneled. By adjudicating these

17

crucial legal matters *sua sponte* and *ex parte*, the district court completely denied Householder his Sixth Amendment right to counsel at a "critical stage" of the proceeding. *See Van v. Jones*, 475 F.3d 292, 313 (6th Cir. 2007). The remedy is reversal and a new trial "without analysis for prejudice or harmless error." *Id.* at 311-12 (citations omitted).

### A. The standard of review is de novo.

This Court reviews constitutional challenges de novo. *United States v. Watkins*, 509 F.3d 277, 280 (6th Cir. 2007).

### B. The district court dismissed a trial juror *ex parte*.

Before trial, the parties litigated *voir dire* procedures, including the jury questionnaire the district court would send to prospective jurors before trial.[7] Householder proposed that the court use a "robust questionnaire" to give him a "a full and fair opportunity to explore the biases and prejudices of prospective jurors." (R. 292-1, Am. Order Completing Record, PageID 11538); (*see id.*, PageID 11550-60) (Householder's proposed questionnaire). Ultimately, the district court issued a sparer

---

[7] The district court sent two questionnaires to prospective jurors: one to determine their availability to sit for a lengthy trial and a second, more substantive questionnaire. (*See* R. 292-1, Am. Order Completing Record, PageID 11573).

18

questionnaire without many of Householder's proposed questions. (*See id.*, PageID 11570). And before trial, Householder's counsel requested that they be permitted to question the venire during *voir dire*, which the district court permitted. (R. 182, FPC Tr. 70-71, PageID 4440-41).

Before *voir dire*, the district court explained that it intended to sit 16 jurors—12 trial jurors and 4 alternates. (R. 298, *Voir Dire* Tr. 4, PageID 11664). *Voir dire* lasted an entire day, and all parties used all their peremptory strikes before the district court impaneled and swore the jurors ultimately selected.

During trial, the district court—without asking for any of the parties' input—excused a trial juror, Juror No. 4. After about two days of trial, a trial juror tested positive for COVID-19, and the district court continued trial for about a week and required the jurors to take COVID tests. (R. N/A, Not. Order, Jan. 29, 2023) (continuing trial). At 3:25 pm on the following Monday, January 30, the district court, via email, informed counsel that one of the trial jurors—Juror No. 4—had not received the results from his COVID test,[8] would not wear a mask if ordered by

---

[8] As the district court acknowledged, Juror No. 4 had not tested positive for COVID and was not symptomatic. (R. 292-2, Am. Order Completing Record, PageID 11630).

the court, and would be "[un]available to serve any longer than 4:30 p.m. on Friday, March 3." (R. 292-2, Am. Order Completing the Record, PageID 11630). Without asking any party for their input, "*the Court* has decided *to cut* this juror *now*, and to return tomorrow with 15 jurors." (*Id.*) (emphasis added). An hour and a half later, Householder's counsel responded to the email and "respectfully request[ed] that the record reflect an objection to the sua sponte discharge of juror # 4 without the Court having at first consulted with the parties." (*Id.*, PageID 11643). Counsel explained that if they had been consulted, "there could have been a less extreme options to deal with the juror and his issues than dismissal and we were not given the opportunity to present these options to the Court." (*Id.*, PageID 11636). The following day, court resumed with 15 jurors, as the district court had indicated in its email. (R. 197, Tr. 383, PageID 4942).

### C.    Householder's Sixth Amendment rights were violated.

Under the Sixth Amendment, criminal defendants have the right to the assistance of counsel for their defense. U.S. Const. amend. VI. Thus, when defense counsel is excluded from a critical stage of a criminal proceeding, it is a per se Sixth Amendment violation. *United States v.*

*Cronic*, 466 U.S. 648, 659 n.25 (1984). In *Van v. Jones*, this Court explained that a stage is critical when "there [is] a reasonable probability that [the defendant's] case could suffer significant consequences from his total denial of counsel at that stage." 475 F.3d 292, 313 (6th Cir. 2007). And if this right is violated, it is structural error: "It is settled that a complete absence of counsel at a critical stage of a criminal proceeding is a *per se* Sixth Amendment violation warranting reversal of a conviction, a sentence, or both, as applicable, *without analysis for prejudice or harmless error*." *Id.* at 311-12 (emphasis added).

Jury selection and dismissal are critical stages of a criminal proceeding. This Court has defined a "critical stage" as one in which there is "a reasonable likelihood" that "significant consequences" will arise "from complete absence of counsel." *Van*, 475 F.3d at 313. The "reasonable likelihood" test examines the nature of the proceeding from which counsel was excluded, not its specific result. *Id.* at 314 (critical stage inquiry "should focus not only on the specific case before us, but the general question of whether such a stage is 'critical'"). Critical stages include (1) the period between arraignment and trial, *see Mitchell v. Mason*, 325 F.3d 732, 741-43 (6th Cir. 2003); (2) a pretrial suppression hearing, *see*

21

*Henderson v. Frank*, 155 F.3d 159, 169-72 (3d Cir. 1998); (3) a postindict-ment lineup, *see United States v. Wade*, 388 U.S. 218, 236-37 (1967); (4) pretrial plea negotiations, *see Missouri v. Frye*, 566 U.S. 134, 140-41 (2012); (5) reinstruction of a jury, *see French v. Jones*, 332 F.3d 430, 436 (6th Cir. 2003); and (6) return of a verdict, *see United States v. Smith*, 411 F.2d 733, 736 (6th Cir. 1969).

Dismissing a juror after he has been impaneled is a critical stage of a criminal proceeding. To begin, it is crystal clear that jury selection is "a critical stage of the criminal proceeding." *Gomez v. United States*, 490 U.S. 858, 873 (1989). And in *United States v. Gay*, this Court held a dis-trict court erred in "engag[ing] in discussions with members of the jury after it was impaneled and [ ] consider[ing] requests for excuses out of the presence of the defendant and without giving notice to defense coun-sel." 522 F.2d 429, 435 (6th Cir. 1975).[9] There, between voir dire and opening statement, the district court excused three jurors without in-forming the defense. *Id.* at 434. The judge had apparently received

---

[9] In *Gay*, this Court analyzed the issue under Rule 43 of the Federal Rules of Criminal Procedure, which requires the defendant's appearance at every stage of trial. 522 F.2d at 434-35. Whether analyzed under that rule or under the Sixth Amendment, the district court's actions here were error and require reversal and a new trial.

requests from those jurors to be excused from jury service, and the judge excused those jurors without giving the defense the opportunity to be heard or to object. *Id.* This Court reversed and remanded for a new trial.

This case is on all fours with *Gay*. As in that case, the district court engaged in discussions with at least some of the impaneled jurors and excused Juror No. 4 without allowing Householder the opportunity to be heard. (R. 292-2, Am. Order Completing the Record, PageID 11644). That's error under *Gay* and under the Sixth Amendment caselaw cited above.

*Gay* shows that dismissing an impaneled trial juror is a critical stage in a criminal proceeding. A critical stage of the proceeding is simply one where "there [is] a reasonable probability that [the defendant's] case could suffer significant consequences from his total denial of counsel at that stage." *Van*, 475 F.3d at 313. By holding that the judge's *ex parte* and *sua sponte* dismissal of three trial jurors violated the defendant's rights under Rule 43, *Gay*, 522 F.2d at 434-35, this Court implicitly held that the dismissal of an impaneled trial juror is a critical stage of the proceeding, *see United States v. Taylor*, 489 F. App'x 34, 43 (6th Cir. 2012) (noting that Rule 43 only implicates a defendant's "right to be present at

23

*critical stages* of the proceedings") (emphasis added). And even without *Gay*, a district court's decision to dismiss an impaneled trial juror is certainly a proceeding where a defendant "could suffer significant consequences from his total denial of counsel at that stage." *Van*, 475 F.3d at 313. The consequence is self-evident: the district court may excuse a juror the parties, through voir dire, selected to sit. Although the district court may have dismissed the juror anyway even it asked for Householder's counsel's input, "it takes the risk of making erroneous decisions that will unfairly disadvantage the defendant." *United States v. Paulus*, 952 F.3d 717, 724 (6th Cir. 2020). As a result, the district court here denied Householder his Sixth Amendment right to counsel by *sua sponte* dismissing a trial juror *ex parte*.

The district court's rationale for its actions is faulty. Although it told counsel for all parties at 3:25 pm on January 30 that it had "*decided* to cut [Juror No. 4] *now*, and to return tomorrow with 15 jurors," (R. 292-2, Am. Order Completing Record, PageID 11640) (emphasis added), it then tried explained—in both email communications with counsel and on the record the following day—that it did not mean what it said. After Householder's counsel objected, (*see id.*, PageID 11643), the court said

24

despite what it had already said (*i.e.*, that it had "decided to cut this juror now") that it "had not excused the juror" until speaking with Householder's counsel. (*Id.*). But, as Householder's counsel informed the court the following trial day, that was not accurate: "what I am suggesting to the Court is that [ ] it was communicated to the Householder team that Juror No. 4 was already dismissed." (R. 197, Tr. 388, PageID 4947). The court's email makes that clear: it had already decided, without awaiting the input of Householder's counsel, to dismiss Juror No. 4 and return with one fewer juror.

The district court's actions in dismissing Juror No. 4 violated Householder's Sixth Amendment rights. Under *Gay*, it violated his rights under Rule 43 too. Both errors warrant reversal without the requirement that Householder show prejudice.

This Court should reverse and remand for a new trial.

## II.    The district court improperly instructed the jury.

### A.    The standard of review is de novo and abuse of discretion.

"A trial court's jury instructions must, as a whole, accurately reflect the law." *Dimora v. United States*, 973 F.3d 496, 502 (6th Cir. 2020) (cleaned up). This Court generally reviews "challenges to jury

instructions under the abuse of discretion standard," but it reviews "the legal accuracy of jury instructions de novo." *United States v. Bauer*, 82 F.4th 522, 529 (6th Cir. 2023) (cleaned up). In so doing, the Court looks "at the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Emmons*, 8 F.4th 454, 470 (6th Cir. 2021) (cleaned up). And it reverses if "the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (cleaned up).

