No. 23-3565

In the
# United States Court of Appeals
## for the Sixth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LARRY HOUSEHOLDER,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Ohio
No. 1:20-cr-77 (Black, J.)

**BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES**

For the Appellee:

KENNETH L. PARKER
United States Attorney

ALEXIS J. ZOUHARY
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

# TABLE OF CONTENTS

Table of Authorities ................................................................. vi

Statement Regarding Oral Argument ...................................xiii

Statement of Jurisdiction........................................................ 1

Issues Presented ...................................................................... 2

Statement of the Case .............................................................. 3

    A. Factual Background .................................................... 4

        1.   Householder sets his sights on Speaker ............................ 4

        2.   FirstEnergy needs a billion-dollar bailout......................... 4

        3.   Householder hires Longstreth to manage his bid for Speaker........................................................................ 5

        4.   Householder and FirstEnergy make a secret deal. ........... 6

        5.   FirstEnergy pays Householder $1 million......................... 8

        6.   Householder uses Generation Now for his benefit............ 9

        7.   FirstEnergy continues to fund Generation Now ............. 11

        8.   FES declares bankruptcy, then funnels $500,000 to Generation Now .................................................... 14

        9.   Householder is elected Speaker ...................................... 16

       10.  HB 6 is introduced and assigned to the new energy-generation subcommittee ................................................. 16

11. HB 6 encounters opposition, and FirstEnergy funnels more money into Generation Now ................................... 18

12. Householder pressures House members to vote "yes" ..... 19

13. The House passes HB 6 .................................................... 20

14. The legislature passes HB 6, and opponents pursue a referendum to repeal it ...................................................... 21

15. FirstEnergy pays Householder to preserve the bailout ... 22

16. Householder oversees a multi-prong plan to preserve the bailout ...................................................................... 25

    a. Pressuring Attorney General Yost .............................. 25

    b. Drafting new legislation ............................................. 26

    c. Thwarting the signature collection ............................. 26

17. The ballot referendum fails .............................................. 27

18. Householder continues to build his political machine with secret FirstEnergy money ......................................... 28

19. Clark coordinates with Householder to corruptly solicit additional bribes for gaming legislation. .......................... 29

20. Householder solicits more money from FirstEnergy ........ 30

B. Federal Proceedings .................................................... 31

    1. Trial Proceedings .............................................. 32

    2. Dismissal of Juror .............................................. 33

    3. Defense Case ...................................................... 36

4.    Jury Instructions ................................................. 38

5.    Verdict and Sentence ......................................... 39

Summary of Argument ........................................................ 41

Argument .............................................................................. 43

I.    The evidence was sufficient. ................................... 43

A.  Public Official Bribery ..................................... 44

1.    The evidence was sufficient to establish an
explicit quid pro quo .................................. 44

2.    Householder's contrary arguments misapply the
law. ............................................................ 55

B.  Money Laundering .......................................... 58

C.  Private Citizen Bribery ................................... 58

II.   The dismissal of Juror 4 for reasonable cause did not
implicate Householder's right to counsel, much less
constitute reversible error ..................................... 59

A.  The district court dismissed Juror 4 for reasonable
cause. ............................................................. 59

B.  The district court communicated its reasons for
dismissing Juror 4 and afforded defense counsel an
opportunity to be heard. ................................. 62

C.  Any error related to the dismissal would be harmless,
in any event. ................................................... 64

III.  The district court properly instructed the jury; and any
instructional error would be harmless ................... 68

A.  The bribery instructions were consistent with
    controlling law. ................................................. 68

    1.  The federal bribery instructions properly required
        proof of a quid pro quo ................................. 68

    2.   The federal bribery instructions did not permit
        the jury to find bribery based on an open-ended
        promise ...................................................... 71

    3.  The federal bribery instructions properly permitted
        the jury to find bribery based on circumstantial
        evidence. .................................................... 74

    4.  The state bribery instructions were not required to
        incorporate the specific elements of federal bribery
        statutes. .................................................... 75

    5.   Any error would be harmless. ................................... 80

B.  The district court did not abuse its discretion in giving
    an instruction regarding the limited use of prior
    inconsistent statements; and any error
    would be harmless. ........................................... 84

IV.  The district court properly admitted the challenged
     evidence; and any error would be harmless ........................ 89

    A.  Householder's Prior Statements ................................... 89

    B.  Co-Conspirator Testimony ....................................... 91

    C.  Cumulative Error .............................................. 93

V.  The district court imposed a procedurally and
    substantively reasonable sentence. ................................ 94

    A.  Procedural Reasonableness ....................................... 94

1.    Value of Bribe ............................................. 94

2.    Obstruction of Justice ................................. 96

3.    Mitigation Argument .................................. 97

B.    Substantive Reasonableness ............................ 98

VI.    The district court judge did not err by failing to sua
sponte recuse himself. ......................................... 100

VII.    Householder waived his right-to-counsel claim, which
does not constitute reversible plain error, in any event.... 103

A.    Householder waived the issue by failing to raise it in
his principal brief. ....................................... 105

B.    Even if not waived, Householder cannot establish
plain error. ............................................. 106

1.    The district court did not plainly limit the right
to counsel ............................................. 106

2.    Householder has not shown an actual deprivation
of counsel, much less a plain or obvious
deprivation affecting his substantial rights ........... 108

3.    Any error did not seriously affect the fairness,
integrity, or public reputation of the judicial
proceedings ........................................... 111

Conclusion .......................................................... 113

Certificate of Compliance ...................................... 114

Designation of Relevant District Court Documents ........... 115

Certificate of Service ........................................... 117

# TABLE OF AUTHORITIES

<u>Cases:</u>

*Bailey v. Redman*, 657 F.2d 21 (3d Cir. 1981) ..................................... 110

*Beckham v. Crews*, 515 F. App'x 355 (6th Cir. 2013) .......................... 109

*Callanan v. United States*, 881 F.2d 229 (6th Cir. 1989) .................... 83

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ..................... 102

*Edwards v. Burt,* 823 F. App'x 326 (6th Cir. 2020) ......................... 64, 65

*Evans v. United States*, 504 U.S. 255 (1992) ................................. passim

*Fed. Election Comm'n v. Colorado Republican Fed. Campaign
    Comm.*, 533 U.S. 431 (2001) ............................................................ 79

*Florida v. Nixon*, 543 U.S. 175 (2004) .................................................. 64

*Gall v. United States*, 552 U.S. 38 (2007). ............................................ 94

*Geders v. United States*, 425 U.S. 80 (1976) ....................... 108, 109, 112

*Gordon v. Lafler*, 710 F. App'x 654 (6th Cir. 2017) ............................ 102

*Hudson v. Jones*, 351 F.3d 212 (6th Cir. 2003) ............................... 66–67

*Inland Bulk Trans. Co. v. Cummins Engine Co.*, 332 F.3d 1007
    (6th Cir. 2003) .............................................................................. 101

*Jackson v. Virginia*, 443 U.S. 307 (1979). ............................................ 55

*Johnson v. United States,* 520 U.S. 461 (1997) ........................... 100, 111

*Mayberry v. Pennsylvania*, 400 U.S. 455 (1971) ................................. 102

*McCormick v. United States*, 500 U.S. 257 (1991) ........................ passim

*McDonnell v. United States*, 579 U.S. 550 (2016) .............. 68, 71, 77, 84

*Mudd v. United States*, 798 F.2d 1509 (D.C. Cir. 1986) .................... 110

*Musacchio v. United States*, 577 U.S. 237 (2016)................................. 44

*Neder v. United States*, 527 U.S. 1 (1999) ...................................... 81, 83

*Olszewski v. Spencer,* 466 F.3d 47 (1st Cir. 2006)................................ 65

*Perry v. Leeke*, 488 U.S. 272 (1989)............................................. 104, 108

*Puckett v. United States*, 556 U.S. 129 (2009)............................ 109, 111

*Railey v. Webb,* 540 F.3d 393 (6th Cir. 2008) ..................................... 100

*Rippo v. Baker*, 580 U.S. 285 (2017) .......................................... 101–102

*Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018) .................. 112

*Ryan v. United States*, 688 F.3d 845 (7th Cir. 2012) ........................... 82

*Skilling v. United States*, 561 U.S. 358 (2010)..................................... 68

*Snyder v. United States*, 144 S.Ct. 1947 (June 26, 2024) .................... 73

*Stubbs v. Bordenkircher*, 689 F.2d 1205 (4th Cir. 1982) ................... 110

*United States v. Bankston*, 820 F.3d 215 (6th Cir. 2016) ................... 100

*United States v. Barnett*, 660 F. App'x 235 (4th Cir. 2016) ................ 76

*United States v. Benjamin*, 95 F.4th 60 (2d Cir. 2024)............. 56, 74, 75

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015)................. 56

*United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994) .......... 45, 56, 57

*United States v. Bravata,* 636 F. App'x 277 (6th Cir. 2016) ................ 61

*United States v. Brown*, 571 F.2d 980 (6th Cir. 1978) ..........................66

*United States v. Cavallo*, 790 F.3d 1202 (11th Cir. 2015) .................109

*United States v. Cisell,* 700 F.2d 338 (6th Cir. 1983)...........................76

*United States v. Cobb*, 905 F.2d 784 (4th Cir. 1990)..........................110

*United States v. Colón-De Jesús*, 85 F.4th 15 (1st Cir. 2023).............107

*United States v. Cotton*, 535 U.S. 625 (2002) ......................................111

*United States v. Cronic,* 466 U.S. 648 (1984) .................................. 64, 65

*United States v. Curry*, 536 F.3d 571 (6th Cir. 2008) ........................... 98

*United States v. Deitz*, 577 F.3d 672 (6th Cir. 2009) ............................ 93

*United States v. De Oleo,* 697 F.3d 338 (6th Cir. 2012) ............ 59–60, 61

*United States v. DiSantis*, 565 F.3d 354 (7th Cir. 2009) ...................... 90

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004).................... 106

*United States v. Dunnigan*, 507 U.S. 87 (1993). .................................. 97

*United States v. Ehmer*, 87 F.4th 1073 (9th Cir. 2023) ................. 65, 67

*United States v. Emmons*, 8 F.4th 454 (6th Cir. 2021). ....................... 43

*United States v. Fowler*, 535 F.3d 408 (6th Cir. 2008)......................... 44

*United States v. Gay*, 522 F.2d 429 (6th Cir. 1975) ........................ 66, 67

*United States v. Hills,* 27 F.4th 1155 (6th Cir. 2022) ............... 44, 46, 71

*United States v. Jackson*, 72 F.3d 1370 (9th Cir. 1995)....................... 77

*United States v. Johnson*, 440 F.3d 832 (6th Cir. 2006) ...................... 77

*United States v. Khoury*, 62 F.3d 1138 (9th Cir. 1995)......................... 65

*United States v. Lawrence*, 308 F.3d 623 (6th Cir. 2002). .................... 96

*United States v. Licavoli*, 725 F.2d 1040 (6th Cir. 1984)............... 75–76

*United States v. Lindsey*, 634 F.3d 541 (9th Cir. 2011) ....................... 66

*United States v. Mahbub*, 818 F.3d 213 (6th Cir. 2016) .................... 111

*United States v. Menendez*, 291 F. Supp. 3d 606 (D.N.J. 2018). .......... 57

*United States v. McCabe,* 103 F.4th 259 (4th Cir. 2024) ..................... 72

*United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010) ............. 54–55

*United States v. Montani*, 204 F.3d 761 (7th Cir. 2000)............... 92, 93

*United States v. Morrison*, 852 F.3d 488 (6th Cir. 2017)............... 95, 97

*United States v. Nelson*, 884 F.3d 1103 (11th Cir. 2018).................. 110

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019) ................ 78

*United States v. Owen*, 407 F.3d 222 (4th Cir. 2005)........................... 64

*United States v. Parkes*, 668 F.3d 295 (6th Cir. 2012).......................... 43

*United States v. Perez-Martinez*, 746 F. App'x 468 (6th Cir. 2018)......97

*United States v. Porter*, 886 F.3d 562 (6th Cir. 2018).....................77–78

*United States v. Presley*, 349 F. App'x 22 (6th Cir. 2009) .............. 87–88

*United States v. Pritchett*, 749 F.3d 417 (6th Cir. 2014).................... 105

*United States v. Qaoud*, 777 F.2d 1105 (6th Cir. 1985) ....................... 76

*United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2021)................ 78

*United States v. Salahuddin*, 765 F.3d 329 (3d Cir. 2014).................. 80

*United States v. Sanders*, 95 F.3d 449 (6th Cir. 1996) ........................ 91

*United States v. Sandoval-Mendoza*, 472 F.3d 645
(9th Cir. 2006).................................................................... 108, 110

*United States v. Santos*, 201 F.3d 953 (7th Cir. 2000)....................... 110

*United States v. Sexton,* 512 F.3d 326 (6th Cir. 2008). ...................... 100

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020)............................ 72

*United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021) .......................... 72

*United States v. Smith*, No. 21-5432, 2021 WL 5567267
(6th Cir. Nov. 29, 2021) ................................................................. 61

*United States v. Terry*, 707 F.3d 607 (6th Cir. 2013) ................... passim

*United States v. Toney*, 161 F.3d 404 (6th Cir. 1998) .......................... 87

*United States v. Torres*, 997 F.3d 624 (5th Cir. 2021) ............... 109, 111

*United States v. Tripp*, 782 F.2d 38 (6th Cir. 1986)............................. 76

*United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004) ....................... 93

*United States v. Universal Rehab. Servs.*, 205 F.3d 657
(3d Cir. 2000) .................................................................................. 92

x

*United States v. Van*, 541 F. App'x 592 (6th Cir. 2013) ...................... 107

*United States v. Wallace*, 51 F.4th 177 (6th Cir. 2022) ........................ 55

*United States v. Warren,* 973 F.2d 1304 (6th Cir. 1992) ...................... 66

*United States v. Williams*, 974 F.3d 320 (3d Cir. 2020) ...................... 111

*Van v. Jones*, 475 F.3d 292 (6th Cir. 2007) ............................................ 65

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) ...................................... 102

Statutes:

18 U.S.C. § 666 .............................................................................. 73

18 U.S.C. § 1343 ............................................................................ 51

18 U.S.C. § 1346 ............................................................................ 51

18 U.S.C. § 1951 ............................................................................ 51

18 U.S.C. § 1956 ............................................................................ 58

18 U.S.C. § 1961 ...................................................................... 43, 75

18 U.S.C. § 1962 ............................................................................ 43

18 U.S.C. § 3553 ................................................................ 98, 99, 100

28 U.S.C. § 455 ............................................................................ 102

Ohio Rev. Code § 2921.02 ............................................................ 51

Ohio Rev. Code § 3517.10 ............................................................ 79

Ohio Rev. Code § 3517.102 .......................................................... 79

Other Authority:

Fed. R. Crim. P. 24 ................................................................ 59

Fed. R. Crim. P. 43 ........................................................... 66, 67

Fed. R. Crim. P. 52 ......................................................... 106, 107

Fed. R. Evid. 403 .................................................................. 90

U.S.S.G. § 2B1.1 ................................................................... 94

U.S.S.G. § 2C1.1 .............................................................. 94, 95

U.S.S.G. § 3C1.1 ................................................................... 96

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument, as the facts and legal arguments are adequately presented in the briefs. However, given the voluminous record, the United States does not oppose Appellant's request for argument, if the Court would find it helpful.

## STATEMENT OF JURISDICTION

The United States concurs in Appellant's jurisdictional statement.

## ISSUES PRESENTED

1. Whether sufficient evidence supported Householder's conviction.

2. Whether the district court's dismissal of a juror for reasonable cause, after affording defense counsel an opportunity to be heard, violated Householder's right to counsel.

3. Whether the district court committed reversible error in its jury instructions.

4. Whether the district court made erroneous evidentiary rulings that affected the outcome of the trial.

5. Whether the district court imposed a procedurally and substantively reasonable sentence.

6. Whether the district court judge should have sua sponte recused himself.

7. If not waived, whether the district court plainly violated Householder's right to counsel, where it permitted him to speak with his attorneys during an overnight recess in his testimony.

## STATEMENT OF THE CASE

A jury convicted former Speaker of the Ohio House Larry Householder of Racketeer Influenced and Corrupt Organizations (RICO) conspiracy. The evidence presented over six weeks proved that FirstEnergy Corp. and its affiliates paid over $60 million in bribes into a web of 501(c)(4) organizations and other entities controlled by Householder, but not publicly linked to him, in exchange for official action benefiting the company.

For all of the scheme's sophistication, the corrupt bargain underlying it was simple: Householder wanted to be Speaker of the House, and FirstEnergy wanted a taxpayer-funded subsidy for two failing nuclear plants. FirstEnergy agreed to bankroll Householder's bid to become Speaker. In exchange, Householder agreed to use his position to help secure a billion-dollar bailout for the plants, and later, to defend the bailout from an effort to repeal it by referendum. Over the course of the conspiracy, Householder solicited and received millions from FirstEnergy, which he used to obtain—and then solidify—his power, to further his political operation, and to benefit him personally.

