No. 23-3565

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

LARRY HOUSEHOLDER,

*Defendant-Appellant*.

On Appeal from The United States District Court
for the Southern District of Ohio
Case No. 1:20-cr-77-1

## BRIEF OF *AMICI CURIAE* ENVIRONMENTAL LAW & POLICY CENTER, CAMPAIGN LEGAL CENTER, AND BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW IN SUPPORT OF PLAINTIFF-APPELLEE

Howard A. Learner
ENVIRONMENTAL LAW &
POLICY CENTER
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
hlearner@elpc.org

Tara Malloy
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
tmalloy@campaignlegalcenter.org

Eric E. Petry
BRENNAN CENTER FOR JUSTICE
1140 Connecticut Ave. NW, Ste. 1150
Washington, DC 20036
(202) 753-5906
petrye@brennan.law.nyu.edu

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3565                    Case Name: United States v. Householder

Name of counsel: Tara Malloy

Pursuant to 6th Cir. R. 26.1, Campaign Legal Ctr., Environ. Law & Policy Ctr., Brennan Ctr.
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No. Campaign Legal Center is a nonpartisan, nonprofit corporation, and is not a subsidiary or affiliate of a publicly owned corporation.
> The Environmental Law & Policy Center is a nonpartisan, nonprofit corporation, and is not a subsidiary or affiliate of a publicly owned corporation.
> The Brennan Center for Justice at NYU School of Law is a nonpartisan, nonprofit corporation, and is not a subsidiary or affiliate of a publicly owned corporation.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

### CERTIFICATE OF SERVICE

I certify that on _____ August 30, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Tara Malloy

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ...................................................................... iv

INTERESTS OF AMICI CURIAE ................................................................. 1

SUMMARY OF ARGUMENT ..................................................................... 2

ARGUMENT ........................................................................................... 5

I.   The First Amendment Provides No Protection for the Corrupt and Knowing Exchange of Campaign Contributions for Official Acts ................................. 5

     A. The First Amendment analysis of campaign finance laws is distinct .......... 6

     B. *McDonnell* provides no support for Householder's claims ..................... 11

II.  The Likelihood of Prosecution for *Quid Pro Quo* Bribery Schemes Provides an Important Check on Corruption in the Public Utilities Industry ............... 14

III. Although the Trial Court Instructed the Jury to Find an Explicit Agreement with Respect to the Bribery-Related Charges, Many of the Payments that Householder Received Were Not "Campaign Contributions." ....................... 21

CONCLUSION ....................................................................................... 26

CERTIFICATE OF COMPLIANCE ................................................................ 28

CERTIFICATE OF SERVICE ....................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                      **Page**

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................................................7, 10

*Casino Association of Louisiana v. State ex rel. Foster*,
   820 So.2d 494 (La. 2002)...................................................................................20

*Citizens United v. FEC*, 558 U.S. 310 (2010) ....................................... 3, 4, 6, 9, 10

*Dimora v. United States*, 973 F.3d 496 (6th Cir. 2020) ..........................................12

*FEC v. Cruz*, 596 U.S. 289 (2022) ..........................................................................4

*Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944).........17

*In re Ohio Edison Co.*, 131 N.E.3d 906 (Ohio 2019).............................................19

*McConnell v. FEC*, 540 U.S. 93 (2003).....................................................6, 11, 25

*McCormick v. United States*, 500 U.S. 257 (1991) ......................... 5, 21, 22, 23, 24

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ........................................ 3, 6, 9, 10, 11

*McDonnell v. United States*, 579 U.S. 550 (2016) ................................ 3, 12, 13, 14

*Ognibene v. Parkes*, 671 F.3d 174 (2d Cir. 2011) .................................................20

*Republican National Committee v. FEC*,
   698 F. Supp. 2d 150 (D.D.C. 2010) *sum. aff'd*, 561 U.S. 1040 (2010) ....... 10, 11

*Schiller Park Colonial Inn, Inc. v. Berz*, 349 N.E.2d 61 (Ill. 1976) .......................20

*Snyder v. United States*, 603 U.S. ---, 144 S. Ct. 1947 (June 26, 2024)................. 16

*United States v. Benjamin*, 95 F.4th 60 (2d Cir. Mar. 8, 2024) ................................7

*United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994) ..........................................3

*United States v. Hills*, 27 F.4th 1155 (6th Cir. 2022).............................................13

*United States v. Menendez*, 291 F. Supp. 3d 606 (D.N.J. 2018) .............................11

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013) ........................................5, 24

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013)...............................................7

*United States v. Siegelman*, 640 F.3d 1159 (11th Cir. 2011) .................................22

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) ........................................ 12, 14

*Verizon Communications, Inc. v. Fed. Communications Comm'n*,
    535 U.S. 467 (2002) ....................................................................................4, 17

*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) ..................................................19, 20

*Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015) ...............................................20

**Statutes and Regulations**

5 U.S.C. § 7353 ......................................................................................................23

18 U.S.C. § 1346 .......................................................................................................3

18 U.S.C. § 1951 .......................................................................................................3

52 U.S.C. § 30103 ...................................................................................................26

52 U.S.C. § 30104 ...................................................................................................26

52 U.S.C. § 30114(a) ..............................................................................................26

52 U.S.C. § 30114(b)(1) .....................................................................................24, 26

52 U.S.C. § 30116 ...................................................................................................26

52 U.S.C. § 30116(a)(3) ............................................................................................8

52 U.S.C. § 30118 .....................................................................................................8

52 U.S.C. § 30119 ...................................................................................................19

52 U.S.C. § 30125(d) ..............................................................................................25

52 U.S.C. § 30125(e) ..............................................................................................25

5 C.F.R. §§ 2635.201-.205 .....................................................................................23

11 C.F.R. § 100.5(e)(6) ...........................................................................................25

11 C.F.R. § 113.1(g) ................................................................................................24

Ind. Code § 4-33-10-2.1 .........................................................................................20