## B.    The district court's bribery instructions were wrong.

The key defining element of bribery is an agreement. But the district court's instructions did not adequately convey that requirement. The judge improperly instructed the jury in at least four ways. *First*, by inadequately explaining the agreement requirement. *Second*, by failing to inform the jury that it needed to find that at the time Householder accepted payment he agreed to take official action on a specific and focused question or matter that was identified at that time. *Third*, by allowing the jury to convict if it only found a bribery by implication. And, *fourth*, by

26

broadly defining the state-law bribery predicate in violation of *McCormick* and *McDonnell.*

1. Start with an agreement. "[A]n agreement is the key component of a bribe." *United States v. Terry*, 707 F.3d 607, 614 (6th Cir. 2013). "To hold otherwise," the Supreme Court has explained, "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable." *McCormick v. United States*, 500 U.S. 257, 272 (1991). Without an agreement requirement, federal bribery law would cast a "pall of potential prosecution" over all officials. *McDonnell v. United States*, 579 U.S. 550, 574 (2016). It would be far too easy to allege that any benefit provided to an official by lobbyists or others was received by the official with improper intent.

The district court did not explain this agreement requirement to the jury.[10] It told the jury to find the public official bribery predicates that the jury needed to find a bribery exchange, meaning "*either*: one, a public official's solicitations of things of value in exchange for performing or

---

[10] Householder objected to the government's proposed instruction because it "does not adequately convey that honest services wire fraud requires an **agreement** between the payor and the public official." (R. 193, Defs.' Objections to Govt. Jury Instructions, PageID 4699).

agreeing to perform specific official action; *or* two, a public official's receipt of things of value when the public official knows that the person who gave the thing of value was doing so in return for the public official performing *or* agreeing to perform a specific official action." (R. 237, Tr. 3728, PageID 9421) (emphasis added).[11] This multi-part bribery definition is erroneous. The district court's definition rejected the requirement that a bribery is an *agreement* between the briber and bribee; its definition permitted the jury to find a bribery if Householder, as the government urged during closing, simply "receive[d] money knowing that the bribe payor is giving that money with the *expectation* that they will get legislation or official action, that's bribery." (R. 238, Tr. 24-3791, PageID 9484). In other words, the government insisted the jury find a bribery if Householder "receive[d] the money knowing that the expectation was legislation in return." (*Id.*, PageID 9485). But an expectation is not, by definition, an agreement. What is required is an objective, agreed-upon exchange. Whether one calls it a promise, an agreement, or an

---

[11] The court told the jury that its instructions of bribery applied to the Hobbs Act extortion predicate too. (R. 237, Tr. 3735, PageID 9428)

{01997861-1}

understanding, there must be an express or implicit this for that. *McCormick*, 500 U.S. at 273. That is the essence of bribery—not a generalized expectation.

2. A district court errs if its instructions permit the jury to find a bribery based on "an open-ended promise to perform official actions for the benefit of the payor." *United States v. Silver*, 948 F.3d 538, 559 (2d Cir. 2020); *see also United States v. Skelos*, 988 F.3d 645, 656 (2d Cir. 2021) (finding error where the jury was not required to find that "*at the time the defendant accepted the relevant payment*, he understood he was expected 'to take official action on a specific and focused question or matter as the opportunities to take such action arose'") (emphasis added). Householder asked the district court, consistent with *Silver* and *Skelos*, to instruct that "this explicit quid pro quo agreement must exist at the time, at the time that the bribe was paid. It cannot be formed later." (R. 237, Tr. 23-3661, PageID 9354). The government objected, claiming that this proposal was "not consistent with the law." (*Id.*, PageID 9356). *But see McDonnell v. United States*, 579 U.S. 550, 572-73 (2016) ("It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' *at the time* of the alleged quid pro

quo.") (emphasis added). The district court ultimately refused to give Householder's instruction.

The district court's refusal is error. As explained above, *McDonnell*, *Silver*, and *Skelos* require that a jury must be instructed that bribery only occurs if the public official at the time of the relevant payment agrees to perform some specific official act. *See Silver*, 948 F.3d at 568 ("the jury should have been instructed that, to convict on honest services fraud, the Government must prove that, at the time the bribe was accepted, Silver promised to take official action on a *specific and focused question or matter* as the opportunities to take such action arose"); *Skelos*, 988 F.3d at 656 ("Although the jury was properly instructed that, for an act to qualify as an 'official act,' it must be taken on a 'question or matter [that is] specific, focused, and concrete,' the jury was not required to find that Skelos and the bribing party shared a specific enough understanding of the question or matter upon payment."). Like in *Silver* and *Skelos*, the district court instructed the jury that it was enough if "the public official understood the agreement was to take a specific official action on the payor's behalf when the opportunity presented itself." (R. 237, Tr. 23-3730, PageID 9423). But this left open the possibility that the jury could find

30

that Householder was expected to take official action "on *any* question or matter in return for the payment." *Skelos*, 988 F.3d at 656. This rendered the instruction erroneous.

3. Next, proving the bribery by implication. The Supreme Court's caselaw says the government may not prove explicit quid pro quos through circumstantial evidence or by implication. *See McCormick v. United States*, 500 U.S. 257, 273 (1991); *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 U.S. Dist. LEXIS 219044, at *33 (S.D.N.Y. Dec. 5, 2022) ("The Court concludes that, for criminal liability for bribery in the context of campaign contributions, there must be a quid pro quo that is clear and unambiguous, meaning that (1) the link between the official act and the payment or benefit — the pro — must be shown by something more than mere implication, and (2) there must be a contemporaneous mutual understanding that a specific quid and a specific quo are conditioned upon each other."). The district court, however, told the jury the exact opposite: it could rely on circumstantial evidence to convict and that bribery could be proven by "knowing winks and nods." (R. 237, Tr. 23-3729, PageID 9422). Householder objected. (R. 193, Defs.' Objections to

Govt.'s Instructions, PageID 4700). The district court erred in giving the instruction and not sustaining Householder's objection.

4.  State law bribery. The district court erred in instructing the jury on the Ohio state law bribery predicate. Householder objected to this instruction. (R. 237, Tr. 23-3678, PageID 9371). Unlike with the honest services fraud and Hobbs Act predicates, the district court included none of the guardrails the Supreme Court erected to ensure that criminal corruption statutes do not infringe on core political speech. Instead, the court merely instructed that to find this predicate, the jury find that a public servant (1) "knowingly solicit[] or accept[] for himself any valuable thing or valuable benefit," (2) "intend[] the valuable thing or benefit to corrupt or to improperly influence him," and (3) "that the corruption or influence was with respect to the discharge of his duties as a public servant." (R. 237, Tr. 23-3741-42, PageID 9434-35). The court did not tell the jury that it must find an explicit agreement, a specific official act, or give any limiting principle the Supreme Court has required be set forth to avoid First Amendment issues and avoid criminalizing everyday political activity. The Supreme Court has strictly limited bribery law to "quid pro quo corruption—the exchange of a thing of value for an 'official act.'" *McDonnell*

*v. United States*, 579 U.S. 550, 575 (2016). The provision of benefits to an official to curry favor is thus lawful—both to give and receive—unless made in exchange for official action. For this reason, cases from the Supreme Court, *e.g.*, *United States v. Brewster*, 408 U.S. 501, 526 (1972), and this Court, *e.g.*, *United States v. Terry*, 707 F.3d 607, 614 (6th Cir. 2013), describe bribery as requiring an explicit "agreement" to undertake specific official action in exchange for a bribe.

The district court's instruction did not convey this agreement requirement—let alone the explicit agreement requirement for campaign contribution cases, like this one. Instead, the court's instruction permitted the jury to convict if it found that the public official simply solicited or accepted valuable benefits. This was error.

The district court erred in refusing to impose the official act and agreement requirements to the state-law bribery offenses.

## C.    The district court improperly instructed the jury that the government impeached a defense witness.

1. *Background*. At trial, one of the government's cooperating witness, Juan Cespedes, testified about a meeting with Householder on October 10, 2018 that he attended, along with David Griffing (an FES executive), Geoff Verhoff (an Akin Gump lobbyist who was lobbying on FES'

33

behalf), and Robert Klaffky (an Ohio lobbyist who was lobbying on FES' behalf too). (*See* R. 211, Tr. 1893, PageID 6777). According to Cespedes, at this meeting, in which a $400,000 check made payable to Generation Now was delivered to Householder, Klaffky slide the check under Householder's hand and "kind of infers that, you know, obviously, you know, we're here to support you." (*Id.*, PageID 6780). In response, according to Cespedes, Householder gave "very strong verbals and nonverbals that he would introduce -- in fact, introduce legislation." (R. 212, Tr. 12-2082, PageID 6966). Although Griffing, Verhoff, and Klaffky also attended this meeting, the government did not call those witnesses to testify about their recollection of the meeting, and the government never even bothered to interview Verhoff or Klaffky. (R. 229, Tr. 22-3639, PageID 8809); (R. 228, Tr. 21-3261, PageID 8431).

So, Householder called Klaffky to testify during the defense case.[12] Klaffky testified that he did not recall specifically what was discussed at the October 10th meeting with Householder (R. 228, Tr. 21-3249, PageID

---

[12] Householder also subpoenaed and planned to call Verhoff. But after the government spoke with Verhoff's counsel, Householder's counsel was informed that he would exercise his Fifth Amendment right. (R. 225, Tr. 20-3167, PageID 8330).

34

8419), but he did not believe that the meeting was "pay to play." (*Id.*, PageID 8426).

During the government's cross-examination, it tried to impeach Klaffky with statements that he made to a newspaper. But, for the reasons outlined below, it utterly failed to impeach him. (*See id.*, PageID (R. 228, PageID 8453-56). Despite this, the district court instructed the jury that the government had impeached Klaffky.