3

*A. Factual Background*

1.   <u>Householder sets his sights on Speaker.</u>

In November 2016, the citizens of Ohio's 72nd district elected Householder to represent their interests in the House of Representatives. (R.228, tr.,8493-94.) Householder had held the same role previously and served two terms as Speaker. (*Id.*,8485-90.) Householder returned to politics intending to reclaim the Speakership. (R.217, tr.,7583-84,8493-94.)

Householder came up with an aggressive—and expensive—two-year re-ascension plan. The plan involved recruiting and helping elect candidates who would then back him for Speaker. (*Id.*,7583-84.)

2.   <u>FirstEnergy needs a billion-dollar bailout.</u>

While Householder sought financing for his bid, FirstEnergy Corp., an Ohio-based public utility holding company, sought a solution to its nuclear generation problem. (R.194, tr.,4751-52.) FirstEnergy was reporting a net loss of hundreds of millions due to poor performance by

4

FirstEnergy Solutions (FES), a wholly owned subsidiary "bleeding cash" because of its unprofitable nuclear power plants.[1] (*Id.*,4770-72.)

FirstEnergy's 2016 annual report disclosed that it was seeking a legislative solution—a taxpayer-funded bailout—for the nuclear plants. (*Id.*,4777.) The subsidy would provide a guaranteed payment and make the plants "very attractive to investors." (*Id.*,4780.) To secure passage of the legislation, the company needed support from House leadership, which it lacked. (R.219, tr.,7944-46.)

    3.   <u>Householder hires Longstreth to manage his bid for Speaker.</u>

Householder asked political strategist Jeffrey Longstreth "to help him get elected Speaker." (R.217, tr.,7585.) Longstreth accepted and agreed not to take on any other clients. (*Id.*,7586.) Assembling a loyal team was paramount: Householder told Longstreth he wanted "casket carriers"—individuals who would stand with him until it was time to "lower [his] casket in the ground." (*Id.*,7595.)

---

[1] "FirstEnergy" refers collectively to FirstEnergy Corp. and its subsidiaries, FES and FirstEnergy Service Co. Until February 2020, all three entities shared a common first name and the defendants often referred generically to the "company" or to "FirstEnergy."

4.   <u>Householder and FirstEnergy make a secret deal.</u>

Householder needed "a main benefactor" to finance his operation, which he found in FirstEnergy. (R.217, tr.,7630-31.)

In November 2016, Householder and FirstEnergy Corp. CEO Chuck Jones discussed FirstEnergy's "urgen[t]" need for a nuclear bailout. (Def.App'x, Ex.212,3.) Two months later, Householder and Longstreth joined Jones and FirstEnergy Corp. Vice President Michael Dowling in Washington, D.C. for the presidential inauguration. (R.217, tr.,7631-32.) Householder flew on the FirstEnergy jet and stayed several nights at the same hotel as Jones. (*Id.*,7682; R.219, tr.,7919-21; R.229, tr.,8664-65.) A FirstEnergy consultant paid for Householder's hotel, though Householder did not disclose the payment on his publicly filed financial-disclosure form. (R.219, tr.,7918-19; R.307, Ex.217,12703-05, Ex.901,12992-13000.) Householder paid for the jet ride only after a newspaper reported on it. (R.219, tr.,8676-77.)

Over several dinners with FirstEnergy executives, Householder outlined his plan to retake the Speakership and his funding needs, while the executives explained their need for a legislative bailout. (R.217, tr.,7634-41; R.307, Ex.215B,12697-12699, Ex.216B,12700-02.)

6

Dowling told Longstreth that FirstEnergy would be "very supportive" of Householder's run for Speaker and directed Longstreth to create a 501(c)(4) organization so FirstEnergy could give Householder "undisclosed and unlimited" payments. (R.217, tr.,7636.) Unlike campaign contributions, contributions to a 501(c)(4) are not limited or publicly disclosed. (R.194, tr.,4746.) But such organizations must "promote social welfare" and "no part of the net earnings may inure to the private benefit of any individual." (*Id.*,4719,4723.)

Householder and Longstreth discussed the fact that "FirstEnergy wanted a (c)(4) . . . to put their money in [ ] so it wouldn't be traced back to them, and so they could put in unlimited money . . . to fund" Householder's plan. (R.217, tr.,7644-45.) The two then created a 501(c)(4) called Generation Now, which functioned as a secret repository for FirstEnergy's bribe payments. (R.217, tr.,7593,7636,7643-45; R.302, Ex.16,12254, Ex.17,12255.) Because Householder's name was not publicly associated with Generation Now, FirstEnergy "could give . . . to the (c)(4) and nobody would ever know" the money went to Householder. (R.302, Ex.271B,12340.) Neil Clark, a lobbyist who acted as Householder's "proxy" (R.211, tr.,6834,6860-61; R.213, tr.,7092-93),

7

described Generation Now as Householder's "secret" (c)(4) that "Householder created for himself." (R.302, Ex.522B,12415-16, Ex.528B,12453.)

    5.   <u>FirstEnergy pays Householder $1 million.</u>

On February 6, 2017, Householder and Jones discussed the bailout legislation, and Jones told Householder that FirstEnergy would pay him $1 million—through Generation Now—that year. (R.217, tr., 7624-25,7640-41; R.307, Ex.221A,12706, Ex.221B,12707, Ex.733,12963.) Householder relayed the million-dollar promise to Longstreth and instructed him to "work out the details" with Dowling. (R.217, tr.,7640.) That same day, Longstreth emailed Dowling wiring instructions for Generation Now, writing: "This is the organization that Chuck and Larry discussed." (R.307, Ex.222B,12708.)

In March, Householder received the first of four $250,000 installments from FirstEnergy into Generation Now. (R.302, Ex.15, 12253; R.217, tr.,7625.) Householder used $60,000 from the first installment to pay off personal expenses. (R.303, Ex.818,12654, Ex.819,12655.) He received a second installment in May. (R.302, Ex.15,12253.)

In July, Dowling texted Longstreth: "I know you guys are there for us." (R.307, Ex.232A,12710-11.) Shortly thereafter, Longstreth attended a meeting at the Greenbrier resort with Jones and Dowling. (R.217, tr.,7618-21.) Jones again discussed FirstEnergy's need for a "state solution"—"a bailout of the nuclear plants"; and Longstreth provided "a very detailed summary of where [Householder] stood in the Speaker's race." (*Id.*,7621-24.) Jones told Longstreth: "[W]e have to get Larry in there . . . because I know he won't let anything bad happen to us." (*Id.*,7624.) Longstreth relayed the details of the conversation, which was a continuation of the discussion in D.C., to Householder. (*Id.*,7625-27.)

A few days later, Longstreth emailed Dowling to "follow up on [their] conversation at the Greenbrier regarding the next donation installment of $250,000 to Generation Now." (R.307, Ex.232D,12712.) In response, FirstEnergy wired $250,000 more to Generation Now. (R.302, Ex.15,12253.) Another $250,000 arrived in December. (*Id.*)

6.   Householder uses Generation Now for his benefit.

In 2017 and 2018, Householder used the FirstEnergy-to-Generation-Now money to fund his plan and build his political power. (R.211, tr.,6664; R.214, tr.,7149.) Householder spent the money on

9

infrastructure (such as office space and payroll), the House races of his recruited candidates (campaign workers, polling, and advertisements), and personal expenses ($300,000 for a civil judgment against him and associated legal fees). (R.217, tr.,7646; R.303, Ex.818,12654, Ex.819,12655.) The FirstEnergy-to-Generation-Now payments were often funneled through a web of other Longstreth-controlled bank accounts, further concealing their source. (R.302, Ex.180,12334.)

Householder recruited candidates "who would be loyal and vote for [him]." (R.217, tr.,7653–54.) He was "the ultimate decider"—and his candidates were known as Team Householder. (*Id.*,7654.) Although Longstreth managed day-to-day operations, Householder was very hands-on. "He wanted to know everything that was going on at the end of every day, meaning . . . soup to nuts." (*Id.*,7587.) When Longstreth left out details, Householder became "pretty angry." (*Id.*,7588.) As a result, Longstreth discussed "pretty much every issue in every race" with Householder. (*Id.*) As Householder explained: "I put the team together. Run the races. Raise most of the money." (R.307, Ex.537B,12950.)

Householder used multiple other "front" entities, with which he was not publicly connected, to advance his goal of becoming Speaker. (R.217, tr.,7656.) Generation Now funded these entities, which then purchased media buys to influence the races of Householder's recruits. (*E.g.*, R.307, Ex.300,12721, Ex.315,12722; R.198, tr.,5231; R.208, tr.,6617-19.) Using these entities provided another degree of separation between Generation Now and Householder's candidates. (R.217, tr.,7661.) For example, Householder used the Growth & Opportunity PAC for advertisements during the 2018 primary and Hardworking Ohioans during the general election. (R.217, tr.,7656; R.307, Ex.300,12722.) Householder came up with the name Hardworking Ohioans, telling Longstreth it "made for a good disclaimer." (R.217, tr.,7667-68; R.307, Ex.315,12722.)

7. <u>FirstEnergy continues to fund Generation Now.</u>

Householder's plan was expensive. During the 2018 general election cycle, he continued to solicit and receive money from FirstEnergy when Generation Now bank accounts ran low. (R.217, tr.,7659; R.302, Ex.15,12253; Ex.286A-C,12344-48.) The money funded Householder's political machine, ensuring that his "team" would be

11

elected and he would win the Speakership. (R.214, tr.,7164; R.217, tr.,7659; R.307, Ex.295E,12719-20.)

Clark called FirstEnergy "the bank" because, whenever Householder needed money, FirstEnergy disbursed it, and because the money was "unlimited." (R.302, Ex.527B,12438, Ex.528B,12453.) The money came from FirstEnergy in different ways. Sometimes FirstEnergy wired money directly to Generation Now; sometimes the money came from Partners for Progress (a 501(c)(4) fully funded by FirstEnergy) to Generation Now; sometimes FirstEnergy hand-delivered checks; and sometimes FirstEnergy wired money to other entities controlled by Householder and his associates. In 2018, FirstEnergy, directly or indirectly through Partners for Progress, paid Generation Now $1.4 million and $900,000 more to other Householder entities. (*Id.*, Ex.15,12253; R.198, tr.,5231-5259,5300-02, 6623-24.)

In spring 2018, for example, FirstEnergy paid Householder $400,000 by funneling two payments through its own 501(c)(4), Partners for Progress, following phone calls between Householder and Dowling. (R.302, Ex.15,12253; R.307, Ex.,734,12966.) Generation Now's

account had less than $10,000 prior to the first payment. (R.302, Ex.,14C,12180.)

As the election grew closer, Jones asked Dowling: "Householder looking for more money?" (R.302, Ex.286A,12344.) Dowling responded: "You know the answer to the Householder question, but I don't know for how much he'll ask. I'll get a list . . . as to the House races he's most interested in winning . . . . He'll want hard money first and then c(4) money for sure." (*Id*.) The following day, Householder met with Dowling and Jones in Jones's office. (*Id.*, Ex.286B,12346.) Shortly thereafter, Householder received another $500,000 into Generation Now from Partners for Progress. (R.302, Ex.15,12253.) Prior to the payment, the Generation Now balance had dipped below $4,000. (R.198, tr.,5261; R.302, Ex.14C,12189.) Householder texted Jones, thanking him for his help. (R.302, Ex.286C,12348.) Jones responded: "We are rooting for you and your team!" Householder replied: "I'm rooting for you as well . . . we are on same team." (*Id*.)

When cash ran low on the eve of the election, Householder again met with Jones and Dowling in Jones's office. (R.217, tr.,7664.) Longstreth joined. (*Id*.) Jones wanted to "help with whatever

13

[Householder] need[ed]." (*Id.*) After the meeting, Longstreth sent Dowling wiring instructions for Hardworking Ohioans because there was no time to first funnel the money through Generation Now. (*Id.*,7667-68; R.307, Ex.295D,12716, Ex.315,12722.) FirstEnergy then wired $500,000 directly to Hardworking Ohioans. (R.307, Ex.315,12722.)

8.  <u>FES declares bankruptcy, then funnels $500,000 to Generation Now.</u>

While Jones and Dowling bankrolled Householder's Speaker bid, FES declared bankruptcy and hired lobbyist Juan Cespedes to work on the bailout. (R.211, tr.,6745-50.) Cespedes's "first order of business" was to ensure Householder became Speaker. (*Id.*,6764-75.) Cespedes coordinated his efforts with the parent company. (*Id.*,6758.)

In August 2018, Cespedes, fellow FES lobbyist Robert Klaffky, and FES executives, met with Householder to discuss bailout legislation. (*Id.*,6766-77.) Householder "had previously been educated on [the issue] by the parent company," so the executives "g[ot] granular." (*Id.*,6767) After the meeting, Householder called Klaffky and said that he "expect[d]" FES to make "a multiple hundred-thousand-dollar contribution." (*Id.*,6768.)

During a subsequent call among Cespedes, Klaffky, and company executives, the group decided that FES would pay Householder $500,000—divided into $400,000 and $100,000 checks. (*Id*.,6783-84.)

A company executive, Cespedes, Klaffky, and another FES lobbyist, Geoffrey Verhoff, met with Householder on October 10, 2018 to provide the first payment. (R.211, tr.,6777.) The same day, Dowling texted Jones that Householder would "learn about the $400k at this mtg." (R.302, Ex.290C,12350-51.)

The meeting's purpose was to establish that the "[financial] support was specifically tied to the legislation . . . ." (R.211, tr.,6786.) When Klaffky slid the $400,000 check across the table to Householder, he said: "Our client care[s] very much about our issue." (*Id*.,6781.) Householder opened the envelope and remarked: "Well, yes, they do." (*Id*.) Householder then talked about "the state of the races" and how he would support the bailout if he became Speaker. (*Id*.,6781-83.) The check was payable to Generation Now because that was "the only way . . . [to] support the Speaker with a contribution th[at] large." (*Id*.,6785.)

Cespedes later delivered the second check—for $100,000—to Longstreth because Householder was away supporting his candidates.

15

(*Id.*,6788-90.) Householder credited FirstEnergy executives for the payments. After the October meeting, Householder texted Jones: "$400k . . . thank you." (R.302, Ex.290B,12349.)

9.    Householder is elected Speaker.

All but one of the Team Householder candidates won election. (R.214, tr.,7159; R.198, tr.,5345-46.) These representatives then voted for Householder, who won the Speakership. (R.198, tr.,5346.) Minutes after being sworn in, Householder announced his intention to create a new energy-generation subcommittee. (R.307, Ex.411,12777-97.)

That evening, Householder texted Jones: "Thank you for everything[;] it was historical." (R.307, Ex.412C,12798.) Meanwhile, Cespedes texted Klaffky: "That 500K investment seems very wise right now . . . this is a good day." (R.303, Ex.748,12644.) Klaffky responded: "High risk, high reward." (*Id.*) With Householder in charge, it became a "matter of when, not if," the bailout legislation would be introduced. (R.211, tr.,6801.)

10.    HB 6 is introduced and assigned to the new subcommittee.

Householder "went to war for" FirstEnergy. (R.302, Ex.525B,12423-24.) Shortly after being sworn in, Householder met with

16

Cespedes, Klaffky, and a company executive to "talk[] through the legislation and [ ] try[ ] to establish a timeline." (*Id*.,6801; R.307, Ex.291A,12713-15.) He then created a new energy-generation subcommittee, which included multiple Team Householder members. (R.199, tr.,5407-10,5419-21,5428-29; R.307, Ex.423,12799, Ex.424,12800-21.)

HB 6 was introduced on April 12, just four months after Householder became Speaker. (R.199, tr.,5428-29; R.307, Ex.458A,12822-48.) Team Householder representatives sponsored the bill, and Householder assigned it to his newly created subcommittee. (R.199, tr.,5419-21,5428-29.)

FirstEnergy played a significant role in drafting the legislation. To avoid leaving "an email or electronic trace" of the company's involvement, Cespedes shuttled drafts between company executives and Householder's energy advisor, making sure to conceal the "very large document" in a bag or folder. (R.211, tr.,6807-09.) This happened "a dozen times." (*Id*.)

11. <u>HB 6 encounters opposition, and FirstEnergy funnels more money into Generation Now.</u>

The proposed legislation encountered immediate opposition. The bill was a "tough vote," meaning that a vote in its favor could carry consequences at the ballot box. (R.217, tr.,7680.) FES retained a media consultant company, planning to spend "less than a million." (R.211, tr.,6811-12,6827.)

Householder upended that plan. (R.217, tr.,7681; R.211, tr.,6830.) After learning of an advertisement opposing HB 6 running in the district of one of the bill's sponsors, Householder texted Jones: "I hope FES is ready for a fight because the first shot was fired at us tonight." (R.302, Ex.460A,12388; R.201, tr.,5549; R.228, tr.,8582.) He added: "Nobody screws with my members." (R.302, Ex.460A,12388.) Householder and Jones discussed FirstEnergy making additional payments to Householder, to which Jones stated: "I would say you're a bargain – not cheap." (*Id.*, Ex.460C,12392.)