Iowa Code § 99F.6(4)(a) .........................................................................................20

iv

La. Stat. Ann. § 18:1505.2(L).................................................................20

Mass. Gen. Laws ch. 23K, § 46.............................................................20

Md. Code Ann, Elec. Law § 13-237 .......................................................20

Mich. Comp. Law § 432.207b(4)-(5) .....................................................20

Neb. Rev. Stat. § 49-1476.01 ................................................................20

N.J. Stat. Ann. § 5:12-138 ....................................................................20

Ohio Rev. Code § 102.02-04 .................................................................20

Ohio Rev. Code § 102.99 ......................................................................21

Ohio Rev. Code § 4909.15-17 ...............................................................17

Ohio Rev. Code § 4909.15(A)(2) ...........................................................17

Ohio Rev. Code § 3517.13(O) ...............................................................24

Va. Code Ann. § 59.1-375 .....................................................................20

Va. Code Ann. § 59.1-376(D)................................................................20

**Other Authorities**

Ohio Elec. Comm'n, Adv. Op. 87ELC-4 ...............................................24

Jason Meisner, *Lawyers for 'ComEd Four' say case was built on 'rotten foundation,' ask for acquittal*, Chicago Trib. (Aug. 28, 2024), https://www.chicagotribune.com/2024/08/28/lawyers-for-comed-four-say-case-was-built-on-rotten-foundation-ask-for-acquittal ............................................16

Joshua C. Macey and Aneil Kovvali, *The Corporate Governance of Public Utilities*, 40 Yale J. on Reg. 569, 590 (2023) ......................................18

Press Release, U.S. Attorney's Office for the Northern District of California, *Former San Francisco PUC Chief Sentenced to Four Years in Prison* (Mar. 18, 2024), available at https://perma.cc/L47E-LPVJ ....................................... 16-17

Press Release, U.S. Attorney's Office for the Northern District of Illinois, *Former Commonwealth Edison Executives and Associates Found Guilty of Conspiring*

*To Influence and Reward Former Illinois House Speaker* (May 2, 2023),
available at https://perma.cc/DK6V-X66D ................................................ 15-16

Robert Walton, *Ohio Regulators Scale Back FirstEnergy Subsidy Proposal*,
UtilityDive, Oct. 13, 2016, https://www.utilitydive.com/news/updated-ohio-
regulators-scale-back-firstenergy-subsidy-proposal/428159/ .......................... 19

Steve Daniels, *ComEd Valued Passage of 2016 Energy Law at $1.8 Billion*, Crain's
Chicago Business, Mar. 20, 2023,
https://www.chicagobusiness.com/politics/comed-valued-passage-2016-energy-
law-18-billion-comed-four-trial ...................................................................... 16

Werner Troesken, *Regime Change and Corruption: A History of Public Utilities
Regulation*, in CORRUPTION AND REFORM: LESSONS FROM AMERICA'S
ECONOMIC HISTORY 259 (2006) ..................................................................... 15

## INTERESTS OF AMICI CURIAE[1]

Amici curiae the Environmental Law & Policy Center ("ELPC"), Campaign Legal Center ("CLC"), and the Brennan Center for Justice at New York University School of Law (the "Brennan Center") are nonpartisan, nonprofit organizations that work to protect the integrity of government and democratic processes.

ELPC is a nonprofit, nonpartisan public interest legal and policy advocacy organization, focused on environmental, energy, and public utilities issues in Ohio and other Midwestern states. CLC is a nonpartisan nonprofit organization that works in the areas of campaign finance, ethics, and voting rights to achieve a more transparent, inclusive, and accountable democracy. The Brennan Center is a nonprofit, nonpartisan law and public policy organization that seeks to strengthen, revitalize, and defend our systems of democracy and justice to bring the ideal of representative self-government closer to reality.[2]

Amici groups have a demonstrated interest in developing and defending strong ethics and campaign finance laws and rules, including on environmental,

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici affirm that no counsel for a party authored this brief in whole or in part, and no person other than the amici groups or their counsel contributed money that was intended to fund the preparation or submission of this brief. Defendant-Appellant Larry Householder opposes the filing of this amicus brief, but Plaintiff-Appellee United States consents.

[2] This brief does not purport to convey the positions of New York University School of Law, if any.

energy and public utilities issues, as well as ensuring the vigorous enforcement of criminal public integrity laws.

## SUMMARY OF ARGUMENT

Defendant-Appellant Larry Householder raises a host of issues on his appeal, but the central theme of his opening brief is that the government is improperly "criminalizing" politics by seeking to convict him of RICO conspiracy based on "campaign contributions permitted by federal law and protected by the First Amendment." Br. of Appellant Householder, ECF No. 22 at 4 ("Householder Br.").

In so arguing, he joins a long list of convicted politicians—from Governor Rod Blagojevich to Senator Robert Menendez to New York legislative leaders Sheldon Silver and Dean Skelos—who have attempted to wrap themselves in the Constitution to shield their criminal self-dealing from accountability. But the First Amendment has never been understood to protect the making or receiving of political donations in exchange for official acts by an officeholder, even as the U.S. Supreme Court continues to debate the parameters of how broadly campaign finance laws can regulate campaign contributions and expenditures made without a showing of corrupt intent.