2. *The district court's erroneous instruction.* Over Householder's objection (R. 237, Tr. 23-3685, PageID 9378), the district court instructed the jury that the government impeached Klaffky with a prior inconsistent statement (*Id.*, PageID 9444-45). This was error for at least two reasons. *First*, the government never even admitted Klaffky's alleged prior inconsistent statement. And, *second*, the government did not establish any inconsistency.

Start with whether the government admitted the supposedly inconsistent statement. The pattern instruction the district court gave says that it should be "given when a prior inconsistent statement" that was not made under oath "has been *admitted.*" Pattern Crim. Jury Instr. 6th Cir. 7.04, use note (emphasis added). The government tried to impeach

Klaffky with statements that he made to a news reporter. (R. 228, Tr. 21-3283-86, PageID 8453-56). But the government never moved to admit those extrinsic statements or the news article.[13] Absent any "extrinsic proof" of these statements, it was error for the district court to give the impeachment instruction. *United States v. Toney*, 161 F.3d 404, 410 (6th Cir. 1998) (finding it error to give the instruction when "the government [did not] offer any extrinsic proof of the alleged inconsistent statements").

Nor did the government show that any of Klaffky's statements to the news media were inconsistent with his trial testimony. "Under Federal Rule of Evidence 613, before a party may impeach a witness with a prior inconsistent statement, the party must first establish that the witness's statement is actually inconsistent with, although not necessarily 'diametrically opposed' to, the prior statement." *United States v. Cody*, 114 F.3d 772, 776 (8th Cir. 1997). Each time the government questioned Klaffky about what he told the reporters, Klaffky admitted that he made

---

[13] Because the government never moved to admit the article, it is outside the record. But this is the article: Andrew J. Tobias & Jake Zuckerman, *Indicted Ohio lobbyist breaks silence during Householder trial testimony*, Cleveland.com, available at https://www.cleveland.com/news/2023/02/indicted-ohio-lobbyist-breaks-silence-during-householder-trial-testimony.html (Feb. 13, 2023).

the statement. (*See* R. 228, Tr. 21-3283-86, PageID 8453-56). And the government did not otherwise show that anything Klaffky told the reporters was inconsistent with his trial testimony. At the charge conference, the government simply offered that Klaffky "didn't say *it* at the start and then he was only -- he ultimately agreed with *it* after being cross-examined on a prior statement. So his prior testimony he did not include *this*. So his prior testimony was impeached, although he ultimately agreed with what he was impeached with." (R. 237, Tr. 23-3685, PageID 9378) (emphasis added). But the government never explained the inconsistency; it never explained what Klaffky did not say. Indeed, he testified, consistent with his statements to the reporters, that he did not recall what was exactly said at an October 10, 2018 meeting. (*See* R. 228, Tr. 21-3285, PageID 8455) (on cross, Q: "But you say you couldn't remember to the newspaper and you said you couldn't remember this morning?" A: "Yeah."); (*Id.*, Tr. 21-3249, PageID 8419) (Klaffky testifying, on direct examination, that he "can't remember" "discussing campaigns" at the meeting). That's not impeachment. *See* Fed. R. Evid. 613(b). The government bore the burden of showing that it impeached Klaffky with some prior inconsistent statement. It failed that task.

37

Because the government never properly impeached Klaffky and never even tried to admit the allegedly impeaching statement, the district court erred by telling the jury that it "heard that before this trial he made a statement that may be different from his testimony here in court." (R. 237, Tr. 23-3751-52, PageID 9444-45).

### D.    These errors were not harmless.

If the district court's instructions may have permitted the jury to convict "for conduct that is not unlawful," its erroneous instructions cannot be "harmless beyond a reasonable doubt." *McDonnell v. United States*, 579 U.S. 550, 579-80 (2016) (cleaned up). That's the case here. The government's theory was that FirstEnergy bribed Householder. Because the district court improperly instructed the jury on this point, it permitted the jury to convict based on conduct that is not unlawful.

That's especially true for the state-law bribery predicate. As explained above, the district court's instruction permitted the jury to find that predicate if it simply found that Householder accepted a "valuable thing" and that he intended it to "improperly influence him" in the "discharge of his duties." (R. 237, Tr. 23-3741-42, PageID 9434-35). No agreement requirement, no explicit quid pro quo requirement, and no official

act requirement. This is like the cases after *McDonnell* that found instructional error when the instructions were "overinclusive" on what acts counted as official acts. *Dimora v. United States*, 973 F.3d 496, 504 (6th Cir. 2020) (collecting cases). But this is even worse, unlike those cases, the district court's instructions permitted the jury to find the state-law bribery predicate without any quid pro or agreement. This error was not harmless.

The remaining predicates do not save the conviction. To start, the government only argued to the jury that Householder's role was limited to the public official bribery predicates and the money-laundering predicates. (R. 238, Tr. 24-3787-88, PageID 9480-81). And absent the public official bribery predicates, there were no proceeds for the money-laundering predicates.

Even so, a RICO conspiracy conviction cannot stand if some of the predicates are deficient. *See Callanan v. United States*, 881 F.2d 229, 235 (6th Cir. 1989). The district court's erroneous substantive instructions were not harmless.

The district court's impeachment instruction was not harmless either. The parties hotly contested what happened at the October 10, 2018

39

meeting, and they put up competing versions of the meeting: Cespedes's account for the government and Klaffky and Householder's account for the defense. During closing argument, the government urged the jury to credit Cespedes's version, not Klaffky's. (R. 238, Tr. 24-3809-10, PageID 9502-03). And without question, the jury must have been influenced by the court's instruction that it consider whether Klaffky made an unidentified inconsistent statement before trial. After all, the court's instruction specifically identified him and his testimony. The district court's improper instruction was not harmless.

## III.   The evidence was insufficient to convict Householder.

### A.   The standard of review is whether any reasonable jury could find the essential elements beyond a reasonable doubt.

"[T]he standard of review on appeal for an insufficient-evidence challenge is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Kennedy*, 714 F.3d 951, 956-57 (6th Cir. 2013) (cleaned up). This Court does not weigh the evidence nor assess the credibility of the witnesses. *United States v. Gooding*, 351 F.3d 738, 741 (6th Cir. 2003). "[It] will

40

reverse a judgment based on a finding of insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010). And it "make[s] all reasonable inferences in support of the jury's verdict." *Id.*

Although a defendant challenging his conviction carries a "very heavy" burden, the burden is not insurmountable. *See, e.g.*, *United States v. Sadler*, 750 F.3d 585, 590-92 (6th Cir. 2014) (reversing wire fraud conviction). After all, "[i]f the evidence … gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances a reasonable jury *must necessarily entertain* a reasonable doubt." *United States v. Caseer*, 399 F.3d 828, 840 (6th Cir. 2005) (citations omitted); *see also United States v. Saunders*, 325 F.2d 840, 843 (6th Cir. 1964) ("Evidence that at most establishes no more than a choice of reasonable probabilities cannot be said to be sufficiently substantial to sustain a criminal conviction upon appeal.").

{01997861-1}

**B.    The evidence was insufficient to convict Householder.**

Householder was charged with and convicted of a single count: RICO conspiracy. The government's burden in proving a violation of the conspiracy offense, section 1962(d), is to show that the defendant "knew about and agreed to facilitate" a substantive RICO violation. *Salinas v. United States*, 522 U.S. 52, 66 (1997). So, conspiracy to violate subsection (c) requires proof that the defendant knew about and agreed to facilitate "the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

Although the government does not need to prove that the defendant "himself commit[ted] or agree[d] to commit the two or more predicate acts requisite to the underlying offense," *Salinas*, 522 U.S. at 65, it must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity," *United States v. Pinson*, 860 F.3d 152, 163 (4th Cir. 2017) (quotations omitted) (vacating RICO conspiracy conviction).

The government's evidence was insufficient to prove that Householder "agreed that either he or another member of the conspiracy would commit at least two racketeering activities." (R. 237, Tr. 23-3725, PageID

42

9418). The court instructed the jury that the racketeering acts at issue were seven different predicates. (*Id.*, PageID 9418-19). In closing argument, the government put these predicates into three buckets: (1) public official bribery, (2) private sector bribery (relating to Defendant Borges's "bribe of Tyler Fehrman"), and (3) money laundering. (Tr. 238, Tr. 24-3786-87, PageID 9479-80). The district court's instructions told the jury that the public official bribery predicates were premised on Householder allegedly "taking specific official action for the benefit of FirstEnergy Corp. and FirstEnergy Solutions, namely, to help enact legislation that would go into effect and save the operation of the nuclear plants." (R. 237, Tr. 23-3715, PageID 9408). The evidence was insufficient that Householder committed or agreed that a co-conspirator would commit any predicate act.

### 1. *Householder did not engage in bribery.*

Start with public official bribery. The corruption laws require clear and specific evidence of an explicit quid pro quo when the alleged bribes are otherwise-lawful campaign contributions—as in this case. The Supreme Court holds any alleged quid pro quo involving a campaign contribution must be "explicit." *McCormick v. United States*, 500 U.S. 257, 273

43

(1991). Although this standard does not require a signed contract, it does require that the defendant explicitly agree to take or withhold a specific official action in exchange for a contribution. *See id.*; *United States v. Siegelman*, 640 F.3d 1159, 1172 (11th Cir. 2011). In other words, the defendant must agree "his official conduct will be controlled by the terms of [a certain] promise or undertaking." *McCormick*, 500 U.S. at 273; *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("What is needed is an agreement, full stop …."). That standard is more demanding than the one used outside the campaign-contribution context. *See United States v. Abbey*, 560 F.3d 513, 517–18 (6th Cir. 2009).