Longstreth and Clark met with Cespedes and company executives to discuss the media campaign. (R.211, tr.,6813.) On Householder's behalf, Longstreth instructed the company to pay Householder through Generation Now "if [it] expected to . . . have continued support" of the

legislation. (*Id.*,6812.) The company "had no choice," and Cespedes advised his client "to do whatever Generation Now and the Speaker said to do." (*Id.*,6814-15.)

During an approximately two-month span while HB 6 was pending before the legislature, FirstEnergy deposited $15 million into Generation Now. (R.302, Ex.15,12253; Def.App'x, Ex.462,4-5.) The Generation Now balance had previously fallen below $13,000. (R.302, Ex.14C,12206.) Householder and his team used the infusion to continue to finance Householder's political operation and fund the new media strategy. (R.217, tr.,7681.) In return, FirstEnergy received "the full support of the Speaker, [who would] make sure th[e] [bailout] legislation was passed." (R.211, tr.,6817.) Cespedes texted: "Who would ever assume a bankrupt company [would be] willing to spend 15 million. What a joke[.] LOL." (*Id.*,6826.)

12. <u>Householder pressures House members to vote "yes."</u>

Householder pressured caucus members who opposed HB 6 to change their position. (R.216, tr.,7458-59; R.219, tr.,7947-48.) Representative David Greenspan was one caucus member Householder targeted. (R.219, tr.,7954-55; *see also* R.216, tr.,7448.) Householder

viewed Greenspan's opposition as "a real problem" and Clark conveyed that to Greenspan. (R.217, tr.,7689.) Clark told Greenspan "that it would be in his best interest to . . . support House Bill 6" by emphasizing that the advancement of legislation and committee appointments were "all at the discretion of the Speaker." (R.219, tr.,7952-54.)

Greenspan took Clark's comment as a threat and contacted the FBI because he wanted "an independent body not affiliated with state government" to "look out for" those who were going to vote "no." (*Id.*,7957-58.) While Greenspan was meeting with the FBI, he received a text from Householder urging him to support HB 6. When Greenspan reiterated his opposition, Householder responded: "I just want you to remember – when I needed you – you weren't there . . ." (*Id.*,7960-62; R.307, Ex.473A,12849-52.) The message made Greenspan feel "threatened" and "back[ed] up statements that Mr. Clark had made to [him] earlier." (R.219, tr.,7962.)

13. <u>The House passes HB 6.</u>

On May 28, the House narrowly passed HB 6, with Team Householder candidates voting in its favor. (R.211, tr.,6828.)

20

Representative Greenspan voted "no." (R.219, tr.,7963.) After the vote, Householder tasked Longstreth with enlisting a mutual friend "to ask Mr. Greenspan to delete his text messages" with Householder "so that they [would not be] available for a public records request." (R.217, tr.,7691.) Longstreth told the mutual friend that "Greenspan left the fort" and "[w]hen you go outside the fort, you get shot at." (*Id.*,7694.) Instead of deleting the messages, Greenspan provided them to the FBI. (R.219, tr.,7965.)

14. <u>The legislature passes HB 6, and opponents pursue a referendum to repeal it.</u>

In July 2019, the legislature narrowly passed HB 6, and the governor signed it. The legislation secured over $1 billion in subsidies for the nuclear plants and an additional $20 to $50 million per year in fixed revenue for FirstEnergy. (R.194, tr.,4784; R.211, tr.,6760; R.216, tr.,7448.) Jones texted Dowling: "We made a bbiiiiig bet and it paid off." (R.302, Ex.517B,12406.) Clark explained FirstEnergy's thinking as follows: "FirstEnergy got $1.3 billion in subsidies, free payments. . . . [S]o what d[id] they care about putting in $20,000,000 a year for this thing." (*Id.*, Ex.528B,12454.)

21

But there was "no time to celebrate." (R.211, tr.,6844.) Opponents immediately organized a committee—Ohioans Against Corporate Bailouts (OACB)—to qualify a referendum to repeal HB 6. (*Id*.) OACB had 90 days to gather approximately 265,000 signatures. (R.216, tr.,7475,7492.)

15. <u>FirstEnergy pays Householder to preserve the bailout.</u>

Householder viewed the referendum as an opportunity. He texted Longstreth that it would allow them to "[s]tay on the good side of FES and [ ] do the defend." (R.307, Ex.,483A,12902.) At the same time, Householder worried that, if HB 6 were repealed, it would "set[] a bad precedent" for the rest of his term. (*Id*., Ex.536B,12927.) People needed to "realize [he] [couldn't] be fucked with." (*Id*.)

Company executives were also "very concerned about the referendum." (R.302, Ex.601C,12462.) But that changed following conversations with Householder (*id*., Ex.601D,12466, Ex.601E,12468; R.303, Ex.734,12613), after which million-dollar payments again began pouring into Generation Now from FirstEnergy. (R.302, Ex.15,12253.) Following those communications, executives believed the referendum was in "excellent hands" because of Householder's "personal

22

involvement." (*Id*., Ex.601C,12458, Ex.601D, 12466 (Dowling: "I had a good conversation with Speaker H today re: the referendum issue. . . . We should all be following his lead").)

For example, six days after HB 6 passed, Householder personally assured FES Executive Chairman John Kiani that "he would do everything in his power to help defeat the referendum," that the company was "in good hands [ ] with Generation Now," and that, "if anything were to go wrong, [ ] he would be prepared to introduce new legislation." (R.211, tr.,6846.) In return, they agreed to continue the "same arrangement" as before, with FirstEnergy paying Householder through Generation Now. (*Id*.,6846-50.)

As the "objective switched from passing legislation to now defending legislation," Generation Now continued to manage the operation, and FirstEnergy continued to secretly fund it. (*Id*.,6844.) Generation Now received $38 million from FirstEnergy between August and October 2019. (R.302, Ex.15,12253.) Cespedes knew that Householder's team lacked experience defeating ballot campaigns, but the company agreed to pay Householder during this period because, as

23

Speaker, he would "provide new legislation . . . if necessary." (R.211, tr.,6848-50.)

Whenever Householder needed more money, he contacted Jones directly or Longstreth contacted Cespedes or Dowling. For example, in October, Householder called Jones and asked for more money. (R.303, Ex.640K,12607 (Jones to Dowling: "I did speak with LH and he says they need it and will spend it. Talked to him about future and he says the future is now.").) Following the call, Cespedes texted Longstreth: "CJ [Chuck Jones] $ is en route." (R.307, Ex.639B,12960.) The next day, Partners for Progress wired $10 million to Generation Now. (R.302, Ex.15,12253.)

After hitting Generation Now's account, the money was transferred to a web of entities and then used to fund Householder's political operation, defeat the referendum, and enrich Householder and his team. In addition to paying Longstreth, Clark, and Generation Now employees (*e.g.*, R.303, Ex.823,12656, Ex.834,12657, Ex.835,12658), Householder also used the money to repair his Florida home and pay off credit card debt. (*E.g.*, *id.*, Ex.812,12653, Ex.819,12655.)

24

16. <u>Householder oversees a multi-prong plan
    to preserve the bailout.</u>

Householder and his team implemented a multi-prong plan to
preserve the bailout that included pressuring officeholders to take
action adverse to the ballot campaign; preparing new legislation; and
thwarting the signature collection. (R.212, tr.,6858,6864; R.302,
Ex.605B,12471, Ex.605H,12502; R.303, Ex.636F,12594.)

*a. Pressuring Attorney General Yost*

Householder sought to influence Attorney General Yost to: (1)
reject petition language so that OACB would have less time to secure
signatures; and (2) interpret the legislation as a "tax" not subject to
referendum. (R.212, tr.,6865-66,6870.) Householder did so in
coordination with Matthew Borges, who had a close relationship with
Yost. (*Id.*,6866-70; R.303, Ex.606A,12510, Ex.737,12618.)

Yost rejected the petition language on the last day of the review
period. (R.202, tr.,5700; R.216, tr.,7493-94.) OACB then submitted a
revised petition, after which Householder and Borges pressured Yost to
again reject the language. (R.303, Ex.608B,12517, Ex.608C,12519-20.)
Householder deleted record of his phone calls with Yost from his phone.
(R.201, tr.,5685-87.)

When Yost ultimately approved the petition (R.202, tr.,5700), OACB had only 54 of the original 90 days to collect more than a quarter-million signatures. (R.216, tr.,7495.) The delay proved to be a "significant impediment." (*Id*.)

### b. Drafting new legislation

Amid these efforts to defeat the ballot campaign, Householder had a back-up plan to ensure the bailout was referendum-proof. Householder directed his staff to draft new legislation characterizing HB 6 as a "tax." (R.217, tr.,7552-58; R.303, Ex.635A,12586-90.)

In September, Jones told Dowling that "[Householder] seemed pretty confident in his referendum strategy and plans to pass it as a tax in a new bill if [OACB] g[o]t enough signatures." (R.303, Ex.634A, 12577.) In October, before the signatures were due, Jones texted Dowling: "Just spoke to the big guy. He's got the 'tax' bill ready to go." (*Id.*, Ex.634B,12580.)

### c. Thwarting the signature collection

Generation Now funds were also used to stymie the signature-collection effort. Clark spearheaded a "buyout campaign" aimed at depriving OACB of signature-collection firms and signature collectors.

26

(R.212, tr.,6906-07; R.216, tr.,7525-29.) Clark also coordinated with Householder and Longstreth on an anti-referendum media strategy. (R.217, tr.,7704-05.) A new 501(c)(4) entity called Ohioans for Energy Security was created to conceal Generation Now as the funding source. (*Id.*; R.307, Ex.153,12691.) As before, advertisements needed Householder's approval. (*Id.*,7706.) One mailer warned voters that "foreign entities ha[d] infiltrated our energy grid" and urged them not to sign the petition. (R.307, Ex.612C,12958-59.)

Borges, among other things, used FirstEnergy-through-Generation-Now money to bribe a manager of the signature-collection effort for inside information and to hire private investigators to track signature collectors, who were then "stalked," "intimidated," "harassed," and even "assaulted." (R.212, tr.,6892-93.) All of the tactics hindered OACB's ability to collect the requisite signatures. (R.216, tr.,7497.)

17. <u>The ballot referendum fails.</u>

On October 21, Dowling alerted Jones that OACB was "bring[ing] signatures to [the] Secretary of State today." (R.303, Ex.634C,12582.) Jones responded: "Larry is ready to do new legislation immediately if

27

they turn in signatures." (*Id*.) Jones continued: "LH says it will NEVER

hit the ballot . . . ." (*Id*.,12583.)

OACB failed to collect enough signatures. (R.216, tr.,7506.) On

October 22, 2019, HB 6 went into effect. (R.194, tr.,4857.)

18. <u>Householder continues to build his political machine with secret FirstEnergy money.</u>

The day HB 6 took effect, FirstEnergy (via Partners for Progress)

wired Generation Now $3 million. (R.302, Ex.15,12253.) The day after,

Kiani texted Jones that he was "worrie[d]" about a legal challenge that

might re-open the referendum. (R.303, Ex.634D,12585.) Jones

reassured him that Householder had "a quick fix"—new legislation. (*Id*.)

Householder and his associates continued to use FirstEnergy money to

further their interests by increasing Householder's political power and

padding their wallets. (*Id.*, Ex.819,12655, Ex.823,12656, Ex.834,12657,

Ex.835,12658; R.307, Ex.822,12991.)

During the 2020 primary cycle, Householder again used the

Growth & Opportunity PAC to secretly influence the races of Team

Householder candidates. (R.217, tr.,7723-26; R.307, Ex.352,12777.)

Rather than send money directly to the PAC, which was required to

publicly disclose its donors, the money was routed through Coalition for

Growth and Opportunity, another 501(c)(4), to avoid "disclos[ing]

Generation Now as the donor." (R.217, tr.,7724-26; R.307,

Ex.300,12721, Ex.340,12733-56, Ex.352,12777.)

19. Clark coordinates with Householder to corruptly solicit
additional bribes for gaming legislation.

While Householder furthered FirstEnergy's interests related to

the bailout, Clark (Householder's "proxy") coordinated with

Householder to solicit other bribes. (*E.g.*, R.307, Ex.739,12971.) During

a June 2019 recorded meeting, Clark described Householder's value to

undercover FBI agents ostensibly seeking sports gaming legislation.

Clark touted how Householder "went to war for" FirstEnergy because of

FirstEnergy's payments and characterized Householder's relationship

with FirstEnergy as "pay to play." (R.302, Ex.525B,12423-24.) Clark

advised the undercovers that they should write a check to Generation

Now—"the Speaker's (c)4"—and "hand-deliver the check to the Speaker"

to advance their legislation. (*Id.*, Ex.,527B,12448.)

In September, Clark arranged a meeting between Householder

and the undercovers, where the group discussed the gaming legislation.

(R.307, Ex.538B,12955). Following a call between Clark and

Householder the next morning (*id.*, Ex.739,12971), Clark confirmed to

29

the undercovers that Householder would draft their desired legislation
and advised them to make a payment to Generation Now or another
Householder entity. (*Id.*, Ex.538B,12954-55.) The FBI ceased the
undercover operation without making a payment. (R.214, tr.,7144-45.)

20. <u>Householder solicits more money from FirstEnergy.</u>

After HB 6 took effect, Householder sought to tighten his grip on
power through a ballot initiative to amend the state constitution so that
he could remain Speaker for 16 more years. (R.217, tr.,7714-18; R.212,
tr.,6922.) Longstreth estimated that they needed $15 to $20 million to
fund the term-limits initiative, so Householder and his associates went
back to their "bank"—FirstEnergy. (R.217, tr.,7716-18.)

Householder told Jones that he would "get a lot done in 16 more
years." (R.307, Ex.330A,12723-24.) In response, Jones referred to
Householder as "an expensive friend." (R.307, Ex.330A,12723-24.)
Dowling called Householder's term-limits proposal "good for the home
team." (*Id.*, Ex.330G,12726-27.) In March 2020, FirstEnergy paid
Householder $2 million for the initiative, wired from Partners for
Progress to Generation Now. (R.302, Ex.15,12253; R.307,
Ex.330G,12727 (Dowling text: "Mums the word to all. $2m").)

Meanwhile, FES was set to soon emerge from bankruptcy as a separate entity. Clark told Cespedes that it was in his client's "best interest" to keep Householder as Speaker for as long as possible because Householder could help extend the HB 6 subsidy from six to ten years—which company executives wanted. (R.212, tr.,6922.) Cespedes understood the exchange to be providing "our support on this ballot issue for . . . being able to add those four years [ ] to our legislation." (*Id.*) Kiani "was more than willing to . . . spend money in exchange for legislation," but the payment never came to fruition due to the impact of COVID-19. (*Id.*,6924-26.)

## B. Federal Proceedings

A grand jury charged Householder, Longstreth, Clark, Cespedes, Borges, and Generation Now with participating in a RICO conspiracy in violation of 18 U.S.C. § 1962(c), (d).[2] (R.22, indictment,1247-89.) The indictment alleged that the defendants constituted an enterprise, as defined under 18 U.S.C. § 1961(4), and conspired to engage in a pattern of racketeering activity consisting of multiple acts of the following

---

[2] FirstEnergy Corp. was charged with conspiracy to commit honest services wire fraud and entered into a Deferred Prosecution Agreement acknowledging the charged conduct. (No.1:21-cr-86,R.3 (S.D.Oh).)

offenses: public official honest services wire fraud and private honest services wire fraud (18 U.S.C. §§ 1343 & 1346); extortion under color of official right (18 U.S.C. § 1951); Travel Act (18 U.S.C. § 1952); money laundering (18 U.S.C. § 1956); engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957); and state bribery (Ohio Rev. Code § 2921.02). The indictment alleged that the enterprise's purpose was to grow and preserve Householder's political power, enrich the enterprise and its members and associates, and conceal those activities. (*Id.*)

Defendants Longstreth, Cespedes, and Generation Now pleaded guilty. Clark died, and the case against him was dismissed. Householder and Borges proceeded to trial.

1.    <u>Trial Proceedings</u>

The government introduced approximately 1,000 exhibits and called twenty-one witnesses, including FBI special agents; a FirstEnergy representative; co-defendants Longstreth and Cespedes; employees of Generation Now; a forensic accountant; current and former state representatives; the energy policy advisor for then-Speaker

Householder; and experts on energy policy, tax-exempt organizations, and ballot measures.

2.    <u>Dismissal of Juror</u>

During the final pretrial conference, the district court noted that "the latest COVID-19 variant or variants appear[ed] to be exceedingly transmissible" and expressed its intention "to keep everyone safe and healthy so as to avoid trial disruption." (R.182, tr.,4377; *see also* R.299, tr.,11920 (assuring venire it would "do everything possible to ensure that [they] were safe and comfortable").)