In this brief, amici will focus on Householder's "constitutional" defense— namely his claim that because the quid pro quo exchanges underlying his prosecution involved purportedly political contributions, his activities receive First Amendment

protection and require the government to meet a higher standard for showing the "agreement" element for a charge under federal and state bribery statutes. *See* Householder Br. at 4-6. *See also* 18 U.S.C. §§ 1346, 1951.

Householder rests this argument primarily upon two Supreme Court decisions reviewing campaign finance laws, *Citizens United v. FEC*, 558 U.S. 310 (2010), and *McCutcheon v. FEC*, 572 U.S. 185 (2014), as well as the Court's decision reversing former Virginia Governor Robert McDonnell's conviction on bribery charges, *McDonnell v. United States*, 579 U.S. 550 (2016). *See* Householder Br. at 4, 27-33, 44-45. None of these cases support his cause.

First, campaign finance laws and criminal public corruption laws are distinct: the First Amendment analysis of the former does not bound the application of the latter. Campaign finance laws prospectively restrict campaign spending by entire classes of individuals or entities regardless of whether these regulated parties have displayed any corrupt intent. Bribery and other public corruption laws, by contrast, apply only after a specific corrupt exchange has been committed by an individual with the requisite intent. Thus campaign finance decisions holding that certain types of campaign spending cannot constitutionally be *banned* do not suggest that corruptly exchanging such monies for official acts is likewise protected.

Indeed, the precedents cited by Householder in no way indicate that the quid pro quo exchanges underlying his conviction warrant First Amendment protection,

but quite the opposite. In both *Citizens United* and *McCutcheon*, the Court was concerned that the government had failed to demonstrate that the campaign finance laws at issue were necessary to prevent potential quid pro quo corruption or its appearance—a governmental interest that has been found to justify several forms of campaign restrictions. *See FEC v. Cruz*, 596 U.S. 289, 305 (2022). But the Court did not suggest that if an elected official *actually* entered into a quid pro quo arrangement—or otherwise "succumb[ed] to improper influences," *Citizens United*, 558 U.S. at 361—that this would warrant similar judicial solicitude.

Furthermore, corruption concerns are particularly acute in the industry at issue in this case, namely the public utilities industry. As with many regulated industries that rely on state-granted monopolies or licenses, there is a long history of pay-to-play abuses associated with the regulation of public utilities. Legislative changes to complex and relatively obscure public utilities statutes—and decisions at the regulatory backwaters of the Public Utilities Commission of Ohio—often can make a difference of hundreds of millions, and sometimes billions of dollars to the utilities and to the public paying higher utility bills. The government's ability to police and prosecute actual instances of quid pro quo corruption therefore is especially crucial to ensure the integrity of public official decisionmakers in this field.

Finally, although Householder suggests otherwise, the court below properly instructed the jury on the "agreement" element of the bribery-related predicate

acts—but it is questionable whether the standard set by *McCormick v. United States*, 500 U.S. 257 (1991), for bribery cases involving campaign contributions even applies here. *See* Br. for Plaintiff-Appellee United States, ECF No. 47 at 71-80 ("U.S. Br."). Notably, many of the payments that FirstEnergy funneled to the 501(c)(4) group Generation Now were converted to Householder's personal use, or otherwise did not constitute the type of "campaign contributions" that *McCormick* deemed "unavoidable" in a system of privately financed elections. 500 U.S. at 272. Thus, "to the extent concerns about criminalizing politically necessary activity" would "justify imposing a higher bar" for demonstrating bribery involving campaign contributions, "such concerns carry significantly less weight" with respect to "things of value" such as the payment of personal debt and taxes, that Householder benefited from here. *United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013).

For these reasons, Householder's reliance on the First Amendment should be rejected and his conviction affirmed.

## ARGUMENT

### I.    The First Amendment Provides No Protection for the Corrupt and Knowing Exchange of Campaign Contributions for Official Acts.

Householder claims that "federal prosecutors have overstepped the limits of their authority" here by criminalizing political contributions that he maintains are permitted by law. Householder Br. at 4. He rests this argument primarily upon campaign finance cases, such as *Citizens United* and *McCutcheon*. But this attempt

to manufacture a defense under the First Amendment for the quid pro quo politics he pursued finds no support in either public corruption or campaign finance case law.

### A. The First Amendment analysis of campaign finance laws is distinct.

Householder's attempt to graft the Supreme Court's analysis of campaign finance laws onto a public corruption case fails because of the dramatically different structure and operation of the two bodies of law.

Campaign finance laws are fundamentally prophylactic, operating by the principle that "[t]he best means of prevention is to identify and to remove the temptation" inherent in unchecked campaign contributions and expenditures. *McConnell v. FEC*, 540 U.S. 93, 153 (2003); *see also McCutcheon*, 572 U.S. at 221. These laws thus apply broadly, and they prospectively restrict entire categories of campaign-related contributions or expenditures, regardless of a would-be donor's intent. *See, e.g.*, *Citizens United*, 558 U.S. at 357 (noting that "restrictions on direct contributions are preventative, because few if any contributions to candidates will involve quid pro quo arrangements"). Given campaign finance laws' broad application and potential impacts on expressive and associational activity, the Supreme Court typically applies heightened scrutiny in reviewing these measures, weighing any First Amendment burdens against the government's interest in the

challenged regulation of money in politics. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 25 (1976).