This requirement comes from the First Amendment. The Supreme Court has long held that the government "may not target … the political access" that financial support for candidates "may afford." *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014). "Ingratiation and access … are not corruption," but rather "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *Id.* "[M]oney is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views

and what they intend to do or have done." *McCormick*, 500 U.S. at 272. The Constitution protects that conduct and bars the government from prosecuting officials who eat with, meet with, or make policy commitments to their campaign contributors—even if those acts come "shortly before or after campaign contributions are solicited and received from those beneficiaries." *Id.*

These principles confirm that in the campaign contribution context the government needs the clearest possible proof to prove bribery—that is, the agreement must be unambiguous and cannot be proven by implication. After all, ordinary political conduct is not enough to prove public corruption, and it is not a crime when elected officials take actions that are supported by or benefit those who have contributed to their campaigns and advocated for those actions. Only an explicit agreement—one for which the evidence is "not" "ambiguous" and susceptible to an innocuous explanation—is sufficient. *United States v. Blandford*, 33 F.3d 685, 696 n.13 (6th Cir. 1994) (quoting Black's Law Dictionary 579 (6th ed. 1990)). Thus, when the evidence permits a plausible explanation of the defendant's conduct that sounds in politics instead of corruption, *McCormick* is not satisfied.

For this reason, federal courts closely police whether the government's evidence crosses the line from legitimate political activity to truly corrupt bargains. The rule that *McCormick* established—requiring an explicit quid pro quo—has since served to draw a clear line between a corrupt bargain and legitimate campaign fundraising. Since *McCormick*, the Supreme Court has repeatedly reaffirmed this core principle of protecting lawful fundraising from government overreach. The Supreme Court has described the "influence and access" that come with campaign contributions as a "central feature of [our] democracy" and added that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1650 (2022) (cleaned up). But putting those actions at the mercy of prosecutors and juries would criminalize "conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures." *McCormick*, 500 U.S. at 272.

For all these reasons, to prove an "explicit" agreement when campaign contributions are the *quid*, the government must have unambiguous evidence of a corrupt agreement—evidence that cannot be explained as ordinary electoral politics. This is confirmed by caselaw:

46

- *United States v. Terry*: evidence was so clear that "[n]o subtle winks and nods were needed"; the donor had "straight up asked [the defendant judge] to deny the bank's motions for summary judgment in the two cases, and with [the defendant's] tape-recorded reply ('Got it.'), [the defendant] agreed to do just that," 707 F.3d 607, 615 (6th Cir. 2013); and

- *United States v. Siegelman*: evidence that the defendant-governor expressly acknowledged his agreement to sell a seat on a board and arranged for the donations to come through intermediaries, *see* 640 F.3d 1159, 1166–67 (11th Cir. 2011).

The evidence in each case had no plausible explanation sounding in politics. Each thus involved an "explicit" and unambiguous agreement.

The government's evidence fell short here. It presented evidence that large energy companies, FirstEnergy and FES, contributed large amounts of money to a 501(c)(4) organization, Generation Now. And that's it. But these were presumptively legal contributions. Although the government spent much of its trial presentations showing of the size of the contributions, it's not clear why that matters. The government needed to show an explicit and unambiguous quid pro quo, but it

47

presented little firsthand evidence of Householder's direct communications with FirstEnergy executives. Instead, it based most of its evidence on innuendo and speculation.

Although the government claimed that this bribery scheme began at two dinners in Washington, D.C. during President Trump's inauguration, (*see* R. 191, Tr. 23, PageID 4534), it introduced little direct evidence to support this. Its cooperating witness, Jeff Longstreth, testified that at the first dinner, on January 18, 2017, "at least 20 people" were at the table, and that he sat on one end of the table, while Householder sat on the other end of the table, speaking with FirstEnergy's CEO, Charles Jones. (R. 217, Tr. 16-2601, PageID 7635).[14] But he could not hear what Householder and Jones were discussing (assuming this meeting actually occurred). (*Id.*); *see also United States v. Inzunza*, 638 F.3d 1006, 1025 (9th Cir. 2011) ("we know nothing of what transpired at Zucchet's half-hour meeting with Malone at the 2001 fundraiser. Suspicion alone will not support criminal liability."). The next night, according to Longstreth,

---

[14] Longstreth's testimony—as the government should have known—was likely false. Documentary evidence showed that Jones arrived in D.C. the following day, January 19, (*see* HX 479 at 11, App'x 194), and phone records showed that he made calls on January 18, 2017 from Naples, Florida, (*see* GX 724B at 5, App'x 21).

48

another, smaller dinner occurred.[15] (R. 217, Tr. 16-2604, PageID 7638). At that dinner, which again was supposedly attended by Householder, Jones, and Dowling, Householder laid out his plan to try and get elected Speaker of the Ohio House of Representatives again. (*Id.*). Meanwhile, the FirstEnergy executives supposedly discussed that they were looking "at the federal level" for a "solution" to the Ohio nuclear power plants. (*Id.*); (*see* R. 219, Tr. 17-2758, PageID 7859) (Longstreth understood there was "sense of urgency from FirstEnergy to pursue a federal solution"). But, as a fallback, if the federal solution failed, they said that "we're going to need to do something at the state level." (R. 217, Tr. 16-2604, PageID 7638). Longstreth did not testify that Householder promised to do anything, nor did he testify that the FirstEnergy executives promised to contribute anything at that dinner.

Nor did the government otherwise introduce unambiguous evidence of a corrupt agreement between Householder and the FirstEnergy

---

[15] This testimony too was likely false. Jones's expense report showed that he had dinner with Tony George and his wife at the Bourbon Steakhouse—not at the Palm, as Longstreth claimed. (HX 479 at 3, App'x 188). For some reason, the government did not bother to obtain or review Jones's expense report before trial; rather, the defense had to subpoena this information. (*See* R. 219, Tr. 17-2825, PageID 7926).

49

executives. While the government presented evidence of meetings and conversations between Householder and Jones, "[i]ngratiation and access … are not corruption." *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014). Moreover, the evidence showed that Householder was a longtime support of "the utilities and energy producers in Ohio." (R. 219, Tr. 17-2725-26, PageID 7826-27); (*see also* R. 224, Tr. 19-3051, PageID 8214). And that he had expressed support for "[u]tility relief" *before* FirstEnergy contributed any monies to Generation Now. (*See* GX 212, App'x 3). Although it is no defense that a public official would have taken the same action absent a bribe, that the official—like Householder did here—publicly extolled certain policy positions before receiving any contributions certainly undermines any inference of a corrupt agreement, *see United States v. Menendez*, 291 F. Supp. 3d 606, 628 (D.N.J. 2018) (public official "advocating a policy position consistent with a position he had taken years earlier" not proof of corrupt deal), just as proof of "unusual official actions" can support such an inference, *Terry*, 707 F.3d at 615.

In short, the government failed to present evidence of an unambiguous agreement. Two cases illustrate this point.

50

Take *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 U.S. Dist. LEXIS 219044 (S.D.N.Y. Dec. 5, 2022). There, the defendant, the lieutenant governor of New York, received campaign contributions from a real estate developer and allegedly in exchange allocated $50,000 to the developer's nonprofit. *Id.* The district court found the government's allegations insufficient and dismissed the bribery counts in the indictment: "*McCormick* requires an agreement that is clear and unambiguous and in turn controls the action. It does not permit the action to serve as proof of the agreement." *Id.* at *47.

*United States v. Menendez* ordered acquittal for similar reasons. There, the government had introduced evidence that Senator Bob Menendez had followed up on a donor's priorities in "close temporal proximity" to his campaign contributions, did so more zealously" than before the contributions, advocated through "unusual" means, and otherwise engaged in a longstanding "pattern of corrupt activity and concealment." 291 F. Supp. 3d at 627–35. The court nonetheless found that this pattern of "context, chronology, escalation, [and] concealment" was legally insufficient to prove an explicit agreement, *id.* at 633, as the government had

51

"not introduced any evidence connecting" the alleged quid to the alleged quo, *id.* at 629–30.

So too here. Like in *Benjamin* and *Menendez* and *McCormick*, the government utterly failed to connect the quid to the alleged quo. In short, the government's evidence showed that energy companies, like FirstEnergy and FES, contributed campaign funds to support Householder, who was known to be a supporter of Ohio utility companies and who eventually helped pass House Bill 6. But, the cases cited above teach us, simply showing meetings, contributions, and official actions are not enough to win convictions.

The government's arguments of payment in exchange for official action were insufficient too. Under this Court's caselaw, whether something counts as an official act is a two-part test: (1) "an official act must involve an official issue—a question, matter, cause, suit, proceeding or controversy" and (2) "the public official must have made a decision or taken an action, or agreed to do so, on that official issue." *Dimora v. United States*, 973 F.3d 496, 503 (6th Cir. 2020) (cleaned up). What this means is that "the official must make a decision or take action, or promise to do so, on the particular question or matter *at the time* he receives payment or other

52

things of value." *United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022).[16] Although the government need not link specific contributions to specific official actions, the government must show that ***at the time*** Householder (or Generation Now) received contributions, Householder agreed to take (or did take) official actions on the official issue. On this fulcrum point, the government's evidence fell short. The government says that the bribe payments began in March 2017 (*see* GX 16, App'x 2) (showing first contribution from FirstEnergy in March 2017), yet the only official actions alleged occurred ***years*** later. What *McDonnell* and the cases following it, including this Court's published decision in *Hills*, require though is that at the time of the payment, the public official must agree to take official action on a specific and focused matter. The government's allegations that Generation Now received contributions for years before Householder took any official action[17] do not meet these requirements.

---

[16] "[W]ithout a requirement that an official must promise to influence a particular question or matter, any official who accepts a thing of value and then later acts to the benefit of the donor, in any manner, could be vulnerable to criminal prosecution." *United States v. Silver*, 948 F.3d 538, 558 (2d Cir. 2020).

[17] Or even could take official action. All of the official actions the government alleged Householder took (*e.g.*, creating a House subcommittee" and "using his position as Speaker to pressure and advise public

At bottom, "[t]here is no there there." *United States v. Menendez*, 291 F. Supp. 3d 606, 633 (D.N.J. 2018) (quoting Gertrude Stein, *Everybody's Autobiography* (1937)). The government relied on speculations, inferences, and generalizations to win a conviction. But those are insufficient to sustain one. This Court should vacate Householder's conviction.