After just two days of trial, a juror tested positive for COVID-19. (Jan. 25, 2023 notation.) "In an effort to ensure everyone's safety," the district court ordered a week-long recess and required all jurors to provide a negative COVID-19 test before returning. (Jan. 29, 2023 notation.)

At 3:25 p.m. on the day before trial was set to resume, the district court's law clerk emailed the parties on behalf of the district court. The email first informed counsel that the juror was "feeling much better and [would] be ready to return tomorrow." (R.292-2, attachment,11630.) The email next explained that CDC guidelines recommended that the juror

33

mask in public. As a result, the court intended to "enforce this masking recommendation for the remainder of the week" and "apply it uniformly to all jurors" to "ensure the jury's safety." (*Id.*)

The email then advised that the court had received test results from all jurors but one. (*Id.*) The juror who failed to produce a result indicated that he did not have a timeframe for receiving it and was "disinclined to take another test that [might] yield faster results." (*Id.*) "To complicate the matter further, th[e] juror told the court that he [would] not wear a mask," even if required, and advised that he was unable to serve after March 3. (*Id.*)

The email explained that the district court had "decided to cut this juror now" and resume trial the next day, as planned, with 15 jurors. (*Id.*) The following reasons were given for the dismissal: (1) the juror did not produce a negative test and had no timeframe for receiving one; (2) the juror refused to obey the masking order; and (3) the juror would "need to be cut anyway in the event that the trial or deliberations" went beyond March 3. (*Id.*)

On behalf of the court, the law clerk then phoned counsel for all parties. When Mr. Oleski, counsel for Householder, was reached at 4:30

34

p.m., he did not object to the juror's dismissal. (R.292, order,n.3,11331; R.292-2, attachment,11643.) Nor did any other party object. (R.292-2, attachment,11643.) After speaking with the parties, the court excused the juror. (*Id*.)

Following the excusal, Mr. Marein, different counsel for Householder, emailed the court at 4:50 p.m. requesting "that the record reflect an objection to the sua sponte discharge of [J]uror #4 without the Court having at first consulted with the parties." (*Id*.,11636.) The clerk responded by explaining that "the Court did hear from your co-counsel before excusing the juror." (*Id*.,11647.)

The following day, the district court addressed the juror's dismissal, repeating the reasons articulated in the prior email. (R.197, tr.,4942-43.) The court then stated:

> I communicated with the lawyers. I got an indication from the government that they were amenable to my approach. We had a conversation with one of Mr. Householder's lawyers, and they, too, were amenable to the Court's approach. 30 minutes or so after that, may not have been 30, we got an e-mail from another one of Mr. Householder's attorneys raising an objection to the Court having excused the juror. That objection was waived by the first lawyer for Householder indicating acquiescence.

(*Id*.)

35

Despite this explanation, Attorney Marein again accused the district court of dismissing the juror before communicating with the parties. The court called his accusation "flat out inaccurate" and stated that it would "put the e-mails on the docket" to ensure they were "formally in the record." (*Id.*,4948.)

The district court issued the following minute entry that same day: "The Court stated for the record that it conferred with counsel via email and telephone prior to excusing Juror #4, at which time no party objected; Defendant Householder did not voice any objection until after the juror was excused." (Jan. 31, 2023 minute entry.)

The jury wore masks for the remainder of the trial. When another juror tested positive for COVID-19, the district court excused that juror "without objection" after consulting with the parties. (Feb. 8, 2023 minute entry.)

3. <u>Defense Case</u>

Householder testified in his defense. Householder downplayed his interactions with Jones and Dowling, despite evidence demonstrating that he flew on their company jet, dined and socialized with them, met

with them at their corporate headquarters, and frequently corresponded with them by phone and text.

Householder specifically misled the jury about his trip to Washington, D.C. in 2017, which he characterized as a family trip. (R.288, tr.,8512-15.) Householder denied dining with FirstEnergy executives at a steakhouse on January 18, 2018, testifying that he and his son "walked around" that evening and then returned to their hotel. (R.228, tr.,8515.) On cross-examination, the government confronted Householder with a photograph of him and his son sitting with Dowling and others in a limousine parked outside the steakhouse on January 18 at 10:20 p.m. and another showing Householder at a bar with the same group later that evening. (R.229, tr.,8656-60,8802-04; R.307, Ex.911,13001, Ex.911A,13002; *see also id.*, Ex.215B,12697-99, Ex.216B,12700, Ex.217,12703-05.) Householder stuck to his story—even after being confronted with the photographs. (*Id.*,8660.)

Householder also attempted to minimize his knowledge of, and involvement in, Generation Now. (R.229, tr.,8537-38,8687-92.) He claimed, for example, that Longstreth created the organization and directed how money was spent. Householder testified that Generation

Now "was formed to . . . educate the public on issues and to support candidates who support those issues" and that it was his "understanding"—based on conversations with Longstreth—that the organization was used for that purpose. (R.229, tr.,8688,8691.) The evidence contradicted his testimony, showing that Generation Now was created for, and functioned for, Householder's benefit, and that Householder oversaw it.

When asked about deleting the record of his calls with Yost, Householder testified that it was his "habit" to "try to delete as much as possible" from his phone to avoid storage costs. (R.229, tr.,8735-36.)

4.   <u>Jury Instructions</u>

The district court instructed the jury that RICO conspiracy required proof that: (1) an enterprise existed; (2) the enterprise was engaged in, or its activities affected, interstate commerce; (3) the defendant was employed by or associated with the enterprise; and (4) the defendant conspired to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity. (R.260, instructions,10596.) The court then instructed the jury on the elements of each type of racketeering activity

38

and explained that the verdict "must be unanimous as to which type or types of predicate racketeering activity a defendant agreed would be committed." (*Id.*,10619.)

### 5. Verdict and Sentence

On March 9, the jury found Householder and Borges[3] guilty. The case then proceeded to sentencing. The presentence report applied several enhancements, including a 22-level enhancement based on the bribe payments and a two-level obstruction-of-justice enhancement based on Householder's perjurious testimony. (R.277, PSR,10964-67.) Householder objected to both enhancements. (*Id.*,10983-90.)

The district court overruled those objections but granted another, yielding a total offense level of 48. That was reduced to 43, the maximum offense level under the guidelines. (R.285, tr.,11186.) A total offense level of 43, combined with a criminal history category of I, resulted in a guidelines range of life imprisonment. After analyzing the § 3553(a) factors, the court imposed a 240-month sentence—the statutory maximum. In doing so, the district court stated that it would

---

[3] Borges's appeal (No. 23-3566) is proceeding on a different schedule and raises largely distinct issues.

impose that same sentence, irrespective of the guideline calculation, because it was "the sentence [it] believe[d] to be appropriate in light of all of the sentencing factors." (*Id.*,11219.)

This appeal followed.

## SUMMARY OF ARGUMENT

There is more than sufficient evidence that Householder conspired to conduct or participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity involving multiple predicate acts of public official bribery and money laundering. His contrary arguments ignore the evidence and misapply the law.

The district court afforded Householder's counsel an opportunity to be heard prior to dismissing Juror 4 for reasonable cause and replacing him with an alternate. There is thus no right-to-counsel error. And any perceived error would be harmless in the circumstances here.

The district court correctly instructed the jury regarding the bribery predicates and the use of inconsistent statements. Any error would be harmless, in any event, given the instructions as a whole and the overwhelming evidence.

The district court admitted recorded statements made by Householder and testimony that his co-conspirators pleaded guilty. The admission of this evidence was correct and had no impact on the verdict, in any event.

The district court imposed a procedurally and substantively reasonable sentence.

The Due Process Clause did not compel the district judge to sua sponte recuse himself. Householder's decades-old fundraising activities did not create the potential for unconstitutional bias.

Householder waived his argument that he was denied the right to counsel during the overnight recess in his testimony because he did not present it in his principal brief. Even if not waived, Householder cannot show any deprivation of counsel, let alone a plain or obvious deprivation requiring reversal.

## ARGUMENT

### I.    The evidence was sufficient.

Householder argues that the evidence was insufficient to convict him because no rational juror could have found that he conspired to conduct or participate in the affairs of the enterprise through "a pattern of racketeering activity."[4] 18 U.S.C. §§ 1962(c)-(d). A "pattern of racketeering activity" requires "at least two [predicate] acts" that are related to the enterprise and to each other and that pose a threat of continued criminal activity. *Id*. § 1961(5). Householder cannot meet the "heavy burden" the sufficiency standard imposes. *United States v. Emmons*, 8 F.4th 454, 478 (6th Cir. 2021).

Householder's enterprise committed dozens of racketeering acts, which the government broke down into three categories: (1) public official bribery; (2) private citizen bribery; and (3) money laundering. Only the first and third categories applied to Householder. (R.238, tr.,9479-80,9485-9532.)

---

[4] This Court usually reviews the sufficiency of the evidence first. *United States v. Parkes*, 668 F.3d 295, 300 (6th Cir. 2012).

### A. Public Official Bribery

Although a RICO conspiracy charge does not require proof that the defendant committed any predicate acts, *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008), Householder committed multiple public official bribery acts in furtherance of the conspiracy. These acts, alone, satisfy the pattern element. *United States v. Hills*, 27 F.4th 1155, 1174 (6th Cir. 2022).

#### 1. The evidence was sufficient to establish an explicit quid pro quo.

The district court's instructions regarding the federal bribery predicates required the government to prove an explicit quid pro quo—that "the contours of the proposed exchange were clearly understood by both the public official and the payor, even if the proposed exchange was not communicated between them in express terms."[5] (R.260, instructions,10606); *McCormick v. United States*, 500 U.S. 257 (1991);

---

[5] The government did not object to the instructions requiring this heightened burden, even though the payments were not campaign contributions under *McCormick. See infra*, III.A.4. However, a sufficiency challenge is assessed against the correct elements, not unnecessarily "heightened" jury instruction requirements. *Musacchio v. United States*, 577 U.S. 237, 243 (2016). Here, the evidence easily satisfied even the heightened standard in the instructions.

*Evans v. United States*, 504 U.S. 255 (1992); *United States v. Terry*, 707 F.3d 607 (6th Cir. 2013); *United States v. Blandford*, 33 F.3d 685, 696 n.13 (6th Cir. 1994). The evidence overwhelmingly satisfied this standard. Householder solicited and received millions of dollars from FirstEnergy in exchange for specific official action related to the bailout, and he did so repeatedly from 2017 through 2020. Householder's contrary arguments ignore the facts and misapply the law.

The jury saw firsthand that FirstEnergy financed Householder's bid for Speaker in exchange for his promise to use that position to pass nuclear bailout legislation. The secret deal was struck over steak dinners in Washington D.C., where Householder went to fundraise for the Speakership.[6]

---

[6] The record refutes Householder's assertions that Longstreth's testimony about the dinners was "likely false." (App.Br., 48-49,n.14,15.) Longstreth testified about two dinners involving Householder and FirstEnergy. (R.217, tr.,7634-40.) The first occurred at the Charlie Palmer Steakhouse on January 18, 2017. This testimony was corroborated by travel itineraries (R.307, Ex.215B,12697-12699, Ex.216B,12700-02) and metadata from photographs that placed Householder and Dowling at the restaurant that night. (*Compare* R.307, Ex.911,13001, Ex.911A,13002 (photos with metadata) *with* R.228, tr.,8514-15,8523-24,8529-30 (Householder testimony).) Jones's expenses and hotel confirmation corroborated Longstreth by showing Jones was in D.C. that night. (Def.App'x, Ex.479,186-87,190-91.) Longstreth testified that he could not recall whether the second dinner

45

When Householder returned home, he created a 501(c)(4) as Dowling directed so that FirstEnergy could give him "undisclosed and unlimited" payments. (R.217, tr.,7636.) In 2017, Jones promised—and FirstEnergy paid—$1 million to Householder through Generation Now so that Householder would "save the two nuclear power plants" through a "state solution" as Speaker. (*Id.*,7623-24.) As Jones told Longstreth: "We have to get Larry in there . . . because I know he won't let anything bad happen to us." (*Id.*)

Throughout 2018, Householder went back to FirstEnergy—which the enterprise referred to as "the bank"—because the money was "unlimited." (R.302, Ex.527B,12438,12453.) Householder used FirstEnergy dollars to fund his political machine, which included recruiting a team of candidates who then voted for him as Speaker. He also used the FirstEnergy money to pay off his personal debts.

---

at The Palm occurred on January 19 or 20 (R.219, tr.,7916), but documents showed it was likely on January 20—not January 19, as Householder suggests. (R.307, Ex.215B,12699; Def.App'x, Ex.478,172.) The jury could thus reasonably credit Longstreth's testimony, which must be interpreted in the light most favorable to the government. *See Hills*, 27 F.4th at 1176 ("the credibility of a trial witness is not relevant to our determination of the sufficiency of the evidence").

Householder's solicitations, and the "unlimited" payments that followed, further evidenced the agreement. For example, when the Generation Now account balance dropped in August 2018, Householder met with Jones at FirstEnergy headquarters to discuss his need for more money. Following the meeting, FirstEnergy infused Generation Now with $500,000. Householder thanked Jones, and Jones responded: "We are rooting for you and your team!" Householder replied: "[W]e are on [the] same team." (R.302, Ex.286C,12348.) On the eve of the 2018 election, Householder again met with Jones to solicit more money. Shortly thereafter, FirstEnergy wired $500,000 dollars directly to Hardworking Ohioans.

Around the same time, FES executives and lobbyists met with Householder and provided him with a $400,000 check. The purpose of the meeting was to establish that FES's payment "was specifically tied to the [bailout] legislation." (R.211, tr.,6781-86.) Klaffky handed the check to Householder stating, "Our client care[s] very much about our issue"; after seeing the amount, Householder responded, "Well, yes, they do," and then discussed how he would support the legislation. (*Id.*) Householder received a second check for $100,000 after the meeting.

47

The over $3.3 million Householder received from FirstEnergy in 2017 and 2018 propelled him to the Speakership. The underlying agreement was that, in exchange for FirstEnergy's financial support, Householder would pass bailout legislation for FirstEnergy's benefit. And that is exactly what happened.

As Speaker, Householder "went to war" for FirstEnergy (R.302, Ex.525B,12423), acting swiftly to uphold his end of the corrupt bargain. He created a new subcommittee, staffed it with members loyal to him, and collaborated with FirstEnergy in drafting the legislation. HB 6 was introduced just three months after Householder took the helm.

While HB 6 was pending, FirstEnergy continued to secretly pay Householder through Generation Now to ensure his "continued support" in passing the legislation. (R.211, tr.,6811-17.) For example, as opposition to the bill mounted, FirstEnergy agreed to pay Householder $15 million more. Cespedes testified that his client "had no choice" but to pay Householder this money and that his advice was: "[D]o whatever Generation Now and the Speaker said to do." (*Id.*,6811-15.) In return, FirstEnergy received "the full support of the Speaker, [who] ma[d]e sure th[e] [bailout] legislation was passed." (*Id.*,6817.)

After receiving the money, Householder oversaw an aggressive media campaign to provide "cover" for representatives supporting the legislation and pressured other representatives to vote "yes." The legislation passed by a narrow margin.

When a ballot referendum threatened to repeal HB 6, FirstEnergy paid $38 million more to Householder through Generation Now in exchange for Householder's promise to preserve the bailout through new official action. Cespedes described this referendum phase—additional payments in return for Householder pressuring Yost to take action adverse to the referendum and preparing backup legislation—as a continuation of the "same arrangement." (R.211, tr.,6846-50.)

FirstEnergy and Householder benefited from their corrupt bargains. HB 6 secured over $1 billion in subsidies and an additional $20 to $50 million per year in fixed revenue for FirstEnergy. Householder used FirstEnergy's bribe payments to staff and fund his political machine and increase his power. He financially benefited as well—netting half a million dollars. (*See* R.303, Ex.819,12655.)[7]

---

[7] Householder's personal payments were made with Generation Now funds passed through Longstreth-owned accounts. (R.217, tr.,7592-93, 7598-7618; R.303, Ex.812,12653, Ex.818,12654, Ex.819,12655.) At trial,

Evidence showed that the corrupt relationship continued into 2020, when FirstEnergy again funded Generation Now following a solicitation by Householder about a term-limits initiative that would allow him to remain in power longer and thus be "good for the home team" at FirstEnergy. (R.307, Ex.330G,12726-32.) In response, FirstEnergy, through Partners for Progress, wired $2 million to Generation Now. (R.307, Ex.330G,12717 (Dowling: "Mums the word to all. $2m").) Jones called Householder "an expensive friend," while highlighting Householder's statement that "he would get a lot done in 16 more years" as Speaker. (*Id.*, Ex.330A,12723.)

Longstreth and Clark similarly solicited Cespedes on Householder's behalf regarding Energy Harbor (formerly FES). Cespedes testified that he spoke with Clark about "exchanging [Energy Harbor's] support" on the term-limits initiative—*i.e.*, millions of additional dollars to Householder—in return for Householder's support in increasing the HB 6 subsidy from six years to ten. (R.212, tr.,6921-

---

Householder claimed that these payments were simply loans he intended to repay, despite evidence—including testimony by Longstreth—to the contrary. (R.217, tr.,7598-7618; R.219, tr.,7904-06.) Regardless, this money benefited Householder.