Few such concerns carry over to the criminal context. Public corruption laws apply only after a specific corrupt act has been committed by an individual with the requisite intent. *See, e.g.*, *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (noting that the need to prove official's corrupt intent "eliminates the possibility that he will be prosecuted for bribery without fair notice"). The intent element radically reduces the activity potentially subject to prosecution, and by extension, any First Amendment implications arising from the enforcement of public corruption laws. *See, e.g.*, *United States v. Benjamin*, 95 F.4th 60, 73 (2d Cir. 2024) ("The quid pro quo requirement . . . alleviates the First Amendment concern."). Indeed, the Supreme Court has consistently recognized that the entire point of campaign finance laws is to reach *beyond* the prosecution of bribery and other public corruption crimes in order to prevent corruption before it occurs. *Buckley*, 424 U.S. at 27-28 (noting that "laws making criminal the giving and taking of bribes deal with only the most blatant and specific attempts of those with money to influence governmental action").

As a result, there is no merit to Householder's insinuation that the Supreme Court's campaign finance decisions should inform this Court's construction of the federal honest service fraud and extortion statutes. That the *potential* for corruption has been found insufficient to sustain certain prophylactic campaign finance

7

restrictions does not mean that an *actual* corrupt exchange of campaign contributions for official acts will not support a bribery conviction. Thus, Householder's claim that the contributions he solicited and received through the 501(c)(4) organization Generation Now were permitted "[u]nder federal law and under the First Amendment," Householder Br. at 5, is misplaced. Corporate political donations to independent 501(c)(4) groups may be protected speech in a general sense, but this means only that the government is constrained from banning them entirely. It does not follow that knowingly and corruptly exchanging such corporate donations for official acts likewise enjoys constitutional protection.

Householder's resort to campaign finance jurisprudence is also unavailing for the simple reason that the decisions he cites do not hold what he claims they do.

Neither *Citizens United* nor *McCutcheon* established a constitutional right for officeholders to solicit or receive things of value in exchange for official action. Instead, the Supreme Court found in those cases that the government failed to produce an evidentiary record to demonstrate that two specific campaign finance laws—the federal corporate expenditure restriction, 52 U.S.C. § 30118, and the federal aggregate contribution limit, 52 U.S.C. § 30116(a)(3)—restricted campaign contributions and expenditures that would lead to quid pro quo arrangements absent regulation. Given this deficiency, the Court suggested that the actual purpose of these laws was to "target the general gratitude a candidate may feel toward those who

support him or his allies, or the political access such support may afford," *McCutcheon*, 572 U.S. at 192, not to prevent "what we have called 'quid pro quo' corruption or its appearance," *id*.

*Citizens United* struck down, under strict scrutiny, the federal ban on spending corporate treasury funds for independent expenditures expressly advocating a candidate's election or defeat. The Court rejected the government's proffered anti-corruption rationale for the law, finding that the record contained no evidence that independent corporate spending had given rise to quid pro quos in the past or present, and only "scant evidence" that independent expenditures even fostered "ingratiation and access" with respect to officeholders. 558 U.S. at 360 (noting that record "does not have any direct examples of votes being exchanged for . . . expenditures" (internal citation and quotation marks omitted)).

The analysis in *McCutcheon* was similar. There, the Supreme Court struck down the federal limits on the amount that an individual could give *in aggregate* to all candidates, political parties, and PACs in an election cycle, in large part because the Court concluded that there was no evidence that large aggregate campaign giving generated quid pro quo corruption. In an earlier 1976 decision in *Buckley v. Valeo,* the Court had previously upheld these aggregate limits as a measure to thwart circumvention of the "base" contribution limits that limited how much an individual donor could give to *each* candidate. 424 U.S. at 38. But the plurality of the

*McCutcheon* Court concluded that the government failed to compile a record showing that quid pro quo corruption or its appearance would result from "donors furnish[ing] widely distributed support" given that donors would still have to operate "within all applicable base limits." 572 U.S. at 226.

Thus, insofar as the Supreme Court expressed skepticism towards the campaign finance laws it reviewed in *Citizens United* and *McCutcheon*, that skepticism was connected to the Court's finding that there was insufficient evidence demonstrating that these laws had prevented quid pro quo corruption or its appearance. Householder's insinuations notwithstanding, these decisions did not rest on any judicial tolerance for *actual* instances of such quid pro quos.[3]

To the contrary, the Supreme Court has continued to sustain campaign finance laws that have been shown to thwart corruption. So, in *McConnell*, the Court upheld

---

[3] Even if *Citizens United* and *McCutcheon* could be understood to have circumscribed the scope of corruption that can be targeted through campaign finance regulation, neither decision narrowed corruption in a manner that supports Householder's defense. In both cases, the Court was concerned that allowing the government to target mere "[i]ngratiation and access"—instead of a demonstrated threat of quid pro quo corruption—would result in campaign finance laws that unduly burdened First Amendment rights. *Citizens United*, 558 U.S. at 360. But even on this point, the jurisprudence is mixed, with the Supreme Court affirming a three-judge court ruling that the BCRA soft money restrictions remained constitutional after *Citizens United* because they prevented the "*selling* of *preferential access* to federal officeholders and candidates in exchange for soft-money contributions." *See Republican National Committee v. FEC*, 698 F. Supp. 2d 150, 158 (D.D.C. 2010), *summarily aff'd*, 561 U.S. 1040 (2010) (emphasis in original).

the party soft money contribution limits in the Bipartisan Campaign Finance Act ("BCRA") because it found "there is substantial evidence to support Congress' determination that large soft-money contributions to national political parties give rise to corruption and the appearance of corruption." 540 U.S. at 154. The Supreme Court has repeatedly affirmed this holding. *See, e.g.*, *McCutcheon*, 572 U.S. at 209 n.6 ("Our holding . . . clearly does not overrule *McConnell*'s holding about soft money."); *Republican National Committee v. FEC*, 698 F. Supp. 2d 150, 153 (D.D.C. 2010) (three-judge court), *summarily aff'd*, 561 U.S. 1040 (2010) ("*Citizens United* did not disturb *McConnell*'s holding with respect to the constitutionality of BCRA's limits on contributions to political parties"). Thus, far from "impl[ying] a First Amendment bar to bribery prosecutions," the Supreme Court's recent campaign finance-related decisions "suggest an ongoing concern with precisely the type of dollars-for-official-action exchange that is at the core of the Government's allegations in this case." *United States v. Menendez*, 291 F. Supp. 3d 606, 621-22 (D.N.J. 2018).