## 2. *The private sector bribery predicates are insufficient.*

As the government argued in closing, the private sector bribery predicates (Travel Act and private honest services wire fraud) were premised on Borges's payment of $15,000 to Tyler Fehrman. (*See* R. 238, Tr. 24-3787, PageID 9480). But there was no evidence that Householder agreed that Borges was to pay this money to Fehrman for information. (*See* R. 212, Tr. 2141, PageID 7025) (Cespedes testifying that he had "no personal knowledge" if Householder was aware of Cespedes's communications with Borges about getting information from Fehrman).

Even if he had, the evidence was insufficient. The Travel Act, 18 U.S.C. § 1952, predicate derived from an alleged violation of Ohio Rev.

officials to take official actions") were actions that he literally could not take in March 2017 when FirstEnergy first began contributing to Generation Now. And they were actions that he could not take for years thereafter.

Code § 3517.22(A)(2). (*See* R. 22, Indictment ¶ 33, PageID 1256-57). That statute prohibits giving "any valuable thing or valuable benefit to any person who is *employed* by or is an *agent* of a *committee* in advocacy of or in opposition to the adoption of any ballot proposition or issue" to improperly influence him. Ohio Rev. Code § 3517.22(A)(2). Although the government presented evidence that Borges gave $15,000 to Fehrman, it neglected to put on evidence to show that Fehrman was an "employee" or "agent" of the ballot campaign (*i.e.*, Ohioans Against Corporate Bailouts). Instead, the government's evidence showed that Borges was employed by Advanced Micro Targeting, Inc. (GX 624B, App'x 6). Nor was Borges an "agent" of the ballot campaign. AMT's CEO made that clear: "we run petitions, we don't have a relationship with the funders." (R. 216, Tr. 15-2476, PageID 7510). The evidence was insufficient on the Travel Act predicate.

The evidence of the private sector honest services wire fraud predicate was insufficient too. Under this Court's caselaw, the government needed to show, among other things, that Fehrman had a fiduciary duty to protect AMT's "property" and that Borges sought to have Fehrman

breach that duty.[18] *See United States v. Frost*, 125 F.3d 346, 366 (6th Cir. 1997. This is because the wire fraud statute—even the honest services fraud statute—is a *property* crime. *See United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014).

The government did not identify a traditional property right, however. Instead, the government's theory was that Borges sought to bribe Fehrman for *information* about signatures collected. (*See* R. 238, Tr. 24-3834-35, PageID 9527-28). But "mere information" is not a property interest protected by the criminal fraud statutes. *Ciminelli v. United States*, 143 S. Ct. 1121, 1128 (2023). And as this Court has explained, "it [cannot] plausibly be said that the right to accurate information amounts to an interest that has long been recognized as property." *Sadler*, 750 F.3d at 591 (cleaned up). The information about signatures is not a property interest.

Nor did the government show that the disclosure of this information harmed AMT. A person violates the honest services statute if he

---

[18] As Justice Gorsuch has observed, "[n]othing in [18 U.S.C. § 1346] attempted to resolve when the duty of honest services arises, what sources of law create that duty, or what amounts to a breach of it." *Percoco v. United States*, 143 S. Ct. 1130, 1140 (2023) (Gorsuch, J., concurring).

56

reasonably contemplates that the victim will suffer "some concrete business harm." *Frost*, 125 F.3d at 368. AMT suffered no harm. It was paid $8 million for its work. (*See* R. 216, Tr. 15-2477, PageID 7511).

### 3. *The money laundering predicates fail.*

Absent any predicate that created "proceeds," the money laundering predicates cannot sustain the conviction.

## IV. The district court committed evidentiary errors.

### A. The standard of review is abuse of discretion.

This Court will reverse a district court's evidentiary decisions if the court abuses its discretion. *See, e.g.*, *United States v. Dunnican*, 961 F.3d 859, 871 (6th Cir. 2020). "Abuses of discretion in evidentiary rulings, however, merit reversal only if the error is not harmless—that is, only if the erroneous evidentiary ruling affected the outcome of the trial." *United States v. Farrad*, 895 F.3d 859, 875 (6th Cir. 2018) (cleaned up).

### B. The admission of two Title III recordings during Householder's cross-examination was erroneous.

Householder took the stand in his defense. During his cross-examination, the government sought to admit two Title III recordings of Householder and Clark: GX 906 and 913. (R. 229, Tr. 22-3567, PageID 8737); (*id.*, Tr. 22-3573-74, PageID 8743). In the first, GX 906, Householder says

57

that "we can f— them over later," apparently in reference to donors to Ryan Smith, one of his political rivals. (GX 906 at :50-53, App'x 25); (*see* R. 229, 22-3574, PageID 8744). And in the second, GX 913, Householder says, in reference to different political rivals, that "we like war" and "if you're going to f— with me, I'm going to f— with your kids." (GX 913 at :10-11, :24-27, App'x 26). Householder objected to the admission of GX 906 on relevance and 403 grounds, (R. 229, Tr. 22-3569-74, PageID 8739-44), but he did not object to the government publishing a couple minute clip of GX 913, (*id.*, Tr. 22-3566-67, PageID 8736-37).

It was error for the district court to admit these recordings. Although Householder objected on both relevance and 403 grounds, the district court did not address the substance of the objections. (*See* R. 229, Tr. 22-3574, PageID 8744 (asking for "further objections" and admitting the exhibit). The recordings were not relevant and even if they were, they were unduly prejudice under Evidence Rule 403.

*Relevance*. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[.]" Fed. R. Evid. 401(a). And "the fact [must be] of consequence in determining the action." Fed. R. Evid. 401(b). This Court has explained that in "a

58

criminal case, a fact is 'of consequence' if it makes it more or less likely that the defendant committed the charged conduct," but it need not "directly prove or disprove an element of the offense." *United States v. Hazelwood*, 979 F.3d 398, 409 (6th Cir. 2020). These recordings—just like the offensive recordings in *Hazelwood*—do not make it more likely that Householder engaged in a RICO conspiracy through bribery. Householder's vindictiveness toward his political rivals did not help the government prove any elements of the crime charged.

*403.* The recordings were also prejudicial under Rule 403. A court may exclude relevant evidence only if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. As the Court pointed in *Hazelwood*, if evidence is irrelevant—as the recordings are here—it cannot have any "probative value (other than character)," which is improper. 979 F.3d at 412. But setting that aside, even relevant evidence should be excluded if it has an "undue tendency to suggest a decision based on improper considerations." *Id.* (cleaned up). For example, evidence that "serves to inflame the passions of the jury" can be unfairly prejudicial, *id.*, as can evidence that invites the jury to "generaliz[e] a defendant's earlier bad act into bad character" and to "tak[e] that as

59

raising the odds that he did the latter bad act now charged." *United States v. Bell*, 516 F.3d 432, 445 (6th Cir. 2008).

The government invited the jury to convict based on improper considerations—that Householder was a vindictive "bully with a lust for power" (to use the district court's words from the sentencing hearing). (R. 285, Sent. Tr. 51, PageID 11218). That is of course is exactly why these recordings should have been excluded. It was irrelevant and prejudicial for the jury to hear that Householder wanted to "f— over" Ryan Smith's donors or that he was "going to f— with your kids." The district court erred, and its error was not harmless.

The timing of the admission of these recordings also compounded the danger of unfair prejudice. Householder was the last defense witness to testify, and the government put on one short rebuttal witness. These recordings were among the last pieces of evidence the jury heard.

**C.    The district court erred in permitting the government to tell the jury about Longstreth and Cespedes's guilty pleas.**

The district court erred in permitting the government to elicit testimony from Longstreth and Cespedes that those two witnesses pleaded guilty and were cooperating with the government. This error was

60

especially egregious given that Householder and Borges agreed that they would not impeach those witnesses with their plea agreements. (R. 181, Mot. to Exclude, PageID 4360). "Generally, the guilty plea or conviction of a co-defendant or co-conspirator is not admissible at trial, and such guilty pleas and convictions are never admissible as substantive evidence of the defendant's guilt." *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996). But this Court has explained that a guilty plea of a co-defendant "***may*** properly be considered as evidence of a witness' credibility." *United States v. Thornton*, 609 F.3d 373, 377 (6th Cir. 2010) (emphasis added). Thus, a "prosecutor may refer to [a plea] agreement in appropriate circumstances to deflect defendant's use of a plea agreement to *attack* the witness' credibility." *United States v. Tocco*, 200 F.3d 401, 416-17 (6th Cir. 2000); *see United States v. Townsend*, 796 F.2d 158, 162 (6th Cir. 1986) ("[T]he elicitation of the fact of the [plea] agreement and the witness' understanding of it . . . should be permitted on direct examination ***in order to anticipate cross-examination by the defendant*** which might give the jury the unjustified impression that the Government was concealing this relevant fact.") (emphasis added).

61

Therefore, "[i]n trials where defendants do not commit to give up attacking the witness's testimony with the cooperating plea agreement, there is [] logic to allow prosecutors to introduce the plea agreement in the prosecutor's direct examination." *United States v. Clark*, No. 1:19-cr-148, 2020 WL 830057, at *13 (N.D. Ohio Feb. 20, 2020) (holding the court erred in permitting the government to elicit evidence regarding co-defendants' guilty pleas). Conversely, however, "[w]hen a defendant offers to forgo a guilty-plea-based attack on a witness's credibility, the Court should not allow evidence of the witness's plea." *Id.* at *14; *accord United States v. Nosal*, No. CR-08-0237 EMC, 2013 WL 11327121, at *8 (N.D. Cal. Mar. 29, 2013) ("In this case, however, where the defendant has stipulated that he will not attack the credibility of the witnesses based on the plea deals, the probative value of the guilty pleas is minimal. The witnesses' credibility is not threatened because Defendant will not impeach on the basis of the pleas.").