22.) And Householder and Clark solicited another bribe unrelated to FirstEnergy: that Householder would draft gaming legislation in exchange for a payment to Generation Now or another Householder entity.

***

Based on this evidence, a rational juror could certainly conclude that Householder committed multiple predicate acts of public official bribery when he solicited and accepted payments in exchange for specific official action. *See* 18 U.S.C. §§ 1343, 1346; 18 U.S.C. § 1951; Ohio Rev. Code § 2921.02. The testimony, communications, and recordings detailing payments in exchange for official action; the swiftness of Householder's actions in securing a bailout for FirstEnergy after becoming Speaker; the pressure Householder exerted on other public officials regarding the bailout; and the astonishing amount of money he received[8] all supported this conclusion.

---

[8] Householder argues that the amount of money at issue is irrelevant. (App.Br., 47.) Not so. A jury could reasonably view the extraordinary amount of money involved as circumstantial evidence that the payments were in exchange for passing and preserving legislation providing significant financial benefits to FirstEnergy, and that Householder knew it. *Evans*, 504 U.S. at 268.

51

Indeed, the co-conspirators' own words evinced the corrupt agreement. Clark revealed that they "call[ed] FirstEnergy the bank," and characterized the relationship between Householder and FirstEnergy as "pay to play." (R.302, Ex.525B,12424, Ex.527B,12438.) Borges similarly called FirstEnergy's payments "Monopoly money" and characterized Householder's relationship with FirstEnergy as "an unholy alliance." (R.303, Ex.615C,12538,12554.)

Longstreth and Cespedes described the bargains in detail. Longstreth testified that FirstEnergy's payments to Householder were given in exchange for a nuclear bailout. (*E.g.*, R.217, tr.,7623-25 (recalling discussion with Jones connecting "state solution" and Speaker's race and testifying that FirstEnergy "wanted to make sure that their donations were being well spent"); *id.*,7665-66 (recalling discussion at Jones's office and testifying that "everybody there knew that the reason" Jones supported Householder's bid for Speaker was because FirstEnergy was "in need of the state solution, the bailout"); *id.*,7690 (testifying that text saying "let's . . . get the rest of the deal done" meant let's "get House Bill 6 passed").) And Cespedes testified

that the $400,000 check given to Householder was "specifically tied to the legislation we were looking to enact." (R.211, tr.,6786.)

Contemporaneous communications corroborated their testimony. When Householder was elected Speaker, Cespedes texted Klaffky that their "investment seem[ed] very wise," to which Klaffky responded: "High risk, high reward." (R.303, Ex.748,12644.) While discussing additional FirstEnergy payments to Householder after introduction of HB 6, Jones called Householder "a bargain"—but "not cheap." (R.302, Ex.460C,12392.) And following passage of HB 6, Jones texted Dowling that their "big bet" had "paid off." (R.302, Ex.517B,12406.) Clark similarly recounted how Householder took millions from FirstEnergy, "went to war for them," and secured them "$1.3 billion in subsidies, free payments." (*Id.*, Ex.525B,12423.)

Longstreth and Cespedes also described the referendum phase, during which FirstEnergy made additional payments in exchange for new official action to preserve the bailout. (R.211, tr.,6848-50; R.217, tr.,7708; *see also*, *id.*,7712.) Cespedes specifically testified about a call in which Householder promised "to do everything in his power to help defeat the referendum" and "to introduce new legislation" if the

53

referendum succeeded. (R.211, tr.,6845-50.) And Cespedes testified that the company agreed to pay Householder because of that promise. (*Id.*,6846-50.)

Text messages corroborated their testimony, showing that company executives were "following [Householder's] lead" on the anti-referendum effort because of his "personal involvement," including his promise to introduce new referendum-proof legislation. (R.302, Ex.601C,12462, Ex.601D,12466; R.303, Ex.634A,12577 (Jones text: "[Householder] seemed pretty confident in his referendum strategy and plans to pass [the bailout] as a tax in a new bill"), Ex.634B,12580 ("He's got the 'tax' bill ready to go"), Ex.634D,12585 ("Householder has [a] 'quick fix'").)

In addition, the jury heard concealment evidence, including the enterprise's use of a secret 501(c)(4) and other entities to receive, conceal, and distribute bribes; Householder's attempt to delete text messages about HB 6 (R.201, tr.,5608; R.217, tr.,7691,7725,7965); and Householder's deletion of his call logs with Yost during the referendum (R.201, tr.,5683-86). *See United States v. McNair*, 605 F.3d 1152, 1197 (11th Cir. 2010) ("[T]he extent to which the parties went to conceal their

54

bribes is powerful evidence of their corrupt intent."). Finally, the jury evaluated Householder's counter-narrative, including his demonstrably false denials about his meetings with FirstEnergy executives and his involvement with (and control over) Generation Now. (R.285, tr.,11182-83 (district court recounting "unequivocally false" aspects of Householder's testimony).)

### 2. *Householder's contrary arguments misapply the law.*

Householder's contrary arguments misapply the governing standards. The sufficiency standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Despite this, Householder asks this Court to consider alternative explanations for the evidence, such as Householder's "longtime support[] [for] public utilities." (App.Br., 50.) But the jury was free to reject that explanation. *Terry*, 707 F.3d at 615; *United States v. Wallace*, 51 F.4th 177, 182-83 (6th Cir. 2022). Householder's contrary claims turn a blind eye to the mountain of evidence against him and do not faithfully apply the sufficiency standard.

Householder also distorts the explicit-quid-pro-quo standard, claiming that *McCormick* requires "unambiguous *evidence* of a corrupt agreement." (App.Br., 49 (emphasis added).) But neither *McCormick*, nor any other case, stands for that proposition. What *McCormick* actually requires is proof of a clearly understood corrupt bargain. *Blandford*, 33 F.3d at 696. Because bribery "does not have a magic-words requirement," *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015), the jury must determine whether the terms of the agreement were clear based on all the "words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them." *Terry*, 707 F.3d at 614. The record here included detailed co-conspirator testimony, communications, recordings, and other evidence from which a rational juror could conclude that the quid pro quos were clearly understood.

Householder cites two district court decisions, neither of which helps his argument. The first, *United States v. Benjamin*, was recently reversed by the Second Circuit. 95 F.4th 60 (2d Cir. 2024). Joining this Court and "every other circuit to have considered the question," the Second Circuit held that "[a]n explicit quid pro quo under *McCormic*k . . .

may be inferred from the official's and the payor's words and actions." *Id.* at 68-69. The second, *United States v. Menendez*, lacked any evidence that the defendants "were aware of the terms of the alleged quid pro quo." 291 F. Supp. 3d 606, 626-28 (D.N.J. 2018). The evidence here, as explained above, could not have been more different.

Finally, Householder argues that FirstEnergy's bribe payments were too attenuated in time from his official actions to constitute bribery. Householder highlights that he could not take specific official action for FirstEnergy when he first started receiving payments because he was not yet Speaker. But this ignores that the bribery predicates were complete when Householder agreed to take future official action in return for payments. *Blandford*, 33 F.3d at 696. Further, this Court has made clear that each payment need not be tied to a specific official act, so long as Householder "understood that, whenever the opportunity present[ed] itself," he would "take specific official actions on [FirstEnergy's] behalf." *Terry*, 707 F.3d at 614. Here, overwhelming evidence showed that Householder solicited and received millions of dollars (the quid) to help him win the Speakership, agreeing that he would use that position to introduce bailout legislation (the

57

quo). Moreover, Householder (personally and through his co-conspirators) continued to solicit and receive additional money from FirstEnergy in exchange for specific official action to ensure the legislation passed and was not repealed after he became Speaker.

### B. *Money Laundering*

As Householder appears to acknowledge (App.Br., 57), if the FirstEnergy-to-Generation-Now payments constituted bribery proceeds (and, for all of the reasons above, they did), the government necessarily proved money laundering. (R.260, instructions,10616,10618). Specifically, the government proved multiple acts of concealment money laundering under § 1956 and almost 100 acts of engaging in monetary transactions over $10,000 under § 1957. (R.217, tr.,7725; R.307, Ex.18,12686-90, Ex.153,12691-92, Ex.154,12693-95, Ex.180,12696, Ex.300,12721, Ex.315,12722, Ex.340,12733-56, Ex.352,12777.) Householder offers no argument to the contrary.

### C. *Private Citizen Bribery*

Householder challenges the evidence underlying the private citizen bribery predicates, which related to Borges's bribe of the manager overseeing the signature-collection effort. But, as Householder

recognizes (App.Br., 39), the government never argued—nor did the evidence establish—that the private-honest services predicate applied to Householder. This Court need not address these arguments.

## II. The dismissal of Juror 4 for reasonable cause did not implicate Householder's right to counsel, much less constitute reversible error.

The district court dismissed Juror 4 and replaced him with an alternate. Householder alleges that the court violated the Sixth Amendment by doing so without affording his counsel an opportunity to be heard. This Court need not grapple with Householder's constitutional claim because the record refutes the factual allegation underpinning it. Householder's counsel had an opportunity to be heard before the dismissal. The Sixth Amendment is thus not implicated. But even if it were, any error would be harmless.

*A. The district court dismissed Juror 4 for reasonable cause.*

A district court may seat an alternate when another juror is "unable to perform" or "disqualified from performing" juror duties. Fed. R. Crim. Proc. 24(c)(1). If the court has "reasonable cause" for the replacement, it need not obtain the defendant's consent. *United States v. De Oleo*, 697 F.3d 338, 341-42 (6th Cir. 2012). Because the district

court is in the best position to assess "reasonable cause," this Court

reviews juror replacements for abuse of discretion. *Id*.

After two days of trial, a juror contracted COVID-19. The district

court was thus faced with the difficult task of advancing a lengthy trial,

while ensuring jurors' health. In addition to ordering a week-long

recess, the court required all jurors to test negative before returning.

The court also required all jurors and parties to wear masks when trial

resumed.

The day before trial was scheduled to resume, Juror 4 failed to

provide a test result or a timeframe for receiving it. He also resisted

taking another test that might yield a quicker result. In addition, Juror

4 informed the court that he would not wear a mask, even if required.

The district court considered these safety issues in conjunction with the

fact that Juror 4 would need to be excused if the trial or deliberations

went beyond March 3—which they did.

On this record, the court clearly acted within its discretion by

dismissing Juror 4. Trial courts have "inherent authority, and even

grave responsibility, to determine what safety measures are necessary

to protect the judge, court personnel, the parties, the lawyers, the

60

jurors, and the audience in and around the courtroom." *United States v. Smith*, No. 21-5432, 2021 WL 5567267, at *2 (6th Cir. Nov. 29, 2021) (internal quotation marks and citation omitted). The district court did that here. To prevent the spread of COVID-19, the court required jurors to present a negative test before returning and to wear masks upon their return. Juror 4's failure to provide a test result, resistance to taking another test, and refusal to wear a mask established reasonable cause permitting dismissal. *See, e.g., De Oleo*, 697 F.3d at 342 (affirming dismissal where scheduling conflict constituted reasonable cause and collecting examples of other dismissals upheld); *United States v. Bravata*, 636 F. App'x 277, 291 (6th Cir. 2016) (affirming dismissal of juror who fell ill for case-management reasons).

Indeed, the mask requirement remained vitally important as trial progressed. One week after the dismissal, another juror tested positive for COVID-19. To avoid another extended recess, the district court adopted additional safety measures recommended by a public health expert, which included having jurors wear N95 masks. (R.205, tr.,5942.)

The district court had reasonable cause to excuse Juror 4 because he jeopardized the prompt and safe resumption of trial. Householder does not—and cannot—show any abuse of discretion.

B. *The district court communicated its reasons for dismissing Juror 4 and afforded defense counsel an opportunity to be heard.*

While trial remained in recess due to COVID-19, the district court communicated—in writing—its intention to dismiss Juror 4, and the reasons supporting it, to counsel for all parties. (R.292-2, attachment,11630.) The court then conferred with counsel over the phone, at which time Attorney Oleski voiced no objection to the proposed dismissal. (R.197, tr.,4943 ("We had a conversation with one of Mr. Householder's lawyers, and they, too, were amenable to the Court's approach."); Jan. 31, 2023 notation order (court "conferred with counsel via email and telephone prior to excusing Juror #4, at which time no party objected").) Householder's counsel had an opportunity to be heard.

Householder's contrary arguments mischaracterize the record. Householder maintains, for example, that the email informing counsel that the court "decided to cut [Juror No. 4] *now*, and to return tomorrow with 15 jurors" was somehow inconsistent with the court's subsequent

communications and on-the-record statements that it "had not excused the juror" until speaking with counsel for the parties, including Householder's counsel. (App.Br., 20 (emphasis added).) But the email correspondence corroborates the sequence of events described by the district court. (*See* R.292, order,11331,n.3; R.292-2, attachment,11629-49.)

While Householder characterizes the district court's "rationale for its actions as faulty" (App.Br., 24), what he really means is false. In other words, reaching the merits of Householder's Sixth Amendment claim requires crediting his allegation that the district court deliberately falsified what occurred—orally and in writing. But Householder fails to substantiate this serious allegation. And, as explained above, the sequence of emails that the district court incorporated into the record and the court's oral and written statements support its factual finding. Indeed, Attorney Oleski (the Householder attorney with whom the court communicated) did not contest the district court's recitation of events in open court, despite having an opportunity to do so. Nor did counsel for the other parties. It was only Attorney Marein—who was not a party to the call with the court—who

claimed that he had not been afforded an opportunity to be heard. (R.197, tr.,4943 ("30 minutes or so after that, may not have been 30, we got an e-mail from another one of Mr. Householder's attorneys raising an objection to the Court having excused the juror").)

Because Householder's Sixth Amendment claim rests on an allegation that the record cannot support, it fails at the outset.

### C.  *Any error related to the dismissal would be harmless, in any event.*

Even if Householder's factual allegation were supported by the record, he still could not establish a *per se* Sixth Amendment violation under *United States v. Cronic*, 466 U.S. 648 (1984). The "*Cronic* structural-error exception is 'narrow.'" *Edwards v. Burt*, 823 F. App'x 326, 334 (6th Cir. 2020) (quoting *Florida v. Nixon*, 543 U.S. 175, 190, 125 (2004)). To warrant automatic reversal under *Cronic*, counsel must have been excluded from a critical stage of a criminal proceeding and counsel's absence must have "'necessarily undermine[d] the reliability of the entire criminal proceeding.'" *Id.* at 337 (quoting *United States v. Owen*, 407 F.3d 222, 228 (4th Cir. 2005)). This interpretation of *Cronic* is consistent with the Supreme Court's critical-stage jurisprudence and with its application of the harmless-error rule. *Id.* at 337-38 (noting

that *Cronic* used "critical stage" narrowly, while other cases use the phrase more broadly to include proceedings where a right to counsel attaches but denial of counsel is subject to harmless-error analysis).

Householder's allegation would not warrant automatic reversal. *See Edwards*, 823 F. App'x at 336-38 (emphasizing narrowness of *Cronic* structural-error); *Van v. Jones*, 475 F.3d 292, 312-13 (6th Cir. 2007) (identifying common thread in Supreme Court jurisprudence to be "whether there was a reasonable probability that [the defendant's] case could suffer significant consequences from his total denial of counsel at the stage"); *see, e.g., Olszewski v. Spencer,* 466 F.3d 47, 64 (1st Cir. 2006) (dismissal of juror due to personal hardship, without notice to counsel, and replacement with alternate juror was harmless); *United States v. Khoury*, 62 F.3d 1138, 1140 (9th Cir. 1995) (same); *cf. United States v. Ehmer*, 87 F.4th 1073 (9th Cir. 2023) (pretrial exclusion of prospective jurors based on case-specific determinations of bias was not "critical stage" under *Cronic* and error was harmless). The dismissal of Juror 4 prior to the start of deliberations for administrative and safety reasons did not implicate any rights or defenses of Householder; nor did it hold significant consequences for him because an impartial jury

remained. *E.g., United States v. Warren,* 973 F.2d 1304, 1308 (6th Cir. 1992) (no showing of prejudice where seated juror was dismissed and replaced with alternate juror over objection of the defendant); *United States v. Lindsey*, 634 F.3d 541, 553-54 (9th Cir. 2011) (even if for-cause dismissals constituted abuse of discretion, the dismissals were harmless because they "did not result in a prejudiced jury panel").