**B.  *McDonnell* provides no support for Householder's claims.**

Householder also invokes *McDonnell* and its progeny, suggesting that these cases counsel against casting a "pall of potential prosecution" over public officials. Householder Br. at 27; *id*. at 29-30 (citing, e.g., *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020); *United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021)). But these

11

decisions principally concerned one element of the federal bribery law—the scope and definition of an "official act"—that is not in question here.

In *McDonnell*, the former Virginia governor was convicted for accepting hundreds of thousands of dollars in gifts and loans from businessman Jonnie Williams in exchange for promoting Williams' pharmaceutical products, including by hosting events for Williams and asking staff and other government officials to consider whether Williams' products should be included in Virginia health insurance plans or studied by Virginia universities. 579 U.S. at 563. The Supreme Court disagreed with the government's position that this type of promotional activity constituted "official acts" under 18 U.S.C. § 201(a) and consequently found that the jury instructions were defective insofar as they relied on this interpretation of the statute. Instead, the Court "adopt[ed] a more bounded interpretation of 'official act'" wherein "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify." *Id*. at 567.

But this case does not concern whether the acts Householder took on behalf of FirstEnergy involved "the formal exercise of governmental power"—they indisputably did. *Dimora v. United States*, 973 F.3d 496, 503 (6th Cir. 2020) (citing *McDonnell*, 579 U.S. at 577-80). Householder certainly does not contend that he was "merely arranging a meeting or hosting an event" or otherwise securing "access" to state officeholders for FirstEnergy, as was the case in *McDonnell*. 579 U.S. at 579.

Thus, Householder's reference to statements characterizing "the 'influence and access' that come with campaign contributions as a 'central feature of [our] democracy,'" Householder Br. at 46 (alteration in original) (quoting *Cruz*, 596 U.S. at 308), while perhaps relevant to a different case, has no bearing here.

Nor does *McDonnell* support Householder's claim that the payor and payee in a bribery scheme must identify all official acts the payee is to perform "at the time" of the agreement. Householder contends that the legitimacy of McDonnell's conviction turned on whether the jury had "determine[d] whether [he] agreed to perform an 'official act' *at the time* of the alleged quid pro quo." *See, e.g.*, Householder Br. at 28-29 (quoting *McDonnell*, 579 U.S. at 572-73) (emphasis by Appellant). But Householder's selective italicization of snippets of *McDonnell* notwithstanding, the opinion establishes no such requirement. Neither *McDonnell*, nor the *Silver* or *Skelos* decisions that followed, called into question the validity of a "stream of benefits" theory of bribery wherein the officeholder agrees to take action on a particular matter or question without specifying the official acts in advance. *See United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022) (explaining that *McDonnell* did not question an "'as opportunities arise'" theory of bribery but

"only convictions for bribery schemes that are akin to payment of a retainer for services yet to be determined").[4]

In short, Householder attempts to manufacture a standard of immediacy where there is none: the authorities he cites require only that the parties to the bribery scheme understand at the time of the agreement the "question of matter" to which the officeholder's acts should relate, not that they immediately identify all official acts the officeholder will undertake in the future.

## II. The Likelihood of Prosecution for Quid Pro Quo Bribery Schemes Provides an Important Check on Corruption in the Public Utilities Industry.

Householder's suggestion that his quid pro quo transactions cannot be criminalized because they are "permitted by federal law and protected by the First Amendment," Householder Br. at 4, is wrong as a matter of law, as described above. But in considering his argument, this court should also bear in mind the context in which this case arises: the rate-regulated public utilities industry. Policing corruption in this industry is particularly difficult—as it is likewise difficult in other industries

---

[4] *McDonnell* did not consider issues of timing, and instead focused on whether the jury instructions had described action that constituted an "official act" within the meaning of federal law. 579 U.S. at 567-70. *Skelos* and *Silver* required their respective jury instructions to make clear that the officeholder should understand at the time of the agreement what "specific and focused question or matter" they were meant to advance through official action. *Silver*, 948 F.3d at 568. But the Second Circuit did not require "the official . . . [to] promise to perform any *precise act* upon the relevant question or matter" at the time of the agreement. *Id.* (emphasis added).

14

reliant on state-granted monopolies or licenses—and amici urge the court to avoid a ruling here that would curtail the government's ability to do so.

Corruption in the public utilities industry is not new. As economist Werner Troesken details in *Regime Change and Corruption: A History of Public Utilities Regulation*, utilities have been engaging in schemes for the "illicit sale of political influence" as far back as the late 19th Century. Werner Troesken, *Regime Change and Corruption: A History of Public Utilities Regulation*, in CORRUPTION AND REFORM: LESSONS FROM AMERICA'S ECONOMIC HISTORY 259, 263 (2006). Troesken provides the example of an 1894 sale of a railway franchise in Chicago secured by purchasing the votes of city council members:

> Four members of the city council received $25,000 each for their votes in favor of the franchise, and other members of the council received $8,000 each for their votes. One particularly important Chicago politician was said to have received $100,000 for his role in securing passage of the franchise.