Once the defense forgoes impeaching on the basis of a guilty plea, the relevance of the plea disappears. After all, the fact that a co-defendant pleaded guilty cannot be used to **bolster** his credibility: "Felony conviction questions are permitted 'to <u>attack</u> [ ] a witness's character for

truthfulness by evidence of a criminal conviction.' Rule 609 does not provide for supporting a witness's character for truthfulness with criminal conviction evidence." *Clark*, 2020 WL 830057, at *14 (quoting Fed. R. Evid. 609).

The district court's conclusion to the contrary was erroneous. It explained that "the existence of the plea speaks to the witness' credibility in general." (R. 298, Tr. 7, PageID 11667). Not so. Householder offered to stipulate that he would not impeach these witnesses with their guilty pleas—meaning the witnesses' credibility was never challenged with respect to their guilty pleas. After that promise, there was no permissible purpose to question Longstreth and Cespedes about their pleas. *See United States v. Walker*, 871 F.2d 1298, 1303 (6th Cir. 1989) (explaining that the "[a]dmissibility of the plea turns on the purpose for which it is offered"). It could not be to assess the witnesses' credibility because Householder promised not to impeach with the pleas. And, at any rate, the evidence rules only permit a criminal conviction to be used to "attack[] a witness's character for truthfulness." Fed. R. Evid. 609(a). The district court erred and abused its discretion in concluding that the

63

government could use the plea agreements to bolster their witnesses' credibility.

The district court's other proffered explanation is also erroneous. It held that, "by excluding references to the pleas and immunity deals, the jury will undoubtedly be left with the impression that Defendants Householder and Borges were the only individuals prosecuted, despite the witness' testimony professing their own guilt." (R. 298, Tr. 7, PageID 11667). But whether other persons were charged with or convicted of crimes is never relevant in a criminal case. *See* Pattern Crim. Jury Instr. 6th Cir. 2.01(3). In fact, before trial, the government argued that the defense should be precluded from presenting evidence that the government did not charge the alleged individual bribers—Jones and Dowling—with criminal offenses. (R. 138, Govt. MiL re Improper Argument, PageID 3761). And in simple terms, the district court's stated rationale was that the jury should consider Longstreth and Cespedes's guilty pleas as substantive evidence of Householder's guilt. That is improper.

Admission of a co-defendant's guilty plea is especially prejudicial in a conspiracy case "because the crime by definition requires the participation of another. The jury could not fail to appreciate the significance of

64

this and would realize, as the court said in a similar case, *United States v. Harrell*, 436 F.2d 606, 614 (5th Cir. 1970), that 'it takes two to tango.'" *United States v. Gullo*, 502 F.2d 759, 761 (3d Cir. 1974). After all, "a guilty plea entered by a codefendant can be especially prejudicial if the plea is made in connection with a conspiracy to which the remaining defendants are charged," as is the case here. *Thornton*, 609 F.3d at 378 (cleaned up). And "[t]here is a spillover risk of inferring Defendant's guilt simply from the pleas." *United States v. Nosal*, No. CR-08-0237 EMC, 2013 WL 11327121, at *8 (N.D. Cal. Mar. 29, 2013) (holding that co-defendant's guilty plea should be excluded under Rule 403).

At bottom, a plea agreement is not probative of any fact to be proven at trial. In fact, given Householder's promise that he would not impeach on this basis, the plea and cooperation agreements were only probative of improper evidence: guilt by association. The government used these agreements to brand the Defendants on trial, Householder and Borges, guilty by association. For example, the government asked Cespedes if he did "some things that were illegal" and if he pleaded guilty to "[c]onspiracy to racketeer." (R. 211, Tr. 1862-63, PageID 6746-47). And it similarly asked Longstreth if he was charged with racketeering and if he pleaded

65

guilty to that offense. (R. 217, Tr. 2560, PageID 7594). That type of evidence is improper and should have been excluded.

### D. The district court's evidentiary errors were not harmless.

The district court's errors, taken together, were prejudicial to Householder's defense and were not harmless. "[T]he government must show *by a preponderance of the evidence* that the error did not materially affect the verdict." *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). And when a district court errors multiply, the "the cumulative effect of these errors" may render the trial fundamentally unfair. *United States v. Adams*, 722 F.3d 788, 832 (6th Cir. 2013).

As explained above, the district court's errors were not harmless. The district court permitted the jury to hear inflammatory recordings of Householder—some of the last evidence the jury heard—and that two of the witnesses pleaded guilty to conspiring with Householder. These errors were not harmless.

66

**V.    The district court erred in sentencing Householder to the maximum sentence permitted by law.**

**A.    The standard of review is de novo and abuse of discretion.**

This Court reviews a sentence for both procedural and substantive reasonableness under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). The Court reviews a district court's legal conclusions regarding the Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. Moon*, 513 F.3d 527, 539-40 (6th Cir. 2008).

A sentence may be procedurally unreasonable if the district court improperly calculates the applicable guidelines range, selects a sentence based on clearly erroneous facts, or fails to adequately explain the chosen sentence. *Gall*, 552 U.S. at 51.

**B.    The district court's maximum sentence is procedurally unreasonable.**

At sentencing, the district court applied a 22-level Guidelines enhancement, adding more than 10 years to what otherwise would have been a 5–7-year range. It did so by finding that all the monies contributed to Generation Now were bribes. That was error.

{01997861-1}

The district court compounded that error by adding an additional 2 levels because it found that Householder's trial testimony was perjurious. That too was error.

1. The value of the bribe is not $60 million. Under the Guidelines, "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500," the court must increase the offense level using the loss table in § 2B1.1. U.S.S.G. § 2C1.1(b)(2). Probation found, as did the district court, that all the contributions made by FirstEnergy and FES to Generation Now "represents payment for a benefit received." (R. 277, PSR ¶ 51, PageID 10966). That is wrong and is not supported by the evidence.

The government needed demonstrate that each payment, all $60 million, represents a bribe—that is, a quid pro quo. "[A] bribery offense sentenced pursuant to § 2C1.1 requires this type of quid pro quo." *United States v. Jones*, 260 F. App'x 873, 877 (6th Cir. 2008). In other words, the government must show that *each* payment was made in return for some specific official action and that Householder promised specific official

68

action "at the time he receive[d] payment or other things of value." *United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022). The Guidelines require this result. *See* U.S.S.G. § 2C1.1 cmt. n.2 ("[T]he applicable amounts under subsection (b)(2) … are determined *separately* for *each* incident and then added together.") (emphasis added). And the government bore the burden to prove the amount of the bribes at sentencing. *See, e.g.*, *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011).

The district court gave this short shrift at sentencing. It held that because it "heard all of the evidence" that it could "say with absolute certainty that the government has met its burden as to the entirety of the contributions. Whether from FirstEnergy Corp., FirstEnergy Solutions, Partners For Progress, it doesn't matter, it was FirstEnergy money in one form or another, it was a bribe for House Bill 6, and Mr. Householder understood that without question." (R. 285, Sent. Tr. 13, PageID 11180). That's all the district court offered to justify its finding that contributions to a 501(c)(4) organization spread over a three-year period were all bribes "for House Bill 6"—even though most of the contributions postdated Governor DeWine signing that bill into law in July 2019. *See, e.g.*, (GX 16, App'x 2) (showing that FirstEnergy contributed about $40 million of the

69

$60 million after August 7, 2019). This improperly raised Householder's offense level by 22.

It was foundationally the government's burden to prove that each contribution was a bribe to justify raising Householder's offense level. The government did not carry this burden. But the district court did not hold the government to that burden; instead, it simply painted with a broad brush and assumed that each contribution was a bribe. That was error.

"An error with respect to the loss calculation is a procedural infirmity that typically requires remand." *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010). Here, the district court's error raised Householder's Guidelines' offense level by 22 levels. This Court should reverse his sentence.

2. The district court also erred by finding Householder's trial testimony perjurious and imposing § 3C1.1's 2-level obstruction adjustment. When a defendant objects to the obstruction enhancement, district courts must follow a specific process if they seek to impose the enhancement on the ground that the defendant lied at trial. *See United States v. Dunnigan*, 507 U.S. 87, 95 (1993). The district court must identify—either

70

expressly or by obvious implication—the statements in the defendant's testimony that the court considers perjurious. *See United States v. Sassanelli*, 118 F.3d 495, 501 (6th Cir. 1997). And the court must make either specific findings that the statements meet each perjury element or a general finding that covers all the specific elements. *See Dunnigan*, 507 U.S. at 95. This process exists to protect a defendant's right to testify at trial. *See id.* at 96–97.

The district court did not follow this process. In just two short paragraphs of the sentencing transcript, the district court overruled Householder's objection to the enhancement. (R. 285, Sent. Tr. 15-16, PageID 11182-83). The court said it found "certain aspects of Mr. Householder's testimony that were unequivocally false," including "his whereabouts and activities during the DC trip; his knowledge of, or involvement with, and control over Generation Now; and his interactions with FirstEnergy executives, just to name a few." (*Id.*).[19] It did not make the specific perjury findings that this Court's cases require.

_____

[19] The PSR, however, only identified Householder's testimony "about what happened on January 18, 2017 and his contact with [Dowling] during his trip to Washington DC for the presidential inauguration in January 2017" as the factual basis for the obstruction enhancement. (R. 277, PSR ¶ 58, PageID 10967).

71

3. The district court erred in failing to explain why it discounted Householder's argument that applying the loss table was unreasonable. When "a defendant argues that the application of a particular guideline-approved practice in a specific case produces a sentencing range that is unnecessarily high, the defendant has raise[d] substantial particularized issues well beyond a simple . . . argument that a sentencing range is excessive." *United States v. Thomas-Mathews*, 81 F.4th 530, 544 (6th Cir. 2023) (cleaned up). And if this "argument is 'nonfrivolous,' the district court should address it expressly." *Id.*; *see also Rita v. United States*, 551 U.S. 338, 357 (2007) (if a defendant "argues that the Guidelines reflect an unsound judgment" a district court must provide some explanation for rejecting the argument).