Householder's primary authority, *United States v. Gay*, 522 F.2d 429 (6th Cir. 1975), does not help him. In *Gay*, following empanelment and without informing counsel, the district court decided to sequester the jury. *Id*. The court then excused certain jurors outside the defendant's presence and without notice or explanation to defense counsel. *Id. Gay* held that the dismissal of the jurors in the absence of the defendants and their counsel, without notice, and without any record, violated Rule 43(a).[9] *Id*. at 435. This Court then analyzed whether the error was harmless, which would have been unnecessary if counsel's absence constituted structural error. *Id.; see Hudson v. Jones*,

---

[9] Householder raises a cursory Rule 43 claim for the first time on appeal. Even if deemed forfeited, and not waived, *see United States v. Brown*, 571 F.2d 980, 987 (6th Cir. 1978), any such error would not be plain in these circumstances, nor would it prejudice Householder or seriously affect the fairness, integrity, or reputation of the proceedings.

351 F.3d 212, 216-17 (6th Cir. 2003). Certainly *Gay*—reversing under Rule 43 after a harmless-error analysis—provides no support for Householder's distinct argument that this Court should reverse on Sixth Amendment grounds, without considering harmlessness.

Indeed, unlike in *Gay*, where the "total absence of a record" prevented this Court from making a harmlessness determination, the record here establishes that any error was harmless. The district court plainly dismissed Juror 4 for reasonable cause. *See Ehmer*, 87 F.4th 1073 at 1106-07 (any error from ex parte pretrial excusals harmless where record showed excusals were proper). Moreover, given that trial continued until March 9, and given that Juror 4 was unable to serve beyond March 3, the juror would have ultimately been excused and replaced with an alternate in any event. Householder thus cannot identify any prejudice from Juror 4's earlier dismissal, nor can he challenge the impartiality of the jury. Any alleged error related to the dismissal of Juror 4 thus cannot succeed.

## III. The district court properly instructed the jury; and any instructional error would be harmless.

Householder argues that the district court issued erroneous instructions related to the bribery predicates and the impeachment of a defense witness.

### A. The bribery instructions were consistent with controlling law.

The government argued that Householder conspired to conduct or participate in a pattern of racketeering activity involving three bribery predicates: honest services wire fraud, Hobbs Act extortion, and state law bribery. The instructions for these predicates meticulously hewed to controlling law, and Householder's contrary arguments are meritless.

### 1. The federal bribery instructions properly required proof of a quid pro quo.

Honest services wire fraud and Hobbs Act extortion criminalize quid pro quo bribery. *See Skilling v. United States*, 561 U.S. 358, 368 (2010) (honest services fraud "covers only bribery and kickback schemes"); *Evans*, 504 U.S. at 260 (Hobbs Act extortion includes "taking a bribe"); *McDonnell v. United States*, 579 U.S. 550, 562, (2016) (the "theory underlying both the honest services fraud and Hobbs Act extortion charges was that [defendant] had accepted bribes"). The

68

relevant instructions for those predicates required the jury to find a quid pro quo exchange of something of value for specific official action. (*See* R.260, instructions,10605-09.)

Householder renews his argument that the instructions inadequately explained what he calls the "agreement requirement." (App.Br., 27.) In doing so, he cites a portion of the bribery instruction, which provided:

> A bribery exchange can include either: (1) a public official's solicitations of things of value in exchange for performing or agreeing to perform specific official action; or (2) a public official's receipt of things of value when the public official knows that the person who gave the thing of value was doing so in return for the public official performing or agreeing to perform a specific official action.

(R.260, instructions,10605-06). Householder's objection to this portion of the instruction runs headlong into Supreme Court authority. *Skilling*, 561 U.S. at 413 (honest services bribery exchange includes a public official's solicitations of things of value in exchange for official action); *Evans*, 504 U.S. at 268-74 (required exchange can be established by showing "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts").

Moreover, Householder's argument that this portion of the instruction did not sufficiently explain the "agreement requirement" ignores the remainder of the instruction. *See, e.g.*, (R.260, instructions,10605 (requiring "bribery exchange" and "quid pro quo"); *id.*,10606 (explaining that public official must solicit, receive, accept, or agree to accept something of value "in exchange" for official action); *id.* (explaining that "[t]he quid pro quo agreement" need not be express); *id.* (explaining that "a bribery agreement" does not require a formal contract); *id.* (requiring that the "bribery agreement . . . must be explicit, . . . mean[ing] that the government must show that the requirements of the proposed exchange were clearly understood by both the public official and the payor . . .")[10]; *id.*,10607 ("it is sufficient if the public official agreed to perform a specific official act in exchange for a thing of value, or if he received payment knowing it was provided to him in exchange for his agreement to perform a specific official act"); *id.*,10609 (requiring, for extortion, that "the defendant or conspirator knew the property was being obtained, accepted, taken, or received in exchange for an official act").)

---

[10] *But see infra*, III.A.4.

To the extent Householder complains that the instructions required only an "expectation" of official action rather than an agreement, he ignores the actual wording of the instructions, which came straight from the Supreme Court and told jurors that they could, "for example, conclude *that an agreement was reached* if the evidence show[ed] that the public official received a thing of value knowing that it was given with the expectation that the official would perform a specific official act in return." (R.260, instructions,10607-08 (emphasis added)); *McDonnell*, 579 U.S. at 572.

Householder can show no error.

> 2. *The federal bribery instructions did not permit the jury to find bribery based on an open-ended promise.*

Householder next argues that the jury should have been instructed that the "explicit quid pro quo agreement must exist at the time . . . the bribe was paid," as he had proposed. (R.174, defendant instructions,4059; R.237, tr.,9354.) But bribery does not require that the quid pro quo be fully executed. *E.g. Hills,* 27 F.4th at 1175. The instructions thus correctly recognized that bribery included "the public official's solicitation or agreement to accept the thing of value in exchange for official action, whether or not the payor actually provides

71

the thing of value . . . ." *United States v. McCabe,* 103 F.4th 259, 281

(4th Cir. 2024) (approving identical instruction).

Householder maintains that his instruction was necessary to

prevent "the possibility that the jury could find that [he] was expected

to take official action 'on *any question or matter* in return for the

payment.'" (App.Br., 30-31.) But the actual instructions again refute

him. Consistent with both *Evans* and *McDonnell*, the instructions

required the jury to find that Householder "intended to exchange a

thing of value from the payor for *specific official action,*" or that

Householder "knew the payor intended to exchange the thing of value

for a *specific official act* from [him]." (R.260, instructions,10606); *Evans*,

504 U.S. at 268. Finally, contrary to Householder's contention, the

district court's further instruction that it was "sufficient that the public

official understood that the agreement was to take a specific official

action on the payor's behalf when the opportunity presented itself" was

not erroneous or anything like the open-ended instructions in *United*

*States v. Silver*, 948 F.3d 538, 559 (2d Cir. 2020) and *United States v.*

*Skelos*, 988 F.3d 645, 656 (2d Cir. 2021). In fact, the instruction given

72

came straight from this Court. *Terry*, 707 F.3d at 614; *accord* Sixth Cir. Pattern Inst. 17.02(3)(C).

Householder additionally argues that the district court's refusal to include his requested instruction ran afoul of the recent decision in *Snyder v. United States*, 603 U.S. – , 144 S.Ct. 1947 (June 26, 2024). (Doc.42, 28(j) letter.) But *Snyder* addressed application of 18 U.S.C. § 666(a)(1)(B) to a public official's acceptance of gratuities—a statute, and conduct, that was neither charged nor instructed on here. To the extent that *Snyder* is relevant, it reinforces that bribes are "payments made or agreed to *before* an official act in order to influence the official with respect to that future official act." *Id.* at 1951. That was what the instructions here required. (*See, e.g.*, R.260, instructions,10605,10607.)

That is also exactly what the evidence showed: corrupt agreements followed by payments and official action. To the extent Householder suggests that the millions of dollars FirstEnergy paid him after HB 6 was passed could not constitute bribe payments (Doc.42,28(j) letter), he ignores the referendum phase of the conspiracy during which FirstEnergy paid Householder millions more in exchange for his agreement to take official action to preserve the bailout, including

73

preparing alternate "tax" legislation to make HB 6 referendum-proof. This was a continuation of the prior corrupt "arrangement." (R.211, tr.,6846-50.) The corrupt solicitation and $2 million payment from FirstEnergy to Householder in February 2020 were similarly part of a continuing corrupt understanding for Householder to "get a lot done" for FirstEnergy as Speaker, including additional legislation to extend the HB 6 subsidy. (R.307, Ex. 330A,12723-24, Ex.330G,12726-32; *see* R.212, tr.,6922 (Cespedes describing 2020 solicitation to exchange "our support on this ballot issue for . . . being able to add those four years back to our legislation")); *Benjamin*, 95 F.4th at 74 ("Under *McCormick* and *Evans*, 'a quid pro quo with the attendant corrupt motive can be inferred from an *ongoing course of conduct*.'") (quoting *Evans*, 504 U.S. at 274) (emphasis in original).

Householder can show no error.

### 3. The federal bribery instructions properly permitted the jury to find bribery based on circumstantial evidence.

Householder also argues that the district court erred by instructing the jury that bribery could be proven by implication. His argument conflicts with this Court's decision in *Terry*. 707 F.3d at 613-15 (recognizing that "context may show that an otherwise legitimate

74

contribution is a bribe"). Householder is wrong to suggest that the Supreme Court has said anything different. (App.Br., 31.)

In *McCormick*, the Supreme Court held that a public official may be convicted for taking bribes in the form of campaign contributions where the government proves an explicit quid pro quo—*i.e*, where "the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 272-73. This Circuit—and every other to consider the question—has held that *McCormick*'s requirement "may be met by implication from the official's and the payor's words and actions." *Benjamin*, 95 F.4th at 68-69, 74 (citing *Terry* and other circuits and holding same).

Householder can show no error.

4.  *The state bribery instructions were not required to incorporate the specific elements of federal bribery statutes.*

The RICO statute includes as racketeering activity "*any* act or threat *involving*" bribery that is "chargeable under State law." 18 U.S.C. § 1961(1). This Court has highlighted the statute's "expansive" language and instructed that it should be "liberally construed to effectuate its remedial purpose[ ]" of combating organized crime. *United*

75

*States v. Licavoli*, 725 F.2d 1040, 1045-47 (6th Cir. 1984). Courts necessarily look to state statutes and cases to determine when bribery is "chargeable under State law." *See id.*; *United States v. Qaoud*, 777 F.2d 1105, 1118 (6th Cir. 1985) (affirming state bribery RICO predicates under Michigan law); *United States v. Cisell*, 700 F.2d 338, 340 (6th Cir. 1983) (question regarding state RICO predicate was certified to state supreme court); *United States v. Barnett*, 660 F. App'x 235, 249 n.5 (4th Cir. 2016) (relying on state law to define state RICO predicates); *cf. United States v. Tripp*, 782 F.2d 38, 42 (6th Cir. 1986) (rejecting argument that RICO statute is unconstitutionally vague by referencing laws of states).

The district court instructed the jury on the state bribery predicate consistent with Ohio law. These instructions did not, as Householder suggests, "permit[ ] the jury to convict if it found that the public official simply solicited or accepted valuable benefits." (App.Br., 33.) Instead, they required the jury to find: (1) that a public servant knowingly solicited or accepted for himself any valuable thing or valuable benefit; (2) that he intended the valuable thing or benefit to corrupt or to improperly influence him; and (3) that the corruption or

improper influence was with respect to the discharge of his duties as a public servant. (R.260, instructions,10614.)

Householder argues that the district court should have engrafted the explicit-quid-pro-quo requirement from *McCormick* and the official-action requirement from *McDonnell* onto the state bribery predicate. Although Householder gestures at the need to "avoid First Amendment issues" (App.Br., 32), he fails to meaningfully develop any argument—or cite any authority—that the Constitution requires superimposing these specific federal bribery requirements onto state bribery statutes. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) (issues lacking developed argumentation are waived).

Householder's lack of authority is unsurprising. *McCormick* and *McDonnell* interpreted federal statutes and did not purport to promulgate bribery rules of universal applicability. *McCormick*, 500 U.S. at 273 (interpreting "under color of official right" in 18 U.S.C. § 1951); *McDonnell*, 579 U.S. at 566-74 (interpreting "official act" in 18 U.S.C. § 201); *see also, e.g., United States v. Jackson*, 72 F.3d 1370, 1376 (9th Cir. 1995) ("[T]he First Amendment does not imply an explicit quid pro quo element into every state bribery offense."); *cf. United States v.*

*Porter*, 886 F.3d 562, 565-66 (6th Cir. 2018) (*McDonnell*'s "official act" requirement, based on § 201, does not apply to distinctly worded federal-program bribery statute); *United States v. Roberson*, 998 F.3d 1237, 1247 (11th Cir. 2021) (same); *United States v. Ng Lap Seng*, 934 F.3d 110, 133-34 (2d Cir. 2019) (same)[11].

Householder's reliance on *McCormick*'s explicit-quid-pro-quo requirement is misplaced for an additional reason: the payments here were not campaign contributions subject to *McCormick*. (*See* R.112, response,2558,n.2.) *McCormick* held that, in applying the federal extortion statute to campaign contributions, the government must prove that the "payments [were] made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick*, 500 U.S. at 272-73. To hold otherwise, *McCormick* reasoned, "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by

---

[11] Congress has "define[d] the particular quid and quos prohibited" differently under different statutes and "not all federal bribery statutes identify 'official act'" as the quo, even under federal law. *Ng Lap Seng*, 934 F.3d at 131-33. Similarly, Ohio defined the applicable quos in § 2921.02. 2 CR Ohio Jury Instr. 521.02 (2020).

private contributions or expenditures, as they have been from the beginning of the nation.'" *Id*. at 272.

The corrupt payments here were large, coordinated, and prearranged payments made to Generation Now, an organization Householder created, controlled, and used for his benefit. (*See, e.g.*, R.302, Ex.527B,12448 ("Generation Now. It's the . . . Speaker's (c)(4)."), Ex.528B,12453 (Clark agreeing "Gen Now is the (c)4 that . . . Householder created for himself."); R.211, tr.,6785; R.217, tr.,7636,7640,7644); *Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 464-65 (2001) (recognizing corruptive influence of prearranged and coordinated expenditures). The purpose of Generation Now was to allow Householder to receive "undisclosed and unlimited" payments from FirstEnergy. (R.194, tr.,4730,4743-46 (official may not lawfully use 501(c)(4) to raise contributions for his benefit).)

Householder could not have lawfully received millions of undisclosed dollars from FirstEnergy for campaign or election purposes. Ohio Rev. Code § 3517.10 (requiring public disclosure of campaign contributions); § 3517.102 (setting contribution limits). The FirstEnergy

payments were akin to bags of cash or deposits into Householder's personal account that he could use for any purpose. (*See* R.303, Ex.819,12655 (using $500,000 for personal expenses).) Because the bribe payments here were in no sense "within the law" or "unavoidable" political activity, *McCormick* would not apply even if it were otherwise germane to this state offense. *See, e.g., United States v. Salahuddin*, 765 F.3d 329, 343 (3d Cir. 2014) (*McCormick* does not apply to charitable contributions given to influence public official).

In any event, the instructions avoided the concerns addressed by *McCormick*. The Ohio statute requires that the official, in accepting a payment or benefit, "intended the valuable thing or benefit to corrupt or to improperly influence him. . . with respect to the discharge of his duties as a public servant." (R.260, instructions,10614.) Conduct falling within this instruction—money to corrupt or to improperly influence the discharge of official duties—is in no sense "unavoidable" political activity. *See McCormick*, 500 U.S. at 272; *see Terry*, 707 F.3d at 613.

### 5. *Any error would be harmless.*

Any instructional error as to any of the bribery predicates would be harmless, in any event, because this Court can conclude, beyond a

reasonable doubt, that the jury nevertheless would have found Householder guilty of RICO conspiracy. *See Neder v. United States*, 527 U.S. 1, 18 (1999).

First, the federal bribery instructions were not erroneous in any of the respects Householder urges. But even if aspects of the instructions were viewed as flawed, any error would not have impacted the verdict in light of the instructions for these predicates as a whole, as discussed above. That is particularly so given the overwhelming evidence of guilt. *See supra*, I.A. Moreover, a finding that the federal bribery predicates were satisfied would have necessarily resulted in the same conclusion as to the state bribery predicate.

And the alleged error in declining to superimpose federal explicit-quid-pro-quo and official-act requirements on the state bribery instructions would also be harmless because the only theory presented involved explicit quid pro quos and official acts. In fact, the government's closing argument treated the federal and state "public official bribery" statutes identically and submitted that they were all satisfied based on the same explicit-quid-pro-quo and official-act evidence; and Householder's closing similarly argued an explicit quid

pro quo involving legislation was required, without once mentioning the Ohio bribery predicate. (R.238, tr.,9480,9484-85,9537,9541,9546, 9552,9587-89,9591-92); *see Ryan v. United States*, 688 F.3d 845, 849-51 (7th Cir. 2012) (holding "the jury *must* have found bribery" predicate because, among other reasons, "both sides argued the case to the jury as one about bribery" and "the prosecutor did not try to take advantage of the portion of the instructions that *Skilling* later disapproved") (emphasis in original).