*Id.* at 268. Werner explains that, even as regulation of public utilities has evolved in response to growing corruption and the resulting inefficiencies, "new forms of corruption emerge." *Id.* at 279.

Modern examples of corruption in the public utilities industry abound. In Illinois, a jury recently found that four Commonwealth Edison (ComEd) executives had conspired to bribe the state's Speaker of the House. Press Release, U.S. Attorney's Office for the Northern District of Illinois, *Former Commonwealth*

15

*Edison Executives and Associates Found Guilty of Conspiring to Influence and Reward Former Illinois House Speaker* (May 2, 2023), available at https://perma.cc/DK6V-X66D. The objective of the ComEd scheme was similar to that of the scheme in the instant case—passage of legislation that would require customers to bailout unprofitable powerplants. Steve Daniels, *ComEd Valued Passage of 2016 Energy Law at $1.8 Billion*, Crain's Chicago Business, Mar. 20, 2023, https://www.chicagobusiness.com/politics/comed-valued-passage-2016-energy-law-18-billion-comed-four-trial. To obtain that legislation, ComEd provided lucrative no-show jobs and business contracts to friends and allies of the Illinois Speaker. *Id.*[5] Another recent bribery scheme, this one in California, involved "payments for a lavish vacation to Hong Kong and China [and] construction work" on the house of the chief of the San Francisco Public Utilities Commission in exchange for lucrative city contracts. Press Release, U.S. Attorney's Office for the

---

[5] The convicted defendants have moved to dismiss the charges and asked for acquittal in light of the Supreme Court's subsequent post-verdict decision in *Snyder v. United States*, 603 U.S. ---, 144 S. Ct. 1947 (June 26, 2024). *See* Jason Meisner, *Lawyers for 'ComEd Four' say case was built on 'rotten foundation,' ask for acquittal*, Chicago Trib. (Aug. 28, 2024), https://www.chicagotribune.com/2024/08/28/lawyers-for-comed-four-say-case-was-built-on-rotten-foundation-ask-for-acquittal.

*Snyder* concerned whether Section 666 of Title 18 extended to a state or local official's acceptance of gratuities, 18 U.S.C. § 666(a)(1)(B); it has no relevance here because Householder was neither charged under § 666, nor convicted of any gratuities-related acts.

Northern District of California, *Former San Francisco PUC Chief Sentenced to Four Years in Prison* (Mar. 18, 2024), available at https://perma.cc/L47E-LPVJ.

A major reason corruption is a recurrent feature of the public utilities industry is the existence of strong financial incentives for public utilities and their regulators to engage in quid pro quo schemes. Utilities like FirstEnergy maintain a monopoly over many of the services they offer their customers, and therefore could charge exorbitant rates if left to their own devices. In states like Ohio, the public utilities commissions are institutionally supposed to counter that monopoly power by directly setting the utility's rates, endeavoring to establish rates that are "just and reasonable." Ohio Rev. Code § 4909.15-17. As the Supreme Court has explained, the aim of "just and reasonable" rate regulation is "navigating the straits between gouging utility customers and confiscating utility property." *Verizon Commc'ns, Inc. v. F.C.C.*, 535 U.S. 467, 481 (2002). The Public Utilities Commission of Ohio (PUCO) balances those competing interests by, among other things, approving the utility's return on equity—the percentage profit that a utility may have an opportunity to earn on its reasonable and prudent capital investments. Ohio Rev. Code § 4909.15(A)(2). By directly setting the utility's rate of return, the PUCO ensures that the utility's investors are not overcompensated for the level of risk that they assume. *See Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944).

The upshot of rate regulation is that, on the one hand, public utilities have an assured revenue stream and profit for their reasonable and prudent investments and expenses, and they are protected from many downside risks faced by private businesses operating in competitive markets. On the other hand, public utilities often cannot increase their profits the way most private enterprises do—through innovation, savvy marketing, or slashing costs. As Professors Joshua C. Macey and Aneil Kovvali explain in *The Corporate Governance of Public Utilities*, "[n]o matter how much a utility cuts costs or improves service, those improvements will be reflected in higher profits only if the regulator approves them." 40 Yale J. on Reg. 569, 592 (2023). Moreover, even when utilities do increase their profits, "regulators often require that the utility refund the value they generate to their customers, and, even if they permit the utility to earn high profits in the short term, they may update rates in the future to prevent the utility from earning outsize profits in the future." *Id.* at 590.

In this environment, "bribery and rent seeking" become a tempting avenue for public utilities to obtain reliably higher profits and returns on investments for shareholders. *Id.* at 591. As Professors Macey and Kovvali explain, "[i]f it is easier to retain regulatory favor by bribing them than providing better service, the utility may be inclined to do so." *Id.* at 592. The same is true *a fortiori* of the legislators

18

who write the rules under which public utility regulators operate.[6] Hence, the fundamental economics of rate-regulated public utilities creates powerful incentives for industry participants to bribe public officials like public utilities regulatory commissioners or legislators.