Here, Householder argued that the "Guidelines vastly overstate[d] the seriousness" of his offense. (R. 279, Householder Sent. Mem., PageID 11038). This was because applying the loss table to his offense increased his offense level by 22 levels, and Householder urged the court to exercise its discretion "when deciding whether or not to follow the sentencing advice that guideline provides." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). And Householder preserved

72

this objection both before and after the court announced its sentence. (R. 285, Sent. Tr. 12, PageID 11179); (*id.*, PageID 11222).

The district court, however, ignored that argument at sentencing. If a defendant "presents nonfrivolous reasons for imposing a different sentence," the "judge should address the parties' arguments and explain why he has rejected those arguments." *United States v. Peters*, 512 F.3d 787, 789 (6th Cir. 2008) (cleaned up). Because the judge failed to do so here, his sentence is procedurally unreasonable.

\*      \*      \*

Because the district court improperly calculated Householder's total offense level and its sentence was procedurally unreasonable, this Court should remand for resentencing.

## C. The district court's maximum sentence was substantively unreasonable too.

Even if this Court overrules Householder's procedural reasonableness argument, it should find that his sentence—a 20-year maximum sentence—is substantively unreasonable. A sentence may be substantively unreasonable if it is "greater than necessary" when juxtaposed against the sentencing factors of 18 U.S.C. § 3553(a). *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766-67 (2020).

73

As another district judge remarked in sentencing a public corruption case, "I've rarely seen an individual get the statutory maximum, as did Mr. Householder." Bill Bush, *Under appeals court order, federal judge sentences John Raphael to 6 months in prison*, Columbus Dispatch, https://www.dispatch.com/story/news/local/2023/07/11/democratic-operative-john-raphael-resentenced-to-serve-six-months-in-federal-prison-for-bribery/70398485007/ (July 11, 2023). That's no accident. The district court here only arrived at the maximum sentence by improperly weighing the § 3553(a) factors.

Although Householder was 64 years old at sentencing, the district court largely discounted that a lengthy term of incarceration would have a minimal impact on specific deterrence. This Court has explained as much: "observers of the criminal justice system have long acknowledged the key argument that elderly offenders pose so low a risk to the public that long or otherwise harsh sentences have little to no utilitarian benefit." *United States v. Payton*, 754 F.3d 375, 379 (6th Cir. 2014) (vacating 45-year sentence) (internal citations omitted). True, the district court found that Householder's "risk of recidivism" to be "on the low end," but for some reason, the court "can't say it's entirely diminished." (R. 285,

74

Sent. Tr. 53, PageID 11220). But imposing a 20-year prison sentence, like in *Payton*, has no utilitarian benefit—especially because Householder's conviction bars him from running for public office again in Ohio. *See* Ohio Rev. Code § 2961.02.

Likewise, the district court gave short shrift to the sentencing disparities it was creating. As Householder pointed out, defendants in the vast majority of public corruption cases received less than a 10-year sentence. (*See* R. 279, Householder Sent. Mem., PageID 11055-56). Moreover, the district court's lengthy sentence of Householder created a disparity with his co-defendants. *See United States v. Presley*, 547 F.3d 625, 631 (6th Cir. 2008) (district court may account for disparities between co-defendants). Borges received a 5-year prison sentence, and the government agreed to recommend prison sentences of no more than 6 months for Longstreth and Cespedes.

Instead, the district court relied on a handful of cases the government supplied. (*See* R. 285, Sent. Tr. 53, PageID 11220); (R. 278, Govt. Sent. Mem., PageID 11012) (listing five comparators). The President

commuted two of those defendants' sentences.[20] Even so, the district court did not explain why it found these sentences comparable.

The district court's maximum sentence was substantively unreasonable.

## VI. There was an appearance of impropriety, and the district judge should have recused himself.

The Due Process Clause of the Fifth Amendment requires a "fair trial in a fair tribunal before a judge with no actual bias against the defendant." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (cleaned up). Under the Due Process Clause, "recusal is required when, objectively speaking, the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam) (cleaned up). Courts ask "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be

---

[20] *Statement from the Press Secretary Regarding Executive Grants of Clemency*, White House, https://trumpwhitehouse.archives.gov/briefings-statements/statement-press-secretary-regarding-executive-grants-clemency-012021/ (Jan. 20, 2021) (commuting Kwame Kilpatrick sentence); Executive Grant of Clemency, https://www.justice.gov/pardon/page/file/1250016/download (last visited Feb. 26, 2024) (commuting Rod Blagojevich's sentence).

76

neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (cleaned up). Because "[b]oth the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself," an unconstitutional failure to recuse is structural error and thus not amenable to harmless-error review. *Id.* at 16.

Additionally, under federal law, a federal judge must "disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). And judges must also recuse themselves when they have "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *Id.* § 455(b)(1).

The judge who presided over Householder's trial is the Honorable Timothy S. Black. Before serving on the federal bench, Judge Black twice ran and lost for an elected seat on the Supreme Court of Ohio, in 2000 and 2002.[21] When Judge Black ran for the Supreme Court, Householder

---

[21] 2000 Election Results, *Ohio Supreme Court—Term Beginning January 1, 2001: November 7, 2000*, Ohio Sec'y of State, https://www.ohiosos.gov/elections/election-results-and-data/2000-elections-results/ohio-supreme-court---term-beginning-january-1-2001-november-7-2000 (last

77

was the then-Speaker of the Ohio House of Representatives, and he opposed Judge Black's election. *See, e.g.*, Jon Craig & Katy Waters, *Ohio Supreme Court; Battle of Independent TV Ads Gets Even Uglier*, Columbus Dispatch, Nov. 1, 2002 at 1A.[22] But more than that: in 2002, Householder helped raise money for an advocacy group called Informed Citizens of Ohio that backed Republican Supreme Court candidates and did not disclose its donors. *See* Jon Craig, *Political-action committees make supreme court plans*, The Columbus Dispatch, Sept. 28, 2002, at 3C[23]; T.C. Brown, *Celeste ex-aide works for secretive GOP court group*, Plain Dealer, Sept. 6, 2002 at B2[24] ("Republican Speaker Larry Householder has said he will help the group raise money from donors who will remain secret."). And, in 2000, Householder raised money for an issue-advocacy group called Citizens for a Strong Ohio, which did not disclose its donors

---

visited Feb. 19, 2024); 2002 Election Results, *Justices of the Supreme Court of Ohio*, Ohio Sec'y of State, https://www.ohiosos.gov/elections/election-results-and-data/2002-elections-results/justices-of-the-ohio-supreme-court/ (last visited Feb. 19, 2024).

[22] Available at https://plus.lexis.com/api/permalink/682fb877-06d2-4014-bba3-776649394e47/?context=1530671.

[23] Available at https://plus.lexis.com/api/permalink/edbfe236-401c-41be-a4d8-5243f2aca8a4/?context=1530671.

[24] Available at https://plus.lexis.com/api/permalink/bd793cc1-629b-4984-83a8-d9d69136bda3/?context=1530671.

78

and ran negative advertisements against one of the Democrats who was running for the Supreme Court that year. *See* William Hershey, *Some Try to Shine Public Disclosure Light on Campaigns*, Dayton Daily News, Feb. 4, 2001.[25]

For his part, Judge Black publicly expressed outrage that these groups would spend money to help defeat his campaigns for the Ohio high court. "The *same groups* have pledged to spend millions on this election again, *attacking me* and distorting my record." John McCarthy, *Candidate pledges to shun outside help*, Associated Press (Feb. 28, 2002)[26] (emphases added and quoting Judge Black). At sentencing here, Judge Black told Householder that while "negative campaign ads are not unlawful," "*I* know that politics can be a dirty game sometimes." (R. 285, Sent. Tr. 48-49, PageID 11215-16) (emphasis added).

During trial, Householder's counsel explained that they "collectively believe that the Court holds animosity towards us" and concluded that it may be premised on Judge Black's Ohio Supreme Court campaigns

---

[25] Available at https://plus.lexis.com/api/permalink/c762ca04-89bc-40c6-8326-53ac31bc76ed/?context=1530671.

[26] Available at https://plus.lexis.com/api/permalink/6ab987f9-cb5b-4350-81ce-074ada8fcd44/?context=1530671.

during which "Mr. Householder was very active in raising money for a 501(c)(4) that was critical of [Judge Black's] campaign." (R. 197, Tr. 389-90, PageID 4948-49). And Householder's counsel asked "if the Court holds personal animosity towards Mr. Householder and, hence, his team? And if that's the case, I'm questioning whether the Court should be presiding over this case?" (R. 197, Tr. 390, PageID 4949). Without disputing the factual assertions in the record, Judge Black simply said that the "answer to your question is no." (*Id.*).

Because there was an appearance of impropriety, Judge Black's failure to recuse is structural error. Whether Judge Black actually harbored a subjective bias against Householder is immaterial. The question is not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, "the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009). The Due Process Clause requires recusal "when the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.* at 872 (cleaned up). The Court framed the inquiry as "whether, under a realistic appraisal of psychological tendencies and

80

human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.* at 883-884 (cleaned up).

Due Process required Judge Black's recusal under these standards. Householder—twice—opposed Judge Black's election to the Ohio Supreme Court. And he did so in ways that were similar to some of the government's allegations here: raising money into an issue advocacy group that did not disclose its donors. For his part, Judge Black, during those campaigns, expressed dismay that these groups raised money and "attack[ed] me and distort[ed] my record." John McCarthy, *Candidate pledges to shun outside help*, Associated Press (Feb. 28, 2002) (quoting Judge Black). Under the objective standard the Supreme Court established in *Caperton*, "the average judge in" Judge Black's position would be unlikely to be neutral and there was certainly a "potential for bias." 556 U.S. at 881. As in *Caperton*, the judge should have recused; his failure to do so is structural error.