The theory that Householder solicited and accepted millions in exchange for his official action passing and preserving the nuclear bailout was the only one presented. And the evidence supporting it was overwhelming—spelled out in testimony, communications, and recordings. (*See, e.g.*, R.302, Ex.525B,12424 (characterizing Householder's receipt of FirstEnergy money and HB 6 efforts as "pay to play"); R.211, tr.,6817 (in return for money, FirstEnergy received "the full support of the Speaker, [who would] make sure th[e] [bailout] legislation was passed"); R.302, Ex.528B,12454 (connecting millions received into Generation Now with FirstEnergy's receipt of "$1.3 billion in subsidies, free payments" through HB 6); R.211, tr.,8780-86 (handing

check to Householder that "was specifically tied to the legislation");
R.302, Ex.517B,12406 (Jones texting Dowling after passage of HB 6:
"We made a bbiiiiiig bet and it paid off."); R.211, tr.,6848-50 (testifying
that company agreed to pay Householder during referendum phase
because, as Speaker, he would "provide new legislation . . . if
necessary"); R.212, tr.,6922 (testifying about corrupt solicitation
"exchanging our [financial] support . . . for then in the future
[Householder] being able to add those four years back to our
legislation").) If the jury was unpersuaded by this evidence of
Householder accepting FirstEnergy money in exchange for specific
official acts, it could not rationally have found him guilty of joining the
conspiracy in the first place, as that was the only theory presented.

    All of this sets the case apart from *Callanan v. United States*, 881
F.2d 229, 235 (6th Cir. 1989), where this Court concluded that the jury
could "rationally" have convicted Attorney Callanan of RICO conspiracy
without finding two valid predicates.[12] It also means that, regardless of
any instructional error, given the trial evidence, there was no basis for

---

[12] In addition, *Callanan* predated *Neder*, and seemingly applies a more
demanding form of harmless-error review than *Neder* holds applicable.

the jury to convict based on "'conduct that [was] not unlawful'" because the sole theory involved money in exchange for official action. (*See* App.Br., 38 (quoting *McDonnell*, 579 U.S. at 579-80).)

> B. *The district court did not abuse its discretion in giving an instruction regarding the limited use of prior inconsistent statements; and any error was harmless.*

The defense sought to call Klaffky and Verhoff, two FES lobbyists who attended the October 10 meeting where Householder received a $400,000 check to Generation Now. While Verhoff invoked his Fifth Amendment right against self-incrimination, Klaffky elected to testify. (R.228, tr.,8391,8449.)

Prior to testifying, Klaffky spoke to a news reporter. The reporter asked about Cespedes's testimony, which placed Klaffky at the center of the October 10 exchange. Cespedes testified that Klaffky slid the check to Householder, while saying, "[o]ur client care[s] very much about our issue," and that Householder responded, "Well, yes they do." (R.211, tr.,6781.) Klaffky told the reporter that he "[did not] recall saying any of those things but was 'not saying that [he] didn't.'" (R.228, tr.,8454.)

On direct examination, Klaffky testified that no bribery agreement was formed at the meeting and that he did not witness any

"pay to play" activity. (*Id.*,8426.) He testified to these conclusions, despite also testifying that he could not recall what was discussed at the meeting. (*Id.*,8419,8452-53.)

On cross-examination, the prosecutor asked Klaffky whether he recalled speaking to the reporter. (*Id.*,8453-55.) The following ensued:

> PROSECUTOR: And you said you don't recall saying any of those things, "but I'm not saying that I didn't," you told that to the reporter; is that right?
> KLAFFKY: Right.
> PROSECUTOR: So you're not saying that you didn't say those things; you just couldn't recall it, right?
> KLAFFKY: Correct.
> PROSECUTOR: But then this morning you drew the conclusion that there was no pay to play, right?
> KLAFFKY: Correct.
> \*\*\*
> PROSECUTOR: And then you told the newspaper that you may have said the things?
> KLAFFKY: Yeah, that's what my point was, yeah. Someone may have said those things, I just don't remember specifically.

(*Id.*)

The district court did not abuse its discretion when it instructed the jury, pursuant to Pattern Instruction 7.04, as follows: "You have heard the testimony of Robert Klaffky. You have also heard that before this trial he made a statement that *may be different* from his testimony here in court. This earlier statement was brought to your attention *only*

*to help you decide how believable his testimony was.*" (R.260,
instructions,10628 (emphases added)); *accord* Sixth Cir. Pattern 7.04.

When the reporter asked Klaffky whether he recalled saying "my
client cares very much about this issue" when Householder received the
$400,000 check—a statement consistent with pay-to-play behavior—
Klaffky said he did not recall but was "not saying that he didn't." At
trial, however, Klaffky unequivocally testified that no "pay to play"
activity occurred during the meeting. The jury could have determined
that Klaffky's testimony under oath—that no "pay to play" activity
occurred—was inconsistent with his statement to the reporter, which
not only disclaimed any recollection of what was said at the meeting but
expressly *allowed* for the possibility of a pay-to-play statement.
Householder never confronts this inconsistency. Instead, he focuses on
the fact that Klaffky admitted making the prior statement to the
reporter. But the fact that Klaffky acknowledged making the prior
statement is not relevant to whether the statement was inconsistent
with his trial testimony.

Householder is equally misguided to suggest that Klaffky's
acknowledgement of the prior statement to the reporter—which

86

obviated the need for the government to separately admit it—somehow rendered the instruction inapplicable. The sole case Householder cites in support, *United States v. Toney*, is inapposite. 161 F.3d 404 (6th Cir. 1998). In *Toney*, the witness denied making the prior statements and the prosecutor then referenced them during closing, despite having never admitted evidence that the witness actually made them. *Id*. at 410. The prior statement here was "admitted" into evidence—Klaffky testified that he made the statement.

Any error in giving the instruction was harmless, in any event. *See id*. at 412-13 (finding error in giving instruction harmless because it was "more probable than not" that the instruction "did not materially affect the verdict"). The instruction "included permissive rather than mandatory language regarding the conclusion the jury could draw from the evidence." *Id*. The jury was thus free to find that Klaffky's prior statement was not, in fact, different from his testimony. Moreover, the instruction on witness credibility—to which Householder does not object—already informed the jury that it could consider prior inconsistent statements when assessing credibility. (R.260, instructions,10584.) Pattern Instruction 7.04 simply "inform[ed] the

87

jury of the limited use of these statements." *United States v. Presley*, 349 F. App'x 22, 30 n.3 (6th Cir. 2009).

There is thus no plausible basis to conclude that the challenged instruction materially affected the verdict. That is particularly true because—even setting aside the prior statement—Klaffky's testimony was not at all credible. Klaffky testified on a tightwire: on one hand, he disclaimed any recollection of what was discussed at the meeting; on the other, he specifically testified that no agreement was formed and no "pay to play" activity occurred. (*See* R.260,inst.,10584 (inviting jury to consider witness's memory when evaluating credibility).) Indeed, Klaffky acknowledged that he would lose his lobbying career if he "g[a]ve a contribution to improperly influence an elected official." (R.228, tr.,8442; *see* R.260, instructions,10584 (inviting jury to consider witness "bias" or "reason for testifying that might cause the witness to lie or to slant the testimony").)

In addition, Klaffky's version differed from Cespedes's version in only limited ways. Klaffky did not dispute that a check was given to Householder. Nor did he specifically dispute Cespedes's testimony regarding what was said. And Klaffky *did* recall Cespedes referencing

the pertinent exchange with Householder *after* the meeting. (R.228, tr.,8459.) Finally, Klaffky's testimony did not touch on the other overwhelming evidence of guilt, which spanned over three years.

## IV.   The district court properly admitted the challenged evidence; and any error would be harmless.

### A.  *Householder's Prior Statements*

Householder argues that the district court erred by admitting excerpts from two Title III recordings during his cross-examination, one over a Rule 403 objection, the other without objection. He can show no error, much less plain error.

Householder testified that he sought to return to the House because he "was discouraged by the divisiveness there was in politics," including "within the caucuses." (R.228, tr.,8494.) The prosecutor then played a short clip from a March 2018 conversation between Householder and Clark, without objection. (R.229, tr.,8737.) In the approximately one-minute clip, Householder told Clark: "We like war, you know that, Neil?" Then, referencing two representatives within his caucus who did not support him for Speaker, Householder said: "Do you think we should make some kind of movement on [them] just to . . . say

89

that if you're going to fuck with me, I'm going to fuck with your kids?" (Def.App'x, Ex.913.)

Householder also testified that he kept track of which donors supported him and which donors supported his opponent for Speaker but denied that there were "any consequences" for supporters of his opponent. (R.229, tr.,8739-40.) The prosecutor then played a less than one-minute clip—this time, over Householder's Rule 403 objection. (*Id.*,8743.) In the clip, Householder discussed his opponent's donors and suggested "fucking them over later." (Def.App'x, Ex.906.)

The district court did not abuse its discretion (let alone plainly err) in admitting Householder's prior statements. The statements were highly probative because they undermined Householder's counter-narrative that he sought the Speakership to build bridges in politics and did not engage in pay-to-play activity. *Cf. United States v. DiSantis*, 565 F.3d 354, 359 (7th Cir. 2009). In addition, the probative value was not outweighed by any unfair prejudice. *See* Fed. R. Evid. 403. That is particularly true given that the recordings' coarse language and bravado was consistent with other evidence. (*See, e.g.*, R.201, tr.,5567;

R.229, tr.,8702; R.302, Ex.525B,12423; R.303, Ex.616C,12551; R.307, Ex.536B,12908.)

Finally, Householder's suggestion that the government used these statements to invite the jury to convict him based on "improper considerations" is entirely unsupported. (App.Br., 60 (citing district court's statement at sentencing).) Householder does not—and cannot—show how these few phrases (even if erroneously admitted) could have possibly prejudiced him given the overwhelming evidence of his guilt, much less seriously affected the fairness, integrity, or public reputation of the proceedings, as required on plain-error review.

### B. Co-Conspirator Testimony

On direct examination, and with a proper limiting instruction, the government may elicit evidence that a co-conspirator pleaded guilty so that the jury "will have appropriate facts on hand to assess the witness's credibility." *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996). The district court allowed the government to do that here with respect to Longstreth and Cespedes.[13] Householder argues that admission of such evidence was improper because he promised to forgo

---

[13] The government did not introduce the plea agreements.

91

attacking the witnesses' credibility on that basis. He is wrong. *See, e.g., United States v. Universal Rehab. Servs.*, 205 F.3d 657, 666–67 (3d Cir. 2000) (en banc) (evidence of witness's guilty plea admissible, even where defendants offered to stipulate that they would not challenge his credibility); *United States v. Montani*, 204 F.3d 761, 766 (7th Cir. 2000) (same).

A jury cannot properly assess a co-conspirator's credibility without knowledge of his guilty plea. *Universal Rehab.*, 205 F.3d at 666–67; *Montani*, 204 F.3d at 766. And a promise not to impeach based on a plea agreement cannot remove the relevance of a co-conspirator's guilty plea because "impeachment is presumed" where a witness testifies about crimes in which he has participated. *Montani,* 204 F.3d at 767. Where a witness's "integrity and character for truthfulness [will] be questioned," the government "has a right to bring out evidence explaining to the jury the reasons for and extent of [a cooperating witness's] bias." *Id.* at 767. Such evidence is also necessary to "counteract the possibility that the jury might believe [the defendants] were being selectively prosecuted." *Universal Rehab.*, 205 F.3d at 666-67.

Householder cannot show any abuse of discretion, nor can he show that this evidence materially affected the verdict, in any event. The district court issued a limiting instruction prohibiting the jury from considering evidence that the co-conspirators pleaded guilty as substantive evidence of the defendants' guilt. (R.260, instructions,10626 (quoting Sixth Cir. Inst. 7.08(3))); *Montani*, 204 F.3d at 767 (any prejudice cured by instruction). In addition, both Longstreth and Cespedes testified for hours about the facts underlying their guilty pleas—specifically, their participation in the conspiracy with Householder. The mere fact of their guilty pleas paled in comparison to their own extensive testimony about their guilt.

### C. Cumulative Error

Householder argues that the cumulative effect of these evidentiary rulings requires reversal. Because there was no error, a cumulative-error analysis is unnecessary. *United States v. Deitz*, 577 F.3d 672, 697 (6th Cir. 2009). But even assuming error, Householder cannot prove the "that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004).

93

# V. The district court imposed a procedurally and substantively reasonable sentence.

## A. Procedural Reasonableness

This Court reviews procedural reasonableness challenges for abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Householder argues that the district court erroneously applied two sentencing enhancements. He cannot establish any error, let alone one that warrants resentencing.

### 1. Value of Bribe

Guideline § 2C1.1(b)(2) provides for an enhancement based on the greater of "the value of the [bribe] payment" or "the benefit received in return for the [bribe] payment." The level of the enhancement is determined by the § 2B1.1 loss table. The district court added 22 levels because it found that the value of the bribe was approximately $60 million—the amount of money FirstEnergy paid Householder through Generation Now. (R.285, tr.,11181.) It used this amount, even though the benefit FirstEnergy received in return was far greater.

Householder argues that the government "needed to demonstrate that each payment, all $60 million, represent[ed] a bribe." (App.Br., 68.) As explained above, that is exactly what the government proved at trial.

94

Generation Now was created for Householder's benefit; and Householder oversaw, controlled, and benefited from the millions that FirstEnergy paid into it in exchange for official action. To the extent Householder specifically challenges the millions he received after the passage of HB 6, his argument ignores the referendum phase during which FirstEnergy paid approximately $38 million into Generation Now in return for Householder's promise to preserve the bailout through additional official action, including new legislation.

Any error would be harmless, in any event, because the district court stated that it would impose the same sentence, "no matter what the guideline calculation [was]." (R.285, tr.,11219); *United States v. Morrison*, 852 F.3d 488, 491 (6th Cir. 2017). In addition, as the district court observed, § 2C1.1(b)(2) instructs that the greater of the value of the payment or the benefit received should be used. (R.285, tr.,11181.) Here, the benefit FirstEnergy received would have included over $1 billion in subsidies and an additional $20 to $50 million per year in fixed revenue—which would have far exceeded the $60 million amount. (*Id.*)

### 2. Obstruction of Justice

Guideline § 3C1.1 provides for a 2-level enhancement where a defendant commits perjury. U.S.S.G. § 3C1.1, cmt. (n.4(B)). For that enhancement, a district court must: "(1) identify those particular portions of the defendant's testimony that it considers to be perjurious; and (2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir. 2002). For the first time on appeal, Householder argues that the district court failed to follow this procedure. He cannot show plain error.

The court found Householder's testimony "unequivocally false" regarding: his whereabouts and activities during the D.C. trip; his knowledge of, and control over, Generation Now; and his interactions with FirstEnergy executives. (R.285, tr.,11182-83; R.277, PSR,10987-89.) The court explained that this testimony was contradicted by "irrefutable evidence to the contrary" and concluded that it would "simply defy logic" to "say that inaccuracies in Mr. Householder's testimony were the result of confusion or a mistake." (R.285, tr.,11182-83.) That was particularly so given that Householder "seemed to

remember everything [ ] about his life and career . . . with pinpoint accuracy," except for "the relatively recent events and facts that were actually material to the case." (*Id.*) The district court's findings covered all three factual predicates for a finding of perjury: that the defendant made: "(1) a false statement under oath; (2) concerning a material matter; (3) with the willful intent to provide false testimony." *United States v. Dunnigan*, 507 U.S. 87, 94-95 (1993). And any error in applying the two-level enhancement would not, in any event, impact Householder's sentence because his total offense level was well above the maximum offense level of 43 and because the district court said that it would have imposed the same sentence, irrespective of the enhancement. *See Morrison*, 852 F.3d at 491; *Perez-Martinez*, 746 F. App'x at 478-79.

### 3. *Mitigation Argument*

Householder argues that the district court failed to address his argument that the loss table "vastly overstate[d] the seriousness of [his] offense" and merited a downward variance. Although Householder mentioned this argument in his sentencing memorandum, he did not raise it at the sentencing hearing. Nor did he lodge an objection based

on the district court's alleged failure to address it, despite being given an opportunity. (R.285, tr.,11222.) Plain-error review therefore applies.

Householder can show no error, plain or otherwise. The court did not ignore Householder's argument; it simply disagreed with it. During its discussion of the § 3553(a) factors, the court emphasized the seriousness of Householder's offense, which it called an "assault on democracy" and a "betrayal of everyone in Ohio." (*Id.*,11215-17.) In doing so, the district court specifically highlighted the $60 million in bribe money that Householder received and the billion-dollar-plus benefit that accrued to FirstEnergy. (*Id.*,11216.) The court thus made clear why it did not find that application of the loss table overstated the seriousness of the offense.

### B. *Substantive Reasonableness*

Householder also challenges the substantive reasonableness of his twenty-year sentence, which he believes is too long. Although the district court imposed the statutory maximum sentence, that sentence fell below the otherwise applicable guidelines range. Householder cannot rebut the presumption of reasonableness that attaches to his sentence. *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008).