In the face of such strong incentives, state ethics and campaign finance laws may prove insufficient to deter quid pro quo exchanges in connection to highly regulated industries like public utilities. Recognizing the heightened risks of corruption, jurisdictions at the federal, state, and local levels have targeted state licensees or others doing business with the government for enhanced restrictions on campaign activity. For instance, at least seventeen states and the federal government have prohibited or strictly limited campaign contributions from governmental contractors and others doing business with the government. *Wagner v. FEC*, 793 F.3d 1, 16 & n.18 (D.C. Cir. 2015) (en banc); 52 U.S.C. § 30119. Similarly, at least nine other states restrict or completely ban campaign contributions from licensed

---

[6] In fact, prior to pursuing the bailout legislation at the heart of this case, House Bill 6, FirstEnergy pursued similar subsidies at PUCO. Robert Walton, *Ohio Regulators Scale Back FirstEnergy Subsidy Proposal*, UtilityDive, Oct. 13, 2016. While PUCO approved FirstEnergy's request in part, the resulting subsidies were smaller than what FirstEnergy requested, and they faced immediate court challenges. *Id.* The Ohio Supreme Court ultimately reversed PUCO's approval, eliminating the subsidy. *In re Ohio Edison Co.*, 131 N.E.3d 906 (Ohio 2019). A few months later, the Ohio legislature enacted House Bill 6, giving FirstEnergy the full bailout that it had been unable to obtain from PUCO.

industries like the gaming industry.[7] Courts routinely uphold such measures. *See, e.g.*, *Wagner*, 793 F.3d at 21; *Yamada v. Snipes*, 786 F.3d 1182, 1205-06 (9th Cir. 2015) (upholding Hawaii ban on state contractor contributions); *Ognibene v. Parkes*, 671 F.3d 174, 190-91 (2d Cir. 2011) (upholding contribution limits on those "doing business" with New York City); *Casino Ass'n of La. v. State ex rel. Foster*, 820 So.2d 494, 508 (La. 2002) (upholding Louisiana prohibition on campaign contributions from gaming industry); *Schiller Park Colonial Inn, Inc. v. Berz*, 349 N.E.2d 61, 69 (Ill. 1976) (upholding Illinois ban on liquor licensee contributions).

Congress and state legislatures have also attempted to combat corruption in state-regulated industries by enacting ethics and transparency laws of general applicability. For example, Ohio requires legislators to disclose all sources of income, including gifts of more than $75, and prohibits any state official from receiving outside compensation related to their official duties. Ohio Rev. Code § 102.02-04. But the penalties for those laws are paltry compared to the potential profits available in the public utilities sector; violation of the Ohio ethics provisions cited above is a misdemeanor offense, with fines capped at the value of the amounts

---

[7] Ind. Code § 4-33-10-2.1; Iowa Code § 99F.6(4)(a); La. Stat. Ann. § 18:1505.2(L); Mass. Gen. Laws ch. 23K, § 46; Md. Code Ann, Elec. Law § 13-237; Mich. Comp. Law § 432.207b(4)-(5); Neb. Rev. Stat. § 49-1476.01; N.J. Stat. Ann. § 5:12-138; Va. Code Ann. §§ 59.1-375, 59.1-376(D).

the public official improperly received, plus the cost of litigation. Ohio Rev. Code § 102.99.

The government's ability to police and prosecute actual instances of quid pro quo corruption therefore represents a crucial deterrent to public utilities corruption. Absent the likelihood of prosecution for bribery, corruption is becoming the rule rather than the exception. Amici accordingly urge this Court to avoid a ruling in this case that would curtail the government's ability to police quid pro quo corruption in the public utilities industry.

## III. Although the Trial Court Instructed the Jury to Find an Explicit Agreement with Respect to the Bribery-Related Acts, Many of the Payments that Householder Received Were Not "Campaign Contributions."

Householder argues that because the quid pro quos in this case involved supposed political contributions, the prosecution must show an "explicit agreement" to sustain a racketeering charge predicated on acts of public official bribery. Householder Br. at 31 (citing, e.g., *McCormick*, 500 U.S. at 273). But although Householder discusses this requirement at length, he fails to show that the trial court misapplied this element in its jury instructions.

*McCormick* held that a Hobbs Act prosecution based on campaign contributions requires the prosecution to show that the payments in question were "made in return for an *explicit promise* or undertaking by the official to perform or not to perform an official act." 500 U.S. at 273 (emphasis added). By requiring the

21

showing of a corrupt agreement, the Court "guarded against" the possibility that a conviction could result from "mere[] proof of a campaign donation followed by an act favorable toward the donor." *United States v. Siegelman*, 640 F.3d 1159, 1170 (11th Cir. 2011). This is an important protection given that "election campaigns [have been] financed by private contributions or expenditures . . . from the beginning of the Nation," *McCormick*, 500 U.S. at 272, and thus a candidate cannot avoid soliciting private contributions to finance their own campaign, barring the rare possibility that they are wealthy enough to self-finance their run.

The jury instructions in this case satisfied this requirement. As the government explains in detail, the jury instructions relating to both the federal and state law bribery predicates *did* direct the jury to consider whether there was an explicit agreement. *See* U.S. Br. at 68-71, 75-79. But, as the government's brief also points out, although *McCormick* required a showing of an "explicit" agreement, it did not preclude circumstantial evidence. *Id*. at 56-57, 74-75. "[T]o hold otherwise," as Justice Kennedy has noted, "would allow defendants to escape criminal liability through 'knowing winks and nods.'" *Siegelman*, 640 F.3d at 1171 (quoting *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring)).

In any event, although a heightened jury instruction for the "agreement" element might be appropriate for the campaign context, this issue is largely irrelevant here because most of the payments that FirstEnergy funneled to the 501(c)(4) group

22

Generation Now were not in fact "campaign contributions" as *McCormick* conceived of such donations. Because virtually none of the funds constituted contributions solicited by Householder for his *own* campaign, the payments from FirstEnergy do not warrant the solicitude shown by the Supreme Court for the direct campaign fundraising that is "unavoidable" in a system of privately financed elections. *McCormick*, 500 U.S. at 272.