The Court should reverse and remand for a new trial before a different federal district court judge.

81

## CONCLUSION

The Court should reverse Householder's conviction and either remand for a new trial or with instructions to enter a judgment of acquittal. Alternatively, the Court should vacate Householder's sentence and remand for resentencing.

Dated: February 26, 2024          Respectfully submitted,

*/s/ Steven L. Bradley*
Steven L. Bradley (0046622)
MAREIN & BRADLEY
526 Superior Avenue, Suite 222
Cleveland, Ohio 44114
Phone: (216) 781-0722
Email: steve@mareinandbradley.com

*/s/ Nicholas R. Oleski*
Nicholas R. Oleski (0095808)
MCCARTHY, LEBIT, CRYSTAL
  & LIFFMAN CO., LPA
1111 Superior Avenue East
Suite 2700
Cleveland, Ohio 44114
Phone: (216) 696-1422
Email: nro@mccarthylebit.com

*Counsel for Larry Householder*

{01997861-1}

## CERTIFICATE OF COMPLIANCE

This brief contains 16,009 words, excluding the parts of the brief exempted by Rule 32(f), and the undersigned filed a motion for leave to file an oversized brief (Dkt. 21), which is pending before the Court. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Nicholas R. Oleski*
Nicholas R. Oleski

*Counsel for Larry Householder*

83

## CERTIFICATE OF SERVICE

I certify that on February 26, 2024, I filed the foregoing electronically with the Clerk of the United States Court of Appeals for the Sixth Circuit. The Court's ECF system will automatically generate and send by email a Notice of Docket Activity to all registered attorneys currently participating in this case, constituting service on those attorneys.

*/s/ Nicholas R. Oleski*
Nicholas R. Oleski

*Counsel for Larry Householder*

84

## DESIGNATION OF
## RELEVANT DISTRICT COURT DOCUMENTS

| R. | Description | Page ID |
|---|---|---|
| 5 | Redacted Complaint | 91-172 |
| 22 | Indictment | 1247-1289 |
| 63 | Juan Cespedes Plea Agreement | 1415-1421 |
| 64 | Jeffrey Longstreth Plea Agreement | 1422-1428 |
| N/A | Minute Entry as to Juan Cespedes (10/29/2020) | N/A |
| N/A | Minute Entry as to Jeff Longstreth (10/29/2020) | N/A |
| 78 | Generation Now Plea Agreement | 1558-1565 |
| N/A | Minute Entry as to Generation Now, Inc. (02/19/2021) | N/A |
| 88 | Order Granting Motion to Dismiss Neil Clark | 1591 |
| 104 | Motion to Strike Prejudicial Surplusage from Indictment by Matthew Borges | 1734-1753 |
| 105 | Motion to Dismiss the Indictment by Larry Householder | 1754-1770 |
| 107 | Motion to Strike Surplusage from Indictment by Larry Householder | 1784-1791 |
| 110 | Response in Opposition to Motion to Strike Surplusage | 2534-2536 |
| 112 | Response in Opposition to Motion to Dismiss Indictment | 2548-2584 |
| 113 | Response in Opposition to Motion to Strike Prejudicial Surplusage | 2585-2606 |

85

| R. | Description | Page ID |
|---|---|---|
| 115 | Reply to Response to Motion to Stike Prejudicial Surplusage | 3356-3376 |
| 116 | Reply to Response to Motion to Dismiss Indictment | 3377-3390 |
| 117 | Reply to Response to Motion to Sever Defendant | 3391-3394 |
| 122 | Notice of Disclosure of Subjects of Potential Expert Testimony | 3456-3457 |
| 129 | Motion to Exclude Irrelevant and Inadmissible Expert Testimony | 3580-3594 |
| 133 | Response in Opposition to Motion to Exclude Expert Testimony | 3730-3741 |
| 135 | Reply to Response to Motion to Exclude Expert Testimony | 3744-3748 |
| 138 | Motion in Limine to Preclude Argument and Evidence Supporting Jury Nullification | 3759-3772 |
| 141 | Motion in Limine to Exclude Certain Alleged Co-Conspirator Hearsay | 3788-3798 |
| 142 | Motion in Limine to Exclude Certain Prejudicial Evidence and Argument | 3799-3806 |
| 144 | Response in Opposition to Motion in Limine to Exclude Certain Alleged Co-Conspirator Hearsay | 3811-3830 |
| 145 | Response in Opposition to Motion in Limine to Exclude Certain Prejudicial Evidence and Argument | 3831-3834 |
| 150 | Response in Opposition to Motion in Limine to Preclude Argument n Evidence Supporting Jury Nullification | 3853-3863 |

86

| R. | Description | Page ID |
|---|---|---|
| 153 | Reply to Response to Motion in Limine to Preclude Argument and Evidence Supporting Jury Nullification | 3876-3884 |
| 157 | Reply to Response to Motion in Limine to Exclude Certain Prejudicial Evidence and Argument | 3900-3903 |
| 158 | Reply to Response to Motion in Limine to Exclude Certain Alleged Co-Conspirator | 3904-3908 |
| 159 | Notice of Supplemental Authority in Support of Motion to Dismiss Indictment | 3909-3911 |
| 160 | Notice of Government's Response to Defendant Householder's Supplemental Authority in Support of Motion to Dismiss Indictment | 3912-3913 |
| 161 | Order resolving Motions in Limine | 3914-3937 |
| 168 | Order Resolving Parties' Motions to Exclude/Limit Testimony of Expert Witnesses | 3945-3970 |
| 172 | Order Denying Motion to Dismiss as to Larry Householder | 4003-4015 |
| 174 | Proposed Jury Instructions by Larry Householder, Matthew Borges | 4030-4118 |
| 175 | Proposed Jury Instructions by USA | 4119-4164 |
| 177 | Trial Brief by USA | 4310-4335 |
| 178 | Response to Trial Brief | 4336-4347 |

| R. | Description | Page ID |
|---|---|---|
| 180 | Final Pretrial Order | 4349-4359 |
| 181 | Motion to Exclude Plea Agreements, Cooperation Agreements, and Immunity Orders | 4360-4369 |
| 182 | Transcript of Proceedings, Final Pretrial Conference | 4370-4461 |
| 184 | Response in Opposition as to Motion to Exclude | 4464-4474 |
| 187 | Reply to Response in Opposition as to Motion to Exclude | 4482-4494 |
| N/A | Minute Entry for voir dire (01/20/2023) | N/A |
| 191 | Trial Transcript Day 1 | 4512-4677 |
| 192 | Notice of Objections to Proposed Jury Instructions by USA | 4678-4692 |
| 193 | Notice of Defendants' Objections to Government's Proposed Jury Instructions | 4693-4712 |
| 194 | Trial Transcript Day 2 | 4713-4926 |
| N/A | Not. Order, Jan. 29, 2023 | N/A |
| 197 | Trial Transcript Day 3 | 4940-5145 |
| 198 | Trial Transcript Day 4 | 5146-5352 |
| 199 | Trial Transcript Day 5 | 5353-5494 |
| 201 | Trial Transcript Day 6 | 5500-5692 |
| 202 | Trial Transcript Day 7 | 5693-5825 |

88

| R. | Description | Page ID |
|---|---|---|
| 205 | Trial Transcript Day 8 | 5939-6065 |
| 206 | Trial Transcript Day 9 | 6066-6269 |
| 208 | Trial Transcript Day 10 | 6474-6638 |
| 211 | Trial Transcript Day 11 | 6642-6853 |
| 212 | Trial Transcript Day 12 | 6854-7037 |
| 213 | Trial Transcript Day 13 | 7038-7112 |
| 214 | Trial Transcript Day 14 | 7113-7264 |
| 216 | Trial Transcript Day 15 | 7415-7542 |
| 217 | Trial Transcript Day 16 | 7543-7736 |
| 219 | Trial Transcript Day 17 | 7804-7980 |
| 220 | Trial Transcript Day 18 | 7981-8047 |
| 224 | Trial Transcript Day 19 | 8110-8258 |
| 225 | Trial Transcript Day 20 | 8259-8378 |
| 226 | Proposed Jury Instructions by Larry Householder | 8379-8381 |
| 227 | Proposed Jury Instructions by USA | 8382-8385 |
| 228 | Trial Transcript Day 21 | 8386-8612 |
| 229 | Trial Transcript Day 22 | 8613-8818 |

89

| R. | Description | Page ID |
|---|---|---|
| 237 | Trial Transcript Day 23 | 9342-9462 |
| 238 | Trial Transcript Day 24 | 9463-9618 |
| 239 | Trial Transcript Day 25 | 9619-9662 |
| 240 | Trial Transcript Day 26 | 9663-9673 |
| 260 | Jury Instructions | 10572-10645 |
| 261 | Jury Verdict as to Larry Householder | 10646 |
| 263 | Jury Verdict as to Matthew Borges | 10648 |
| 278 | Sentencing Memorandum by USA as to Larry Householder | 10995-11031 |
| 279 | Sentencing Memorandum by Larry Householder | 11032-11073 |
| 283 | Supplemental Memorandum Supporting Sentencing Memorandum by Larry Householder | 11137-11156 |
| 284 | Order Denying Motion to Strike as to Matthew Borges | 11157-11167 |
| 285 | Transcript of Proceedings as to Larry Householder Sentencing Hearing | 11168-11225 |
| 286 | Transcript of Proceedings as to Matthew Borges Sentencing Hearing | 11226-11284 |
| 288 | Judgment as to Larry Householder | 11308-11314 |
| 292 | Am. Order Completing the Record | 11330-11331 |

90

| R. | Description | Page ID |
|---|---|---|
| 292-1 | Am. Order Completing the Record Attachment A | 11537-11628 |
| 292-2 | Am. Order Completing the Record Attachment B | 11629-11649 |
| 293 | Notice of Appeal | 11650-11651 |
| 298 | Transcript of Proceedings, voir dire | 11661-11893 |

{01997861-1}