The district court thoroughly addressed the § 3553(a) factors in arriving at a sentence that it found sufficient, but not greater than necessary. The court attached significant weight to certain factors, including Householder's breach of public trust and the need to deter other public officials from doing the same; Householder's bullying behavior and "lust for power;" and his attempt to "con the jury" through perjurious testimony after having already "conned the people of Ohio." (R.285, tr.,11218-19.) The district court balanced these considerations with mitigating factors that it found deserving of less weight, including Householder's age and risk of recidivism.

The district court also addressed the need to avoid unwarranted sentencing disparities, explaining that a sentence at or near the statutory maximum was "not out of the norm" for RICO conspiracies led by high-ranking public officials, while also emphasizing that Householder's conduct was "unprecedented." (*Id.*,11219-20.) Householder believes the district court gave "short shrift" to sentencing disparities, pointing to sentences received by defendants in other public-corruption cases and to the potential sentences of his co-

defendants. (App.Br., 75.) But the court simply found other sentences more comparable. (R.285, tr.,11219-20.)

Householder's other arguments "boil[] down to an assertion that the district court should have balanced the § 3553(a) factors differently," which fall outside of this Court's review. *United States v. Sexton,* 512 F.3d 326, 332 (6th Cir. 2008).

## VI.   The district court judge did not err by failing to sua sponte recuse himself.

Householder argues that the Due Process Clause compelled the district judge, Judge Timothy Black, to recuse himself, and that the judge's failure to do so requires reversal of his conviction. But Householder never moved for recusal on any ground, much less on the constitutional ground he now raises. Plain-error review therefore applies. *See United States v. Bankston*, 820 F.3d 215, 233 (6th Cir. 2016).[14] Householder's claim fails under any standard, however,

---

[14] Although preserved claims of unconstitutional bias constitute structural error, Federal Rule of Criminal Procedure 52(b) still applies to unpreserved claims. *See Johnson v. United States,* 520 U.S. 461, 466-67 (1997). While *Railey v. Webb,* 540 F.3d 393 (6th Cir. 2008) stated, with little discussion, that such claims were not subject to forfeiture, it ultimately rejected the claim on the merits.

because he cannot show that his decades-old fundraising activities came anywhere close to creating a potential for unconstitutional bias.

Defense counsel alluded to the possibility of judicial bias just once, on the third day of trial. (R.197, tr.,4948-49.) Counsel orally represented that Householder had raised money for a 501(c)(4) organization "that was critical" of Judge Black's 2000 campaign for the Ohio Supreme Court. (*Id.*) Counsel then questioned whether the judge held "personal animosity towards Mr. Householder and, hence, his team . . . [a]nd if that's the case . . . whether [he] should be presiding over this case." (*Id.*) When the district court stated that it held no such animosity, counsel dropped the matter and never revisited it. (*Id.*) Having failed to develop the record below, Householder now seeks to impermissibly supplement it on appeal with hearsay contained in twenty-year-old newspaper articles. This Court should reject his attempt. *See Inland Bulk Trans. Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1012 (6th Cir. 2003). But even if this Court considers and credits the articles, Householder's judicial bias claim cannot succeed.

The Due Process Clause requires recusal only when "the probability of actual bias on the part of the judge or decisionmaker is

too high to be constitutionally tolerable." *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam).[15] The pertinent question is whether, "as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).

It is the "extraordinary situation where the Constitution requires recusal." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 887 (2009) (recusal required where judge has financial incentive in case's outcome); *see Williams*, 579 U.S. at 8 (recusal required where judge had "significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case"); *Mayberry v. Pennsylvania*, 400 U.S. 455, 465-66 (1971) (recusal required where judge "becomes embroiled in a running bitter controversy" with one of the litigants); *see also Gordon v. Lafler*, 710 F. App'x 654, 660 (6th Cir. 2017) ("appearance of bias is only sufficient to establish judicial bias of a constitutional dimension in a limited class of cases"). The situation here is not that. Householder's

---

[15] Householder briefly adverts to 28 U.S.C. § 455, but he does not claim that recusal was warranted under that statute or otherwise develop any statutory recusal claim. Any argument is therefore waived, and would, in any event, fail for reasons paralleling those described here.

fundraising activities over twenty years ago—which have not even been directly linked to then-candidate Judge Black,[16] let alone the proceedings here—come nowhere close to creating unconstitutional potential for bias. *See id*. Nothing suggests that Judge Black ever read the articles presented for the first time on appeal or knew about Householder's involvement in decades-old judicial campaigns. There was no due process violation.

## VII.  Householder waived his right-to-counsel claim, which does not constitute reversible plain error, in any event.

Throughout trial, the district court judge routinely admonished witnesses not to discuss their testimony during breaks, including overnight breaks. (*See, e.g.,* R.194, tr.,4767; R.197, tr.,5143; R.219, tr.,7978.) These routine admonishments, for which Householder and his counsel were present, did not include any carve-out for discussions with counsel.

Householder testified in his defense over the course of two days. During the first day, the court, as it had for other witnesses, instructed

---

[16] The articles the United States could access, at most, indicate that Householder raised money for organizations that supported Republican judicial candidates and opposed a Democratic candidate (but not then-candidate Judge Black).

Householder not to discuss his testimony during short breaks. (*See, e.g.,* R.228, tr.,8448,8506-07,8562.) As before, these instructions did not exempt discussions with counsel. *See Perry v. Leeke*, 488 U.S. 272, 280-85 (1989) (order prohibiting defendant from consulting with counsel during brief recess in testimony did not violate Sixth Amendment).

When court recessed at the end of the first day, Householder's direct examination had not yet concluded. After excusing the jury, the district court addressed Householder and gave a different instruction: "[Y]ou're not to discuss your testimony during the break. You can speak to your attorneys, however, understood?" (R.228, tr.,8611.) Householder responded that he understood, and defense counsel neither objected to the instruction nor sought clarification. (*Id.*)

Householder resumed testifying the next morning. Following about an hour of direct examination, the government cross-examined him. During brief recesses in Householder's cross-examination, the district court instructed Householder not to discuss his testimony with anyone, "including [his] attorneys." (R.229, tr.,8721,8653.)

Householder now argues that the district court's instruction before the overnight recess prohibited him from discussing his testimony with

counsel in violation of the Sixth Amendment. But not only did Householder fail to object to the instruction below, he failed to even raise this argument in his principal brief. Under these circumstances, the Court should find his argument waived. But even if not waived, Householder cannot show any deprivation of his right to counsel, let alone a plain or obvious one affecting his substantial rights. Nor can he show that the instruction seriously affected the fairness, integrity, or public reputation of the proceedings.

A.  *Householder waived the issue by failing to raise it in his principal brief.*

Over three months after filing his principal brief, Householder moved to file a supplemental brief raising this additional issue. (Doc.40 (order submitting supplemental brief "for whatever consideration, if any, the ultimate merits panel may choose to give it along with the principal briefs").) Householder cites no procedural basis for his belated filing, nor does he provide any explanation as to why he could not have presented this issue earlier. *Cf. United States v. Pritchett*, 749 F.3d 417, 434 (6th Cir. 2014) (observing precedent "that an issue is waived when it is not raised in the appellant's opening brief" but recognizing exception where intervening authority arises). Under these

105

circumstances, the issue should be deemed waived. (*See* Doc.35 (response to motion for leave to file supplemental brief).)

### B.  *Even if not waived, Householder cannot establish plain error.*

If this Court reaches the merits of the claim, plain-error review applies. Fed. R. Crim. Proc. 52(b). The "demanding" nature of this standard reflects the importance of the contemporaneous-objection rule. *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). Householder cannot satisfy this standard. Indeed, although he argues that the district court's instruction amounted to a clear and obvious violation of the Sixth Amendment, this alleged error was not clear or obvious—even to him—because he raised it for the first time in a supplemental brief filed months after his principal brief.

#### 1.  *The district court did not plainly limit the right to counsel.*

Householder represents that "the district court instructed [him] that although he could 'speak to [his] attorneys,' he could 'not [] discuss [his] testimony during the break.'" (Supp.Br., 2-3.) But what the district court actually said was this: "Mr. Householder, you're not to discuss your testimony during the break. You can speak to your attorneys, however, understood?" (R.228, tr.,8611.) Householder claims the district

106

court prohibited him from discussing his testimony with counsel. But the more natural interpretation is that the court prohibited Householder from discussing his testimony with anyone *except* his counsel. That is particularly so given the usual format of the court's instruction to witnesses (including Householder) during that and preceding days: a blanket prohibition on the discussion of testimony during breaks, with no mention of counsel. The district court's admonitions to Householder the following day, when it instructed him not to discuss his testimony with anyone, "including [his] attorneys," lend further support to this interpretation. (R.229, tr.,8721,8653.)

Householder re-orders the instruction for a reason. The actual wording does not support his claim. At worst, the instruction is ambiguous. And, under plain-error review, ambiguity ends the inquiry. *See* Fed. R. Crim Proc. 52(b) (requiring "clear or obvious" error); *see United States v. Van*, 541 F. App'x 592, 595–96 (6th Cir. 2013); *United States v. Colón-De Jesús*, 85 F.4th 15, 23-24 (1st Cir. 2023). Householder's claim cannot succeed because the district court's statement did not plainly or obviously limit his ability to consult with counsel about his testimony.

### 2. Householder has not shown an actual deprivation of counsel, much less a plain or obvious deprivation affecting his substantial rights.

Even interpreting the district court's statement as Householder urges on appeal—as a restriction on communicating with counsel about his testimony—he can show no plain or obvious error. Such a restriction falls somewhere between the Supreme Court's decisions in *Geders v. United States*, 425 U.S. 80, 91 (1976), which held that an order prohibiting a defendant from communicating with counsel "about anything" during an overnight recess in his testimony violated the Sixth Amendment, and *Perry v. Leeke*, which held that an order prohibiting a defendant from consulting with counsel during a brief recess in his testimony did not violate the Sixth Amendment. *See United States v. Sandoval-Mendoza*, 472 F.3d 645, 650-51 (9th Cir. 2006) ("whether prohibiting a defendant and his lawyer from discussing his testimony during an overnight recess violates the Sixth Amendment" is a "difficult question" that falls "in the middle" of *Geders* and *Perry*). Householder correctly calls these Supreme Court decisions "guideposts." (Supp.Br., 7.)

Despite acknowledging that *Geders* is a guidepost, Householder argues that the district court's instruction was nevertheless plainly erroneous under that decision. But *Geders*, which concerned a flat prohibition on all communication, did not address the type of restriction Householder alleges was imposed here. Nor has this Court had occasion to do so. *See Beckham v. Crews*, 515 F. App'x 355, 356-60 (6th Cir. 2013). Given the absence of controlling authority, Householder cannot demonstrate an error, much less one that was "obvious or clear." *See Puckett v. United States*, 556 U.S. 129, 135 (2009) (to be "clear or obvious," error cannot be "subject to reasonable dispute"). Indeed, the decision Householder identifies as finding plain error in this circumstance concerned a full ban on communication with counsel—as in *Geders*—not a limited restriction. *United States v. Torres*, 997 F.3d 624, 628 (5th Cir. 2021).

Although other courts have applied *Geders* to situations where the district court more narrowly constrained counsel's ability to confer with the defendant during an overnight recess, they have done so where the record showed that the defendant desired to confer with counsel but was prevented from doing so. *See United States v. Cavallo*, 790 F.3d

1202, 1218 (11th Cir. 2015); *Sandoval-Mendoza*, 472 F.3d at 650; *United States v. Cobb*, 905 F.2d 784, 791-92 (4th Cir. 1990); *Mudd v. United States*, 798 F.2d 1509, 1510 (D.C. Cir. 1986); *but see United States v. Santos*, 201 F.3d 953, 965-966 (7th Cir. 2000) (failing to indicate whether objection occurred and declining to decide whether restriction constituted reversible error).

The record here is devoid of any indication that Householder and his counsel sought to discuss his testimony but did not do so because of the court's instruction. The case most squarely on point—*United States v. Nelson*, 884 F.3d 1103 (11th Cir. 2018)—found no error at all under such circumstances. *Id.* at 1109. *Nelson* held that "a condition precedent to a *Geders*-like Sixth Amendment claim is a demonstration, from the trial record, that there was an actual 'deprivation' of counsel—*i.e.*, a showing that the defendant and his lawyer desired to confer but were precluded from doing so by the district court." *Id.* at 1109; *see Stubbs v. Bordenkircher*, 689 F.2d 1205, 1207 (4th Cir. 1982); *Bailey v. Redman*, 657 F.2d 21, 23-24 (3d Cir. 1981). As in *Nelson*, the record reveals no actual deprivation here. In these circumstances, Householder also cannot demonstrate that his substantial rights were affected.

### 3. Any error did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

Householder's claim also fails because he cannot establish that the instruction seriously affected the fairness, integrity, or public reputation of the proceedings. *Puckett*, 556 U.S. at 135. The fourth prong imposes an independent barrier to relief that must be applied on "a case-specific and fact-intensive basis." *Id.* at 142. A particularized inquiry is necessary because "countervailing factors" may show that an error—even if obvious and affecting substantial rights—does not impugn the fairness and integrity of the proceedings and does not warrant correction on appeal. *Id.*[17] Countervailing factors certainly mitigate any error here.

---

[17] The Supreme Court has twice denied defendants relief under this prong after assuming the existence of an unpreserved structural error. *See Johnson*, 520 U.S. at 468-70; *United States v. Cotton*, 535 U.S. 625, 632 (2002); *see also, e.g., United States v. Williams*, 974 F.3d 320, 340-41 (3d Cir. 2020); *Torres*, 997 F.3d at 628-29. Householder tries to avoid this inquiry altogether based on this Court's decision in *United States v. Mahbub*, 818 F.3d 213, 224 (6th Cir. 2016). But *Mahbub* found the third and fourth prongs satisfied based on a *Batson* error. That sort of error, which violates the right to equal protection, itself damages the fairness, integrity, and reputation of the judicial proceedings. The same cannot be said of the alleged error here, as explained above.

First, as discussed above, the district court's order did not, on its face, restrict Householder from discussing his testimony with counsel. To the extent Householder interpreted it that way—and desired to confer with counsel on that subject—he could have objected or sought clarification. On this record, however, there is no indication that Householder and his counsel actually desired to confer and were prevented from doing so. Nor does Householder identify how he would have testified differently absent the court's order—particularly given that there is a recognized interest in limiting the coaching of witnesses. *See Geders,* 425 U.S. at 89-91.

In addition, awarding a new trial here would wrongly incentivize defendants to remain silent in the face of ambiguous instructions, instead of timely objecting when the instructions can be clarified. Finally, the costs of a retrial would be significant. *See Rosales-Mireles v. United States*, 585 U.S. 129, 143 (2018). Erasing Householder's conviction and granting him a new trial under these circumstances would result in an unwarranted windfall that would itself impugn the fairness and integrity of the proceedings.

112

## CONCLUSION

This Court should affirm the judgment and sentence.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

/s/ Alexis J. Zouhary
ALEXIS J. ZOUHARY
Assistant United States Attorney
221 East Fourth Street
Cincinnati, Ohio  45202
(513) 684-3711
Alexis.Zouhary@usdoj.gov

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation specified in this Court's July 22, 2024 order. The brief contains 19,976 words of Century Schoolbook (14 pt) proportional type. Word for Microsoft 365 is the word-processing software that I used to prepare this brief.

/s/ Alexis J. Zouhary
ALEXIS J. ZOUHARY

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

The following are relevant under Sixth Circuit Rule 30(g).

| Record number | Description | PAGE ID# |
| --- | --- | --- |
| 22 | indictment | 1247–1289 |
| 112 | response | 2548–2570 |
| 174 | jury instructions | 4112–4118 |
| 182 | transcript | 4370–4461 |
| 194 | transcript | 4713–4926 |
| 197 | transcript | 4940–5145 |
| 198 | transcript | 5146–5352 |
| 201 | transcript | 5500–5692 |
| 202 | transcript | 5693–5825 |
| 205 | transcript | 5939–6065 |
| 211 | transcript | 6642–6853 |
| 212 | transcript | 6854–7037 |
| 214 | transcript | 7113–7264 |
| 216 | transcript | 7415–7542 |
| 217 | transcript | 7543–7736 |

| 219 | transcript | 7804–7980 |
| 228 | transcript | 8386–8612 |
| 229 | transcript | 8613–8818 |
| 238 | transcript | 9463–9618 |
| 240 | transcript | 9663–9673 |
| 260 | jury instructions | 10572–10645 |
| 277 | presentence report | 10952–10994 |
| 285 | transcript | 11168–11225 |
| 292 | order | 11330–11649 |
| 299 | transcript | 11894–12126 |
| 302 | notice | 12149–12506 |
| 303 | notice | 12507–12658 |
| 307 | notice | 12683–13002 |

## CERTIFICATE OF SERVICE

I certify that this Brief for Plaintiff-Appellee United States was served on counsel for Defendant-Appellant Householder by filing with the Court's CM/ECF system this 26th day of August, 2024.

/s/ Alexis J. Zouhary
ALEXIS J. ZOUHARY