First, hundreds of thousands of dollars received by the 501(c)(4) group were converted to Householder's personal use—including to pay for his credit card debt and property taxes. U.S. Br. at 8, 10. These payments are more accurately characterized as gifts, not campaign contributions, because they supported Householder personally, with little or no expressive content. An officeholder has no "right" under the First Amendment to make or receive a gift, and consequently, legislatures can—and often do—restrict all gifts to public officials and employees of more than de minimis value. *See, e.g.*, 5 U.S.C. § 7353; 5 C.F.R. §§ 2635.201-.205.

Nor is an officeholder under any compulsion to accept a gift, which stands in contrast to a candidate's need to raise contributions in the vast majority of electoral races at the federal and state level that are privately financed. As the D.C. Circuit observed, "soliciting campaign contributions may be practically unavoidable so long as election campaigns are financed by private . . . expenditures, [but] . . . accepting

free dinners is certainly not." *Ring*, 706 F.3d at 466 (internal quotations omitted).[8] In short, *McCormick*'s concerns about "criminalizing politically necessary activity" in corruption cases predicated on campaign contributions "carry significantly less weight" when the quid pro quo instead comprises "other things of value," such as the gifts and benefits Householder personally received here. *Id*.

Furthermore, even those funds that Householder solicited for the 501(c)(4) that were put to political ends did not fund Householder's *own* campaign; instead, the money largely went to elect other state candidates in the hope that they would support Householder's bid for the House speakership. U.S. Br. at 10-11; *see also id.* at 16 ("All but one of the Team Householder candidates won election."). Although officeholders cannot "avoid" raising private donations to fund their *own* campaigns in our current electoral system, *McCormick*, 500 U.S. at 272, they are not similarly compelled to solicit contributions for the campaigns of *other* candidates to further their careers or ambitions for party leadership.

Nor is there any legal authority suggesting that an officeholder has an unbounded right to fundraise for other candidates without limitation or disclosure. To the contrary, while federal law allows federal elected officials to raise

---

[8] Federal and Ohio law permit candidates to accept donations within the applicable contribution limits, but proscribe the "personal use" of campaign funds by candidates. 52 U.S.C. § 30114(b)(1); 11 C.F.R. § 113.1(g). *See also* 35 Ohio Rev. Code § 3517.13(O); Ohio Elec. Comm'n, Adv. Op. 87ELC-4.

contributions for other candidates, Congress strictly regulates this fundraising, recognizing the clear corruption risks such solicitations would otherwise pose. The contributions that federal officeholders and party officials solicit for other candidates—and for politically-active tax-exempt groups like Generation Now—must comply with federal contribution limits and source restrictions. *See* 52 U.S.C. § 30125(d), (e).

The Supreme Court, too, has refused to recognize any supposed First Amendment "right" of officeholders to solicit unlimited, undisclosed donations on behalf of *other* candidates, their political party, or tax-exempt groups active in elections. *McConnell*, 540 U.S. at 182. As the Court explained in upholding BCRA's ban on federal officeholders' solicitation of unlimited soft money, "[l]arge soft-money donations at a candidate's or officeholder's behest give rise to all of the same corruption concerns posed by contributions made directly to the candidate or officeholder." *Id*. Indeed, even when the candidate exerts far less "control [over] how the funds are spent" than Householder did, the Court recognized that "the value of the donation to the candidate or officeholder is evident from the fact of the solicitation itself." *Id*.[9]

_____

[9] Insofar as federal officeholders wish to fundraise on behalf of other federal candidates through an entity they control, as Householder did here, they typically must register a political committee known as a "leadership PAC" for this purpose. *See* 11 C.F.R. § 100.5(e)(6). Like most federal committees, leadership PACs are

Thus, while the jury here was in fact instructed to find an explicit quid pro quo agreement, the payments in this case are not the type of campaign activity that warrant a heightened instruction under *McCormick*. Few of the payments made here implicated core First Amendment expression or association, and fewer still were in any sense "necessitated" by our system of privately financed election campaigns.

## CONCLUSION

For these reasons, the Court should affirm Defendant-Appellant Householder's conviction.

---

bound by the federal contribution limits, and must file regular public reports listing all receipts and disbursements. *See, e.g.*, 52 U.S.C. §§ 30103, 30104, 30116. Importantly, candidates are barred from converting their leadership PAC funds to their "personal use" or for the direct benefit of any other person. 52 U.S.C. §§ 30114(a), (b)(1). This "PAC" regime is thus designed to guard against both the corruption and dark money risks that came to fruition in this case.

**Dated: August 30, 2024**

Respectfully submitted,

*/s/ Tara Malloy*
Tara Malloy (DC Bar No. 988280)*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
tmalloy@campaignlegalcenter.org

Howard A. Learner (IL Bar No. 3127346;
admitted in the 6th Circuit)
ENVIRONMENTAL LAW & POLICY
CENTER
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
hlearner@elpc.org

Eric Petry (DC Bar No. 90001202)*
BRENNAN CENTER FOR JUSTICE
1140 Connecticut Avenue NW, Suite 1150
Washington, DC 20036
(202) 753-5906
petrye@brennan.law.nyu.edu

*Counsel for Amici Curiae*

*\*Registered as Amicus Attorney*

## CERTIFICATE OF COMPLIANCE

1.  Pursuant to Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1) it contains 6,144 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Tara Malloy*
Tara Malloy

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2024, I electronically submitted the foregoing motion to the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit for review by using the CM/ECF system and that ECF will send a Notice of Electronic Filing (NEF) to all participants who are registered CM/ECF users.

/s/ *Tara Malloy*
Tara Malloy